IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 05-cv-00480-MSK-CBS

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

JOSEPH P. NACCHIO,
ROBERT S. WOODRUFF,
ROBIN R. SZELIGA,
AFSHIN MOHEBBI,
JAMES J. KOZLOWSKI, and
FRANK T. NOYES,

      Defendants.

---

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS AND MOTION TO STRIKE

---

**THIS MATTER** comes before the Court pursuant to Defendant James Kozlowski's

(hereafter "Kozlowski") Motion to Dismiss **(# 51)**, Plaintiff Securities and Exchange

Commission's (hereafter "the SEC") response **(# 76)**, and Kozlowski's reply **(# 90)**; the SEC's

Motion to Strike **(# 54)** Kozlowski's Answer **(# 53)**, Kozlowski's response **(# 77)**, and the SEC's

reply **(# 85)**; Defendant Afshin Mohebbi's (hereafter "Mohebbi") Motion to Dismiss **(# 62)**, the

SEC's response **(# 88)**, and Mohebbi's reply **(# 103)**; Defendant Joseph Nacchio's (hereafter

"Nacchio") Motion to Dismiss **(# 67)**, the SEC's response **(# 86)**, and Nacchio's reply **(# 105)**;

Defendant Robert Woodruff's (hereafter "Woodruff") Motion to Dismiss **(# 69)**, the SEC's

1

response **(# 89)**, and Woodruff's reply **(# 106)**; Defendant Frank Noyes'( hereafter "Noyes")

Motion to Dismiss **(# 73)**, the SEC's response **(# 87)**, and Noyes' reply **(# 107)**.

## SUMMARY OF THE COMPLAINT

According to the Complaint **(# 1)**, between 1999 and 2002, the Defendants engaged in a

number of distinct schemes, each with the goal of artificially inflating the reported revenues of

Qwest Communications International Inc. ("Qwest").  Allegedly,  the Defendants engaged in the

following practices:

Sales of IRUs

A substantial part of Qwest's annual revenues were derived from sales of access to

Qwest's fiber-optic communications network in the form of indefeasible rights of use ("IRUs").

An IRU is defined in the Complaint as "an irrevocable right to use a specific amount of dark or lit

fiber for a specified time period."  In essence, by selling an IRU,[1] Qwest granted access to

portions of its fiber optic communications network to other communications providers for a

specified period of time.  The Complaint alleges that the Defendants engaged in four separate

fraudulent practices regarding IRU sales.  First, the Complaint alleges that several of the

Defendants engaged in acts that either actively misled or failed to adequately advise investors that

IRUs represented one-time, non-recurring sales, rather than a recurring source of revenue.

---

[1]The Complaint refers to IRU "sales," but the definition of an IRU suggests that its assignment is more akin to the rental or lease of the fiber by a buyer.  *See Docket* # 1 at ¶18.  The conceptual confusion is compounded by the SEC's assertion that IRU sales are "non-recurring," despite the fact that, after making an IRU "sale," Qwest continued to retain ownership of the fiber, and thus, the ability to re-sell access to the same fiber for another time period at the expiration of a particular IRU.  Nevertheless, for purposes of this motion, the Court must accept all allegations in the Complaint as true, including the SEC's characterization of IRU sales as "one-time, non-recurring" transactions.

*Docket* # 1, ¶ 52-96.  Second, it alleges that Defendant Mohebbi engaged in a practice of deeming IRU sales to be "portable" – that is, Mohebbi promised communications providers that they could exchange a purchased-but-unused IRU for equivalent access to the network at a later date.  The Complaint alleges that  generally accepted accounting principles prevented Qwest from immediately recognizing the revenue derived from sale of portable IRUs, and that in order to allow Qwest to immediately benefit from such sales, Mohebbi concealed portability promises from Qwest's accountants, leading the accountants to improperly recognize the IRU sales revenue. *Docket* # 1, ¶ 103-105,127-55.  Third, it alleges that Mohebbi and Noyes backdated contracts for IRUs to allow recognition of revenue in the quarter before the transaction actually occurred. *Docket* # 1, ¶ 106.  Finally, it alleges that Mohebbi and Noyes engaged in "swaps."  A "swap" was a transaction in which in Qwest would sell IRUs to a buyer and simultaneously purchase other IRUs from that buyer, even though Qwest did not need or intend to use the network access it was purchasing.  The swap was designed to stimulate sales of IRUs to generate immediately recognizable revenue. *Docket* # 1, ¶ 107-09.

Manipulation of Dex revenue

The Complaint also alleges that Nacchio, Woodruff, and Szeliga manipulated the accounting of revenue from Dex, Qwest's telephone directory publishing business.  In general, revenue from the Dex operation was booked at the time that telephone directories were delivered to customers, usually in January of a given year.  However, to disguise falling revenues in 2000 and 2001, Nacchio, Woodruff, and Szeliga agreed to accelerate the distribution of numerous directories, delivering the directories in December 2000 rather than January 2001, for example. This allowed Qwest to book revenues in the earlier year. Qwest allegedly made misleading

3

statements to its shareholders to explain the increased revenue, and failed to disclose the schedule changes or adjust its projections for the Dex unit's revenues for the following years. *Docket* # 1, ¶ 110-121.

### Reduction of vacation reserves

The Complaint also alleges that ordinarily Qwest accounted for earned-but-unused employee vacation obligations through a liability entry on its balance sheet. But in 2001, Szeliga reduced the amount of this liability three separate times, even though no reduction in Qwest's actual liabilities to its employees had occurred.  By reducing the vacation reserve liability, Qwest improved its financial position.  However, Szeliga never notified shareholders of her modification of the vacation liability accounting. *Docket* # 1, ¶ 122-126.

### Insider trading

The Complaint alleges, in remarkably brief and conclusory terms, that Nacchio, Woodruff, and Szeliga engaged in insider trading. *Docket* # 1, ¶ 157-60.  The precise significance of this allegation to the claims asserted is not clear.

## ISSUES PRESENTED

The Complaint asserts seven claims: (i) securities fraud, in violation of 15 U.S.C. § 77q(a)(1), against all Defendants; (ii) securities fraud, in violation of 15 U.S.C. § 77q(a)(2) and (3), against all Defendants; (iii) securities fraud, in violation of 15 U.S.C. § 78j(b), against all Defendants; (iv) falsification of books and records, in violation of 15 U.S.C. § 78m(b)(5), against all Defendants; (v) deceit of auditors, in violation of 17 C.F.R. § 240.12b2-2, against Nacchio, Woodruff, Szeliga, and Mohebbi; (vi) aiding and abetting Qwest's filing of false SEC statements,

in violation of 15 U.S.C. § 78m(a), against all Defendants; and (vii) aiding and abetting Qwest's

failure to keep accurate books, in violation of 15 U.S.C. § 78m(b)(2), against all Defendants.

Each of the Defendants filed a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6).[2]

Kozlowski (**# 51**) moves to dismiss: (i) the First and Third Claims, both alleging securities fraud,

for failing to plead sufficient facts to establish scienter; and (ii) the Sixth and Seventh Claims,

alleging that Kozlowski aided and abetted Qwest's filing of false SEC statements and failure to

keep accurate books, for failing to sufficiently allege the necessary element of substantial

assistance in the primary violation.  In addition, Kozlowski filed an Answer (**# 53**) to the Second

and Fourth Claims, asserting, among others, affirmative defenses of laches and unclean hands.

The SEC moves (**# 54**) to dismiss those affirmative defenses on the grounds that defenses of

laches and unclean hands may not be asserted against the Government.

Mohebbi (**# 62**) moves to dismiss: (i) the securities fraud claims, for failing to adequately

allege that Mohebbi made a material misrepresentation, that any such misrepresentation involved

the purchase or sale of a security, and that any such misrepresentation was made with scienter; (ii)

the Fourth Claim, falsification of books and records, for failing to adequately allege that Mohebbi

knowingly circumvented or failed to implement accounting controls, that Mohebbi knowingly

falsified any book or record, or that Mohebbi actually falsified any book or record; (iii) the Fifth

Claim, deceit of auditors, for failing to adequately allege that Mohebbi made a materially false

statement to a Qwest auditor; and (iv) the Sixth and Seventh Claims, under an aiding and abetting

---

[2]Defendant Szeliga originally filed a Motion to Dismiss (**# 65**), but the following day, withdrew (**#71**) that motion, stating that she had reached a settlement in principle with the SEC. The settlement fell through, however, and on February 17, 2006, Szeliga filed a new Motion to Dismiss (**# 173**).  That motion is yet to be fully briefed, and thus, the Court does not address it at this time.

theory, for failing to adequately allege that Mohebbi had any knowledge of a primary violation by Qwest and that he provided substantial assistance to such a violation.

Nacchio (# 67) moves to dismiss all claims against him. Although Nacchio has identified the elements of each claim, contrary to the Court's Practice Standards, his arguments, particularly with regard to the securities fraud claims, do not clearly identify the element or elements he claims are not present in the Complaint.[3] As best the Court can determine, with regard to the securities fraud claims, Nacchio argues that: (i) the securities fraud claims fail to adequately allege that he made any misrepresentations, or that any such misrepresentations were material; (ii) the Fourth Claim fails to adequately allege that Nacchio circumvented accounting controls, and that he did so knowingly; (iii) the Fifth Claim does not adequately allege that Nacchio made false statements to auditors, nor that such statements were material; and (iv) the Sixth and Seventh Claims fail to allege Nacchio's knowledge of a primary violation and his substantial assistance to such a violation.

Woodruff (# 69) moves to dismiss all the claims against him, incorporating by reference the general arguments made by Kozlowski and Nacchio.

Finally, Noyes (# 73) moves to dismiss: (i) the First and Third Claims, sounding in securities fraud, for failing to adequately allege scienter; and (ii) the Sixth and Seventh Claims, that Noyes aided and abetted violations by Qwest, for failing to adequately allege Noyes' knowledge of a primary violation and his substantial assistance.

---

[3]When identifying the elements that he contends are not alleged in the Complaint, Nacchio repeatedly refers to the SEC's failure to state a "theory" that supports allegations of material misrepresentations. On a motion to dismiss under Rule 12, the Court is concerned only with whether the Complaint sufficiently alleges <u>facts</u> supporting each element of a claim. The Court generally does not adjudicate the existence or sufficiency of "theories."

## JURISDICTION

The Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331.

## ANALYSIS

**A.  Standard of review**

A motion to dismiss brought under Rule 12(b)(6) tests the sufficiency of the allegations of a Complaint.  The issue to be determined is not whether the plaintiff is likely to ultimately prevail, but whether it has alleged sufficient facts to be entitled to offer evidence in support of the claims. *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002).

 In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-plead allegations in the Complaint as true and view those allegations in the light most favorable to the plaintiff.  *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1149 (10th Cir. 2001), *quoting Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).  The Complaint cannot be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Benefield v. McDowall,* 241 F.3d 1267, 1270 (10th Cir. 2001); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).  In other words, the Court must analyze the claims asserted and determine whether there is a  factual allegation, which if true, would establish each element of each claim.

The Court must limit its review to the four corners of the Complaint, but may also consider documents attached to the Complaint as exhibits, *Oxendine v. Kaplan*, 241 F.3d 1272,

1275 (10th Cir. 2001), as well as unattached documents which are referred to in the Complaint and central to the plaintiff's claim, so long as the authenticity of such documents is undisputed. *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001).

Fed. R. Civ. P. 9(b) requires averments of fraud to be pled with "particularity." In general, this requirement is intended to afford the Defendants "fair notice of the plaintiff's claims and the factual ground upon which they are based." *Koch v. Koch Industries, Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000). To satisfy the particularity requirement, a plaintiff is generally required to "set forth the time, place and contents of the false representation, the identity of the party making the false statements, and the consequences thereof." *Id.* Logically, the requirements of Rule 9(b) are relaxed somewhat when the alleged fraud arises from the speaker's omission of material facts, as one cannot allege with particularity the time, place, and contents of something that was never said. In these circumstances, Rule 9(b) is satisfied if the Complaint alleges the particular information that should have been disclosed, the reason the information should have been disclosed, the person who should have disclosed it, and the approximate time or circumstances in which the information should have been disclosed.

The rule is directed only at the averments of the fraudulent statement itself, and does not require particularized pleadings as to other issues, such as the intent, knowledge, or state of mind of the person making the statement. *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997). Moreover, although the rule requires the plaintiff to identify the person or persons allegedly responsible for making the misstatement, it does not require the plaintiff to particularize the reasons why the plaintiff believes the alleged speaker to be responsible for the

8

statement. *Id.* at 1253 ("Rule 9(b) does not require that a complaint set forth detailed evidentiary matter as to why particular defendants are responsible for particular statements, or that the allegations be factually or legally valid").  For example, where misstatements are made in "group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers," Rule 9(b) does not require a plaintiff to identify the individual source of a particular statement, so long as it adequately advises which defendants are alleged to be responsible for the contents of the document. *Id.* at 1254.

### B.  Securities fraud claims

All moving Defendants challenge the sufficiency of the SEC's pleading of the First Claim, brought under Section 17(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77q(a)(1),[4] and Third Claim, brought under Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b).[5]  The elements of both claims are essentially the same, and require the SEC to allege: (i) a misrepresentation or omission; (ii) of a material fact; (iii) in connection with the purchase or sale of a security; (iv) with scienter; and (v) using a method within the jurisdictional means. *SEC v. C. Jones & Co.*, 312 F.Supp.2d 1375, 1379 (D. Colo. 2004).  Mohebbi, Nacchio, and Woodruff also

---

[4]"It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly to employ any device, scheme, or artifice to defraud."  15 U.S.C. § 77q(a)(1).

[5]"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).

seek dismissal of the Second Claim, brought under Section 17(a)(2) or (3) of the Securities Act.[6]

That claim shares the same elements as the First and Third Claims, except that the third element

requires only proof of negligence, rather than scienter. *Id.*  A misrepresentation or omission is

"material" if "a reasonable investor would consider it important in determining whether to buy or

sell stock." *C. Jones & Co.*, 213 F.Supp.2d at 1379, *citing Grossman*, 120 F.3d at 1119.  To

allege scienter, the SEC must allege facts showing that the Defendants acted with either the intent

to defraud, or with recklessness towards an obvious danger of misleading investors.  *C. Jones*,

213 F.Supp.2d at 1380.

Mohebbi, Nacchio, and Woodruff challenge the sufficiency of the SEC's allegations that

they made misstatements and/or that the misstatements made were material.  Kozlowski,

Mohebbi, Woodruff, and Noyes all challenge the sufficiency of the SEC's allegations of scienter.

Mohebbi also challenges the sufficiency of the SEC's allegations that any misrepresentations were

made in connection with the purchase or sale of securities.

a.  misrepresentation or omission

Turning first to whether the SEC has adequately alleged that Mohebbi made a

misrepresentation or omission, paragraphs 97-109 of the Complaint allege that Mohebbi's

involvement in making IRU sales portable, Mohebbi's participation in the backdating of contracts,

and Mohebbi's purchasing of unneeded fiber in order to induce buyers to make IRU sales.  In

---

[6]"It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly . . . to obtain money or property by means of any untrue statement of a material fact or any omission  . . .; or to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  15 U.S.C. § 77q(a)(2), (3).

each instance, the Complaint asserts that Mohebbi failed to advise Qwest's accountants and auditors of these schemes. *See e.g. Docket* # 1, ¶ 97, 104, 106.[7]  The general timeframe in which these omissions occurred, the subject matter which Mohebbi allegedly should have disclosed to Qwest's accountants and auditors, and the consequences flowing from these omissions are sufficiently particularized to satisfy Rule 9(b).

The Complaint also alleges that Nacchio made numerous misrepresentations or omissions. For example, the Complaint identifies statements made by Nacchio about Qwest's revenues that failed to disclose the non-recurring nature of the IRU sales. *See e.g. Docket* # 1, ¶ 59, 74, 90. These allegations are sufficiently particularized, as they allege the nature of the information that should have been disclosed (*i.e.* that large amounts of Qwest's revenue was derived from non-recurring IRU sales), the general timeframe in which Nacchio should have disclosed it (*i.e.* as part of his discussions of Qwest's current financial performance), and the consequences flowing from the omissions (*i.e.* a misleading impression that Qwest's revenues were from recurring sources). The Complaint also alleges false statements and omissions by Nacchio relating to the modification of the Dex publishing schedule. *Id.* at ¶ 116, 117.  These allegations are sufficient to plead misrepresentations or omissions by Nacchio.

Nacchio argues that the failure to disclose the non-recurring nature of the IRU sales does not constitute a misrepresentation because the SEC alleges that Qwest engaged in numerous IRU sales repeatedly over a three-year period.  Nacchio contends it is oxymoronic to allege that, on

---

[7]The issue before the Court is whether the SEC has alleged sufficient facts to state each claim against each Defendant.  Where the SEC has asserted claims supported by numerous discrete acts, each of which would be sufficient on its own to state the claim, this Court will only determine whether <u>any</u> of the acts is sufficiently pled.  The Court expresses no opinion on the sufficiency of the many allegations in the Complaint that are not specifically discussed herein.

one hand, shareholders were entitled to know that Qwest engaged in one-time, "non-recurring" transactions to meet a revenue target, yet on the other hand, the SEC alleges that Qwest engaged in such transactions on a systematic and continuous basis over an extended period of time. *Docket* # 68 at 4-5.  Nacchio contends that the latter case indicates that the revenue from IRU sales was recurring after all.  Although Nacchio's logic has a superficial appeal, there is nothing inherently illogical about the SEC's claims.  A person who sells his wedding ring to a pawn shop for some fast cash has engaged in a one-time, non-recurring transaction, as he loses possession of the ring and can never sell it again.  At the same time, that person can return to the pawn shop repeatedly, say, to sell the television and the toaster, making several more one-time, non-recurring transactions.  On the surface, it might appear that our hero has found a steady, recurring stream of revenue, but it would be a misstatement of fact to suggest that the revenue is recurring when it is actually derived from the liquidation of assets that are not being replenished.  Under the same logic, the SEC's assertion that Qwest relied on repeated,  "non-recurring" sales of discrete IRU assets to sustain itself over a span of years is not necessarily inconsistent.

Finally, Woodruff contends that the Complaint fails to make particularized allegations of misrepresentations by him.  The misrepresentations asserted against Nacchio are, in most instances, statements that are also attributed to Woodruff.  Thus, the Court finds that the Complaint adequately alleges misrepresentations by Woodruff, as well.

b.  <u>materiality</u>

The SEC has alleged that "investors and analysts discount[ ] non-recurring one-time revenue events like IRU and equipment sales when valuing the company and its stock." *Docket* # 1, ¶ 51.  Taking this allegation as true, the SEC has adequately alleged that any misrepresentations

or omissions relating to nondisclosure of the non-recurring nature of IRU sales – such as the

misrepresentations or omissions made by Mohebbi, Nacchio, and Woodruff – were material.

Similarly, the SEC alleges that the failure to disclose the adjustment to the Dex publishing

schedule "failed to apprise investors that Dex generated more than one-quarter of the revenue

increase by publishing its Colorado Springs directory twice in 2000, or that the schedule change

could produce a commensurate decline in Dex revenue for the first quarter of 2001." *Docket* # 1,

¶ 116.  Although the Complaint does not expressly allege that a reasonable investor would find

the adjustment of the Dex publishing schedule to be material, one could logically infer that an

event that causes an increase or decrease of 25% of revenues is a fact that a reasonable investor

might consider important.  Accordingly, the SEC has also sufficiently alleged materiality of any

misrepresentations or omissions relating to the Dex publishing schedule.

Nacchio challenges the sufficiency of the SEC's allegations of materiality.  He argues that,

contrary to the SEC's "theory," there is no valid distinction between "recurring" and "non-

recurring" revenue, and thus, Qwest's failure to disclose that the IRU sales were non-recurring is

immaterial.  Nacchio asserts that "The Complaint fails to plead any rule, regulation, or other

authority, be it legal or accounting, that requires a public company to report its produce revenues

as recurring or non-recurring." *Docket* # 68 at 3.  However, this argument misapprehends the

SEC's burden at the pleading stage, inviting the Court not just to adjudicate the sufficiency of the

pleading, but also to assess the SEC's ability to ultimately prove its allegations.  The relevant

element of materiality examines whether the misrepresentation or omission is such that a

reasonable investor would consider it important. *Grossman*, 120 F.3d at 1119.  The SEC has

clearly alleged that investors consider the distinction between recurring and non-recurring revenue

to be important.  *Docket* # 1, ¶ 51.  Whether the SEC can ultimately prove this allegation is a matter that the Court does not consider at this time.  The existence *vel non* of a rule or regulation covering the subject matter of the alleged misrepresentations might make it more or less likely that the misrepresentation was material to investors, but that is an issue affecting the weight of the evidence, and is inappropriate to consider at the pleading stage.

Nacchio makes an additional argument: that any misrepresentations he may have made were mere "puffing."  It is true that vague statements of corporate optimism are not materially misleading, as "reasonable investors do not rely on them in making investment decisions."  *Grossman*, 120 F.3d at 1119.  However, this argument finds little traction where the misrepresentations alleged against Nacchio involve, among other things, deceit as to the source and nature of Qwest's revenues.  Whether Qwest's revenues arose from recurring Internet services or non-recurring IRU sales is an objectively demonstrable fact, not a "vague statement of corporate optimism."

Nor is such representation a "prediction," as Nacchio argues in the alternative.  The misrepresentations Nacchio is alleged to have made involved descriptions of Qwest's revenues for a particular period, not predictions as to whether Qwest would achieve some revenue figure in the future.  Nacchio also argues that the SEC's recurring/non-recurring distinction is inherently predictive, in that characterizing a revenue stream as non-recurring is the equivalent of predicting that it will not be sustainable in the future.  This argument confuses the objective fact of whether particular transactions in the past were capable of indefinite replication with the prediction as to whether revenues from similar transactions will continue into the future.  At the time Nacchio reported each fiscal quarter's revenues, whether certain items of revenue came from one-time,

14

non-recurring sales or not – *e.g.* IRU sales vs. revenues derived from providing Internet services to customers – was a matter of historical fact, not a prediction.  Whether Nacchio would have predicted the continuation of IRU sales is largely irrelevant, as the SEC has alleged that investors reflexively discount revenues gained from non-recurring transactions.  In other words, it is the investors, not Nacchio, who predict whether non-recurring revenues will last or not.

      c.  <u>In connection with the purchase or sale of securities</u>

      Mohebbi argues that the omissions attributed to him involve his internal communications with other Qwest personnel, rather than public statements to investors.  As such, he contends that the SEC has not alleged that his misrepresentations were made "in connection with the purchase or sale of securities."  In response, the SEC contends, *citing Anixter v. Home-Stake Production Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996), that a person may be held liable for non-public misrepresentations or omissions if that person could anticipate that the misrepresentation or omission would eventually reach investors.  In *Anixter*, the Tenth Circuit explained that "[t]here is no requirement that the alleged violator directly communicate misrepresentations to [investors] for primary liability to attach . . . [so long as there is] a showing that he knew or should have known that his representation would be communicated to investors."  *Id., citing  SEC v. Holschuh*, 694 F.2d 130, 142 (7th Cir.1982).  In reply, Mohebbi argues that *Anixter* is distinguishable, because the violator there was "an accountant who was intimately involved in that company's public filings," whereas Mohebbi describes himself as one "whose role was limited to operations and who was neither [an officer] or director of Qwest."  *Docket* # 103 at 4.

      Under *Anixter*, there are sufficient allegations that Mohebbi's omissions occurred in connection with representations to Qwest investors.  The allegations of misrepresentations or

omissions by Mohebbi relate primarily to Mohebbi's failure to advise Qwest's accountants and auditors that he had agreed to make certain IRU sales portable, as portability would prevent Qwest from immediately recognizing the revenue generated by the IRU sales. *Docket* # 1, ¶ 102-104. The Complaint alleges that, as a result of Mohebbi's silence, Qwest's accountants improperly recognized $ 366 million in revenue from 1999 to 2001. *Docket* # 1, ¶ 105. Although not expressly alleged, the Complaint clearly implies that Mohebbi anticipated and intended that his concealment of the portability agreements from accountants would result in Qwest misleading investors as to its current revenues. *See Docket* # 1, ¶ 102, 104. The fact that Mohebbi did not directly participate in the preparation of the misleading financial statements is of no significance under *Anixter*. Indeed, under Mohebbi's argument, a corporate employee who knowingly supplies false books to an unwitting corporate accountant would incur no liability when those false books were used to generate misleading financial reports for investors. Because the Complaint adequately alleges that Mohebbi's ommissions had the intended result of deceiving investors as to Qwest's actual revenues, the SEC has sufficiently alleged that Mohebbi's misrepresentations and omissions occurred in connection with the purchase or sale of securities.

      d. <u>Scienter</u>

The Complaint adequately alleges that Woodruff knew that investors differentiated between revenue obtained from recurring transactions and revenue from non-recurring transactions, *Docket* # 1, ¶ 51, and that Woodruff knew that non-recurring revenue from the sales of IRUs was being presented to investors as revenue derived from recurring sources. *Id.*, ¶ 52. This is sufficient to allege that Woodruff acted with the intent to deceive investors.

The Complaint also adequately alleges conduct by Mohebbi that was, at the very least, reckless as to whether investors would be deceived. It alleges that Mohebbi knew that making IRU sales portable prevented the immediate recognition of that revenue, *Docket # 1, ¶ 102*, yet he concealed his portability agreements from Qwest's accountants. *Id.*, ¶ 104.  Although the Complaint does not expressly allege that Mohebbi did so with the intent that investors would be deceived, his concealment was at least reckless, in that it created a high likelihood that the financial statements issued by Qwest's accountants would mislead investors by improperly recognizing IRU sale revenue.  *Id.*, ¶ 105.  Thus, the SEC sufficiently alleges scienter by Mohebbi.

Similarly, the Complaint alleges that Noyes engaged in conduct with the intent of deceiving Qwest's accountants, and, ultimately, investors.  For example, the Complaint alleges that Noyes purposefully backdated a contract so that Qwest could recognize the revenue derived from that contract in an earlier financial quarter.  *Docket # 1, ¶ 106*.  The Complaint does not expressly allege that Noyes did so with the intent to deceive investors, but the logical inference to be drawn from the SEC's allegations is that Noyes did so with the intent that Qwest's accountants would improperly recognize the revenue in the earlier quarter.  *Id.*  For the same reason that Mohebbi's deceit of Qwest's accountants suffices to demonstrate recklessness towards the investors who would forseeably rely on the accountants' reports, Noyes' purposeful deceit of the accountants regarding the contract dates adequately pleads scienter.

The Complaint alleges that Kozlowski believed that Qwest should disclose facts concerning the IRU sales in its 1999 10-K filing, *Docket # 1, ¶ 65*, and that Kozlowski drafted language making such a disclosure.  *Id., ¶ 68*.  However, Kozlowski later decided to remove the

drafted disclosure language from the filing, and the filing was made without any disclosure relating to IRU sales.[8] *Docket* # 1, ¶ 70.  Taken in the light most favorable to the SEC, these assertions are sufficient to allege Kozlowski's intent to deceive investors.

Because the Complaint adequately pleads scienter against each Defendant under the more rigorous scienter standards associated with the First and Third Claims, Mohebbi, Nacchio, and Woodruff's argument that the SEC fails to plead the lesser negligence requirement of the Second Claim is also without merit.  Thus, all motions seeking dismissal of the securities fraud claims are denied.

### C.  Falsification of books

Nacchio, Woodruff, and Mohebbi challenge the sufficiency of the SEC's Complaint with regard to the Fourth Claim under 15 U.S.C. § 78m(b)(5), sometimes referred to as a claim under Section 13(b)(5) of the Exchange Act.[9]  It does not appear that any court has attempted to conclusively define the elements that constitute a violation of this statute, but the text of the statute contemplates three different ways in which it may be violated: (i) a defendant knowingly circumvents an existing system of accounting controls; (ii) a defendant knowingly fails to

---

[8]The Complaint indicates that Kozlowski's decision to remove the disclosure language from the filing was done at the direction of Woodruff.  Arguably, Kozlowski might claim facts – *e.g.* that he was persuaded by Woodruff that the filing would not be deceitful even with the disclosure language removed – that would defeat the SEC's allegations of scienter.  However, because the standard of review on this motion requires the Court to view the pleadings in the light most favorable to the SEC, the allegations of scienter against Kozlowski are sufficient at this stage.

[9]"No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account . . ."  15 U.S.C. § 78m(b)(5).

implement a system of accounting controls; or (iii) a defendant knowingly falsifies a relevant

corporate book or record.  15 U.S.C. § 78m(b)(5).

It is not clear from the Complaint whether the SEC's claims against each Defendant are

based on an allegation that the individual personally made false entries in corporate books, or

whether it alleges that the individual circumvented or failed to implement an accounting control.

The responsive briefs filed by the SEC suggest that the SEC relies upon SEC Rule 13b2-1, 17

C.F.R. § 240.13b2-1, promulgated to give effect to 15 U.S.C. § 78m(b)(5).  *See Docket* # 86 at

12-13 (response to Nacchio motion); *Docket* # 88 at 13 (response to Mohebbi motion).  That rule

states that "No person shall directly or indirectly, falsify or cause to be falsified, any book, record

or account."  Thus, it would appear that the SEC is proceeding only on the theory that the various

Defendants directly or indirectly caused Qwest's books to be falsified, not on any theory involving

accounting controls.  *But see Docket* # 1, ¶ 149 (a conclusory assertion that certain Defendants

failed to device and implement accounting controls, not cited by the SEC in its response briefs).

The Complaint adequately pleads that Mohebbi caused Qwest's books and records to be

falsified, in that he allegedly concealed portability deals from Qwest's accountants so that those

accountants would improperly recognize the IRU  revenue.  *Docket* # 1, ¶ 103-05.  Although

Mohebbi did not directly falsify Qwest's books, this allegation is sufficient to plead that he

indirectly caused such falsification to occur by concealing key facts from those who maintained

Qwest's books.

The Complaint also adequately pleads a Section 13(b)(5) claim against Woodruff.

Paragraph 127 of the Complaint alleges that Woodruff was "responsible for all of Qwest's

accounting," and that he was responsible for the financial statements that falsely recognized IRU

revenue.  *Docket* # 1, ¶ 127.  This is sufficient to allege that Woodruff falsified Qwest's books and records.

The Complaint is not so clear with regard to Nacchio, however.  In its response brief, the SEC identifies two paragraphs that it contends allege that "Nacchio fraudulently approved of Qwest's reporting of non-recurring revenue from IRU and equipment sales as revenue for data and internet services, causing Qwest's records to be materially false and misleading."  *Docket* # 86 at 13, citing *Docket* # 1, ¶ 52, 55.  Paragraph 52 of the Complaint generally alleges that "Qwest fraudulently included the [non-recurring IRU] revenue in its reported recurring data and Internet services revenue," but mentions Nacchio only in the context of alleging that he "made no meaningful public disclosure of this fraudulent practice."  *Docket* # 1, ¶ 52.  This allegation, which suggests that Nacchio knew of and failed to disclose the practice, is insufficient to plead that Nacchio <u>caused</u> Qwest's books and records to be falsified.  Paragraph 55 of the Complaint is brief enough to be quoted verbatim: "Nacchio, Woodruff, and Szeliga knew of Qwest's one-time IRU and equipment sales and approved the fraudulent public reporting of such sales as recurring revenue."  *Docket* # 1, ¶ 55.  This allegation is also problematic.  It does not refer specifically to Qwest's "books or records," speaking instead of "public reporting."  What is meant by the SEC's reference to "public reporting" is not clear.  Absent some indication that the allegation that Nacchio "approved . . . fraudulent public reporting" is an allegation that Nacchio caused Qwest, directly or indirectly, to falsify its books, records, or accounts, the allegations in Paragraphs 52 and 55 are insufficient to plead a violation of 15 U.S.C. § 78m(b)(5) or 17 C.F.R. § 240.13b2-1

against him.[10]    Accordingly, the Fourth Claim is dismissed, with leave to replead, as against

Nacchio.[11]

### D.  Deceit of auditors

Mohebbi, Nacchio, and Woodruff also challenge the sufficiency of the SEC's Fifth Claim,

alleging deceit of Qwest's auditors in violation of 17 C.F.R. § 240.13b2-2.  Rule 13b2-2 provides,

in pertinent part, "[n]o director or officer  . . . shall, directly or indirectly, make or cause to be

made a materially false or misleading statement to an accountant in connection with, or [o]mit to

state or cause another person to omit to state any material fact . . . in connection with [a]ny audit,

review or examination of financial statements . . . or [t]he preparation or filing of any document or

report required to be filed with the [SEC]."  17 C.F.R. § 240.13b2-2 (internal numbering

omitted).

---

[10]The SEC also argues that pressure asserted by Nacchio on others to meet ambitious
revenue targets "indirectly caused" them to falsify Qwest's books.  *Docket* # 86 at 13.  Even
assuming that Nacchio set inflated performance targets and pressured employees to meet them,
these allegations would be insufficient to plead that Nacchio knowingly caused these employees to
falsify corporate records.  It is also arguable that other portions of the Complaint not cited by the
SEC could nevertheless support a claim that Nacchio falsified Qwest's records.  However, the
SEC, as author of the Complaint, is in the best position to guide the Court to the facts supporting
its claim, and the Court will not wander through the woolly and elliptical Complaint without the
SEC's guidance.

[11]Because the Court dismisses the claim against Nacchio, it need not address Nacchio's
argument that the Fourth Claim sounds in fraud, and thus, must be pleaded with particularity
under Rule 9(b).  *Citing SEC v. Lucent Technologies, Inc.*, 363 F.Supp.2d 708, 727-28 (D.N.J.
2005).  Even if Nacchio is correct,  Rule 9(b) only requires the fraudulent statement – not the
defendant's motive or intent or other matters – to be pleaded  with particularity. *Schwartz* 124
F.3d at 1252.  As the Court has found with regard to the securities fraud claims, the SEC has
adequately plead the nature and content of fraudulent misrepresentations or omissions by each
Defendant.  To the extent those misrepresentations or omissions involved the recording of
information in Qwest's books and records, Rule 9(b) would be satisfied by the SEC's pleading of
the Fourth Claim, regardless of whether *Lucent* is correct or not.

For the reasons stated with regard to the Fourth Claim, the SEC has adequately alleged that Mohebbi failed to advise Qwest's accountants of material facts regarding portability of, and thus the ability to recognize the revenue from, IRU sales.  This is sufficient for this claim, as well.

Similarly, the Complaint alleges that both Nacchio and Woodruff made false representations to Qwest's auditors in management representation letters.  *Docket # 1, ¶ 70.*  Although the Complaint does not quote these misrepresentations *in haec verba*, it is clear from the context of the allegation that the misrepresentations were in the form of Nacchio and Woodruff certifying to the auditors the accuracy and completeness of Qwest's financial statements, when they knew that the financial statements omitted information relating to the extent of Qwest's reliance on IRU sales.  *See Docket # 1, ¶ 66, 70.*  The Complaint adequately alleges that the information was material, as both Woodruff and one of Qwest's outside auditors believed that such disclosure was necessary.  *Id.*  Thus, the SEC has sufficiently pleaded the Fifth Claim against all moving Defendants.

### E.  Aiding and Abetting

The final two claims in the Complaint allege that each Defendant aided and abetted Qwest's making of false SEC filings and keeping of false books and records.  To plead a claim under an aiding and abetting theory, the SEC must allege facts which, if true, would establish that: (i) Qwest committed a primary violation of the relevant securities laws; (ii) each Defendant provided substantial assistance to Qwest's commission of that violation; and (iii) each Defendant did so with scienter, that is, with knowledge or recklessness as to whether the Defendant was aiding or abetting such a violation.  *SEC v. Autocorp Equities, Inc.,* 292 F.Supp.2d 1310, 1331-32 (D. Utah 2003), *citing Graham v. SEC,* 222 F.3d 994, 1000 (D.C. Cir. 2000).  All of the

22

moving Defendants challenge the sufficiency of the SEC's assertions of substantial assistance and scienter.

The SEC has adequately alleged that Qwest committed a primary violation of securities laws, both by making filings with the SEC that were materially false, *see e.g. Docket* # 1, ¶ 70, 79, 84, and by failing to keep accurate books and records, *id.* at ¶ 105, 106.

The Complaint adequately alleges that Kozlowski provided substantial assistance in Qwest's filing of false SEC statements, in that Kozlowski participated by removing disclosure language about IRU sales from Qwest's 1999 10-K filing, thereby rendering the filing materially misleading. *Docket* # 1, ¶ 69, 70. Taken in the light most favorable to the SEC, the Complaint adequately alleges Kozlowski's scienter in aiding the false filings, in that it alleges that Kozlowski knew that the disclosure language was necessary to keep the filing from being misleading, but nevertheless elected to remove it. *Id.* at ¶ 64, 69. This is sufficient to plead Kozlowski's liability for aiding and abetting false filings. Similarly, the Complaint adequately alleges that Kozlowski substantially assisted Qwest's keeping of false books and records, in that Kozlowski was responsible for Qwest improperly recognizing IRU revenue. *Id.* at ¶ 127. It also alleges that Kozlowski knew that IRU revenue could not be recognized if it was portable, and that despite being informed that portability agreements had been made, Kozlowski recognized the IRU revenue anyway. *Id.* at ¶ 127, 137. This is sufficient to plead aiding and abetting liability against Kozlowski based on the false books and records claim.

For the reasons discussed with regard to the Fourth Claim against Mohebbi – namely, that the Complaint adequately alleges that Mohebbi purposefully concealed portability information from Qwest's accountants so that Qwest would improperly recognize IRU revenue – the SEC has

adequately alleged that Mohebbi aided and abetted Qwest's keeping of false books and records.

Moreover, because Qwest's records with regard to revenues form the basis upon which Qwest

compiles its reports to the SEC, *see* 15 U.S.C. § 78m(b)(1) (filings with SEC include balance

sheet, earnings statement, and identification of income), allegations that Mohebbi knowingly

mislead Qwest's accountants is sufficient to allege scienter and substantial assistance to Qwest's

filing of false SEC reports.

     The Complaint adequately asserts that Nacchio caused Qwest to issue misleading SEC

filings, *see e.g. Docket* # 1, ¶ 34, 70, 93, and that Nacchio knew, based on his knowledge of

Qwest's finances, that the filings were misleading, *id.* at ¶ 53.  This is sufficient to plead the Sixth

Claim, aiding and abetting false SEC filings.  However, for the reasons stated by the Court in

dismissing the Fourth Claim against Nacchio, the SEC has failed to adequately allege that Nacchio

aided and abetted Qwest's keeping of false books and records.[12]  Thus, the Seventh Claim as

against Nacchio is dismissed without prejudice.

     For the reasons stated with regard to the Fourth Claim against Woodruff, the SEC has

adequately alleged that Woodruff aided and abetted Qwest's keeping of false books and records.

Because Qwest's books were, in turn, used to prepare its SEC filings, this conduct is also

sufficient to plead a claim of aiding and abetting false SEC filings against Woodruff.

     Finally, the Complaint adequately alleges that Noyes participated in improperly

recognizing IRU revenue, *Docket* # 1, ¶ 131, 137, 152, and that he did so with knowledge that it

---

[12]Notably, the SEC's brief in response to Nacchio's motion does not expressly identify those portions of the Complaint that the SEC asserts demonstrate Nacchio's aid to Qwest's keeping of false records.  The entirety of the SEC's argument is devoted to the issue of scienter, with the exception of the final sentence, which addresses Nacchio's responsibility for false "public filings."  *See Docket* # 86 at 14-15.

was improper, *id.* at ¶ 137.  This is sufficient to allege aiding and abetting the keeping of false

books and records, and for the reasons stated previously with regard to Mohebbi, also suffices to

plead aiding and abetting the filing of false SEC reports.

Thus, the motions to dismiss by Kozlowski, Mohebbi, Woodruff, and Noyes are denied in

their entirety.  Nacchio's motion to dismiss is granted, insofar as the Fourth and Seventh Claims

as alleged against him are dismissed without prejudice, and denied in all other respects.

### F.  Kozlowski's affirmative defenses

Finally, the Court turns to the SEC's motion to strike Kozlowski's affirmative defenses of

laches and unclean hands, alleging that such defenses cannot be asserted against the Government,

and are thus inadequate as a matter of law.  Fed. R. Civ. P. 12(f) ("the court may order stricken

from any pleading any insufficient defense").   In response, Kozlowski essentially concedes that

the defense of laches is unavailable, *see Docket* # 77 at 3 n. 4, but contends that the unclean hands

defenses he asserts are based on misconduct by the SEC during its investigation of this case –

namely, by intertwining its investigation of the Defendants with a criminal investigation being

conducted by the Department of Justice.[13]

---

[13]The precise grounds upon which Kozlowski alleges that a joint civil-criminal investigation by the SEC and Department of Justice is improper is not entirely clear.  Kozlowski appears to rely entirely on Fed. R. Crim. P. 6(e), which cloaks grand jury proceedings in secrecy, but he does not expressly allege that SEC attorneys obtained information from grand jury proceedings themselves.  Rather, he contends that the SEC participated in "joint proffer sessions" in which Department of Justice attorneys disclosed "information and documents in possession of the United States Attorney's Office."  *Docket* # 77 at 9.  Kozlowski apparently concedes that these "proffer sessions" are not actual grand jury proceedings, but argues that this information falls within the ambit of grand jury secrecy in that it identifies "the strategy or direction of the investigation," *citing Fund for Constitutional Government v. National Archives and Records Service*, 656 F.2d 856, 869-70 (D.C. Cir. 1981).

A motion to strike an affirmative defense as insufficient is adjudicated under the same standard as a motion to dismiss: namely, the Court must strike the defense only if it cannot be maintained under any set of circumstances.  *See e.g. Unger v. U.S. West, Inc.*, 889 F.Supp. 419, 422 (D. Colo. 1995); *Resolution Trust Co. v. Tri-State Realty Investors of Kansas City, Inc.*, 838 F.Supp. 1448, 1450 (D. Kan. 1993).

The Court is not prepared to say that a defense of unclean hands, based on the claim that the SEC improperly comingled its investigation into this case with a criminal investigation being conducted by the Department of Justice, cannot be maintained under any circumstance.  Although the Court agrees generally with the SEC that coordination[14] between civil and criminal investigations serves important public purposes, it cannot say a jointly-conducted civil and criminal investigation could never justify a defense of unclean hands.  Whether this case presents such a circumstance is a matter that cannot be adjudicated on the face of the pleadings, and must therefore await development of a more complete factual record.[15]  Accordingly, the Court grants

---

[14]At the same time, there is also a lack of precision in the SEC's reply brief, which argues for the permissibility of "civil and criminal actions [pursued] simultaneously or successively," "simultaneous investigations," and "cooperat[ion] and shar[ing] information relating to their investigations."  However, the SEC has apparently freely admitted that, in this case, it has conducted "joint witness interviews with DOJ personnel."  Caselaw approving of simultaneous-yet-independent investigations or the sharing of limited or general information is not especially helpful in analyzing the propriety of investigations, such as the one here, involving jointly-conducted witness interviews.  Any future briefing of this issue should focus on authority addressing the specific type of conduct at issue, not general examples of permissible interagency cooperation.

[15]The Court expresses no opinion on the degree, if any, to which Kozlowski should be entitled to conduct discovery in support of this defense.  That matter is best left to the sound discretion of the Magistrate Judge, informed by the specific nature of the discovery requests and the objections raised by the SEC, as well as any relevant legal authority cited by the parties relating to the scope of the defense.

that portion of the SEC's motion that seeks the striking of Kozlowski's defense of laches, but denies the motion to the extent it seeks to strike the defenses of unclean hands.

## CONCLUSION

For the foregoing reasons, Kozlowski's Motion to Dismiss (**# 51**), Mohebbi's Motion to Dismiss (**# 62**), Woodruff's Motion to Dismiss (**# 69**), and Noyes' Motion to Dismiss (**# 73**) are **DENIED**.  Nacchio's Motion to Dismiss (**# 67**) is **GRANTED IN PART**, insofar as the Fourth and Seventh Claims asserted against Nacchio are dismissed, without prejudice and with leave to replead within 14 days of the date of this Order, and **DENIED IN PART**, insofar as the Complaint adequately pleads the remaining claims against Nacchio.  The SEC's Motion to Strike (**# 54**) is **GRANTED IN PART**, insofar as Kozlowski's affirmative defense of laches is stricken, and **DENIED IN PART**, without prejudice, with regard to Kozlowski's defenses of unclean hands.

Dated this 29th day of March, 2006

**BY THE COURT:**

_Marcia S. Krieger_
_____

Marcia S. Krieger
United States District Judge

27