# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 05-CV-480–MSK-CBS

SECURITIES AND EXCHANGE COMMISSION

                Plaintiff,

v.

JOSEPH P. NACCHIO, et al.

                Defendants.

---

## THE UNITED STATES' STATEMENT OF INTEREST
## AND MOTION FOR ENTRY OF PROTECTIVE ORDER

Pursuant to 28 U.S.C. § 517[1], the United States files this Statement of Interest to oppose the disclosure of any information in this case relating to classified contracts, potential contracts, and all contacts and communications involving the U.S. Intelligence Community (as defined by the National Security Act of 1947, 50 U.S.C. § 401a(4)) and Qwest Communications International Corporation ("Qwest"), or its subsidiaries, current or former officers or employees. Agencies of the U.S. Intelligence Community are not parties to this litigation.[2] Defendants Nacchio, Woodruff, Mohebbi, and Kozlowski, however, intend to seek in discovery information relating to classified contracts and potential contracts involving the U.S. Intelligence Community, as well as meetings and communications in which the Intelligence Community shared classified information with

---

[1] 28 U.S.C. § 517 provides that "any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States . . . or to attend to any other interest of the United States."

[2] Pursuant to Local Rule 7.1(A), undersigned counsel has conferred with counsel for the parties as to whether they will oppose the filing of this motion and will file a supplemental certificate of compliance upon receipt of all of the responses from the various parties.

Qwest employees, including defendant Joseph Nacchio, former Chief Executive Officer of Qwest. Much of the information defendants seek is classified because its disclosure would cause serious, and in some instances, exceptionally grave harm to national security. Accordingly, the Director of National Intelligence, in conjunction with the heads of certain agencies within the U.S. Intelligence Community, has asserted the military and states secrets privilege ("state secrets privilege"), as well as a claim of statutory privilege. On the bases of these absolute privileges, the United States hereby moves for the entry of a protective order to protect against the disclosure of information that could implicate the national security interests of the United States.

The grounds for this motion are set forth in the Memorandum in Support of United States' Statement of Interest and Motion for Entry of Protective Order, the accompanying unclassified Declaration and Formal Claim of State Secrets and Statutory Privileges By J. Michael McConnell, Director of National Intelligence, as well as the classified declarations lodged for the Court's *in camera, ex parte* review.

Dated: November 19, 2007

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

/s/ Karen Richardson
JOSEPH H. HUNT
VINCENT M. GARVEY
KAREN K. RICHARDSON
Attorneys, Federal Programs Branch
U.S. Department of Justice
Civil Division, Room 6126
Post Office Box 883
Washington, DC  20044
Tele. No.:  (202) 514-3374
Attorneys for the United States of America

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 05-CV-480–MSK-CBS

SECURITIES AND EXCHANGE COMMISSION

                Plaintiff,

v.

JOSEPH P. NACCHIO, et al.

                Defendants.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
UNITED STATES' STATEMENT OF INTEREST
AND MOTION FOR ENTRY OF PROTECTIVE ORDER[3]**

      The United States seeks a protective order in this case to protect against the disclosure of information relating to any classified contracts, potential contracts, and contacts and communications involving agencies of the U.S. Intelligence Community (as defined by the National Security Act of 1947, 50 U.S.C. § 401a(4)) and Qwest Communications International Corporation ("Qwest") and its subsidiaries, current or former officers or employees, including former Chief Executive Officer ("CEO") Joseph Nacchio.  Defendants Nacchio, Kozlowski, Mohebbi, and Woodruff intend to seek in discovery classified information relating to the U.S. Intelligence Community and Qwest.

      Although, during the relevant time period, Qwest had involvement in a few unclassified contracts awarded by the National Security Agency ("NSA"), much of the contract and contact

---

[3] This is submitted pursuant to 28 U.S.C. § 517, which provides that "any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States . . . or to attend to any other interest of the United States."

information defendants seek relating to the Intelligence Community is classified and specifically protected from disclosure by the military and state secrets privilege ("state secrets privilege"). If properly invoked, as it is here by the Director of National Intelligence, that privilege acts as an absolute bar to disclosure of material that would harm national security -- regardless of a party's need for the information. See Declaration and Formal Claim of States Secrets and Statutory Privileges By J. Michael McConnell, Director of National Intelligence (hereinafter "McConnell Decl.") (attached hereto as Exhibit 1); see also Classified Declarations lodged and available for the Court's *in camera*, *ex parte* review (hereinafter "Classified Declarations") (cover page for Classified Declarations attached as Exhibit 2). As explained in the declarations accompanying the United States' motion, because the exposure of the information at issue here could reasonably be expected to cause damage to the national security, the United States' interest in protecting such information from disclosure is paramount and must be safeguarded.

The information requested by defendants is also protected from disclosure by Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L No. 108-458, 118 Stat. 3638 (Dec. 17, 2004) (amending sections 102 through 104 of Title I of the National Security Act of 1947 and codified at 50 U.S.C. § 403-1(i)(1)) because the information reveals intelligence sources and methods. This statutory protection, if invoked, as it is here, by the Director of National Intelligence, provides an absolute bar to the disclosure of national security information that the statutory provision was designed to protect.

For these reasons, the Court should uphold the United States' assertion of the state secrets and statutory privileges and preclude the disclosure of any classified information relating to classified contracts, potential contracts, or contacts involving agencies of the U.S. Intelligence

Community.

# BACKGROUND

A. **Contracts and Contract Negotiations involving Qwest and the U.S. Intelligence Community**

At various times during the relevant time period (1997 to 2002),[4] officials and employees of several U.S. intelligence agencies or agencies with classified connections to the U.S. Intelligence Community were engaged in discussions with Qwest officers and employees, including Joseph Nacchio, the then-CEO of Qwest, relating to contracts and potential contracts with the government. See Classified Declarations. Some, but not all, of those negotiations involving Qwest officials resulted in contracts with the government. Id. With the exception of unclassified information, including certain, specific information related to unclassified contracts involving the NSA[5], any information relating to actual or potential classified contracts involving or connected to the U.S. Intelligence Community, as well as all classified communications and contacts involving or connected to the U.S. Intelligence Community, and the identification of the specific agencies of the

---

[4] Defendants Nacchio, Woodruff, Mohebbi and Kozlowski do not specify the time periods covered by their requests for information relating to the U.S. Intelligence Community. The claims raised by the Securities and Exchange Commission ("SEC") cover the period 1999 to 2002. See Complaint ¶ 1. Because the classified information at issue in Mr. Nacchio's criminal proceedings, discussed below, covered information back to 1997, however, the United States reasonably interprets the defendants' requests as being restricted to the time period 1997 to 2002. Should the Court determine that the information sought relates to other time periods, the United States reserves the right to assert any privileges as to information relating to those other time periods as well.

[5] Qwest was an unsuccessful bidder for "Groundbreaker," an information technology (IT) initiative awarded by NSA on or about July 31, 2001. In addition, Qwest may have other unclassified contracts with NSA for IT support and services. The fact that the contracts existed or that NSA was the contracting agency are not classified facts. Any information relating to the contracts, however, that would reveal the NSA's mission, activities, infrastructure or technological capabilities is classified and must be protected from disclosure.

-3-

U.S. Intelligence Community in relation to Qwest, are subject to the state secrets and statutory privileges.  Id.

  B.  SEC Civil Enforcement Action

On March 15, 2005, the SEC brought a civil enforcement action against Joseph Nacchio, the former CEO of Qwest, and six other Qwest officers alleging that, between 1999 and 2002, the defendants engaged in a fraudulent scheme designed to mislead the investing public about the company's revenue and growth.  See Complaint ¶ 1.  The SEC alleges, among other things, that the defendants projected Qwest revenue and earnings that they knew were overly aggressive, fraudulently characterized non-recurring revenue (from one-time sales of fiber capacity in the form of indefeasible rights of use (IRUs) and equipment) as recurring data and Internet services revenues, and manipulated IRU transactions to meet revenue targets by, among other things, purchasing fiber that Qwest did not need to close IRU swap sales.  Id. ¶¶ 3, 56-59, 62, 107.

  C.  Defendant Joseph Nacchio Convicted of Insider Trading

On December 20, 2005, Joseph Nacchio was indicted on forty-two (42) counts of insider trading.  See Indictment dated December 20, 2005, United States v. Nacchio, 2007 WL 222143, 05-cr-0545 EWN (D. Colo.) (Exhibit 3).  Mr. Nacchio was accused of improperly selling his Qwest stock during his tenure as CEO at Qwest when he knew, but did not reveal publicly, that Qwest was not likely to meet its publicly-stated financial goals.  Id.  As a defense to the criminal charges, Nacchio argued that he had remained optimistic that Qwest would overcome stiff competition and weak sales because he was privy to top-secret information relating to potential classified contracts with the government that he anticipated Qwest would be awarded.  See Defendant Nacchio's Response to The Government's Memorandum Brief Regarding CIPA

(unsealed), dated January 18, 2006 pgs. 4-5, United States v. Nacchio, 05-cr-0545 EWN (Exhibit 4).[6]  On April 19, 2006, a jury found Mr. Nacchio guilty of nineteen (19) of the forty-two (42) charges against him.  See Slip Opinion, United States v. Nacchio, 2007 WL 222143, 05-cr-0545 EWN (D. Colo. July 27, 2007) (Exhibit 6).  On August 3, 2007, Mr. Nacchio was sentenced to six years in prison and ordered to pay a $19 million fine.  See Judgement in A Criminal Case, United States v. Nacchio, 2007 WL 2221437, 05-cr-00545 EWN (D. Colo. Aug. 3, 2007) (Exhibit 7).

### D.     Requests for Classified Information

Defendants Woodruff, Mohebbi, and Kozlowski have submitted letters to the Department of Justice indicating that they will seek in discovery information relating to Qwest's potential contracts with the government, contract negotiations, and communications between defendant Nacchio and the United States Government, as well as the types of telecommunications capacity and/or fiber at issue, the routes of the telecommunications capacity and/or fiber, and the potential dates of acquisition for the telecommunications capacity.[7]  Defendant Nacchio presented his requests for information orally through his counsel to the undersigned Department of Justice counsel so as to avoid the possible disclosure of classified information.  He requests in discovery

---

[6] Although Mr. Nacchio's criminal defense counsel were provided limited access to classified information relating to Qwest pursuant to the Classified Information Protection Act ("CIPA"), 18 U.S.C. Appx. III et seq., Mr. Nacchio ultimately did not introduce evidence relating to that defense.  See Relevant pages of Sentencing Transcript, dated July 27, 2007, pg. 111, United States v. Nacchio, 2007 WL 222143, 05-cr-0545 EWN (D. Colo.) (district court noting at sentencing, in the course of denying Nacchio's motion for bail pending appeal, that "[w]hen trial came, the [government contracts] defense was gone. There was nothing about that defense at all.") (Exhibit 5).

[7] See Letter dated July 18, 2007 from Kevin D. Evans to Karen Richardson, U.S. Department of Justice; Letter dated August 15, 2007 from Paul R. Grand to Karen Richardson, U.S. Department of Justice; Letter dated August 21, 2007 from David Meister to Karen Richardson, U.S. Department of Justice (letters attached as Exhibit 8).

all of the classified information that he was provided during his criminal proceedings, as well as all of the classified information relating to Qwest and U.S. intelligence agencies that he requested, but was denied access to, during the criminal proceedings. He also seeks to depose the head of several Government agencies.[8]

## ARGUMENT

### I. DISCLOSURE OF CLASSIFIED INFORMATION RELATING TO THE U.S. INTELLIGENCE COMMUNITY IS BARRED BY THE MILITARY AND STATE SECRETS PRIVILEGE

The military and state secrets privilege is a unique privilege, with constitutional underpinnings, which permits the Government to protect against the unauthorized disclosure in litigation of information that may adversely affect national security interests. See United States v. Reynolds, 345 U.S. 1, 7-8 (1953); Al-Haramain v. Bush et al., __ F.3d __, 2007 WL 3407182, * 5 No. 06-36083 (9th Cir. Nov. 16, 2007); Black v. United States, 62 F.3d 1115, 1118 (8th Cir. 1995), cert. denied, 517 U.S. 1154 (1996). "Although the state secrets privilege was developed at common law, it performs a function of constitutional significance" because the privilege derives from the President's Article II powers to conduct foreign affairs and provide for the national defense. El-Masri v. United States, 479 F.3d 296, 303 (4th Cir. 2007), cert. den. __ U.S. __, 2007 WL 1646914 (Oct. 9, 2007) (citing United States v. Nixon, 418 U.S. 683, 710 (1974)).

      A.    The Standard of Review is a Narrow One, and a Properly Invoked Claim of Privilege is an Absolute Bar to Disclosure

The state secrets privilege is not limited to military secrets, but is "both expansive and

---

[8] The United States reserves the right, pursuant to Rule 26 of the Federal Rules of Civil Procedure and otherwise, to raise objections to any discovery propounded or depositions noticed in the future by these or any of the other defendants.

malleable." Ellsberg v. Mitchell, 709 F.2d 51, 57 (D.C. Cir. 1983).  The privilege protects a broad range of state secrets, including information that would result in "'impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments.'"  Black, 62 F.3d at 1118 (quoting Ellsberg, 709 F.2d at 57); Kasza v. Browner, 133 F.3d 1159, 1166 (9th Cir.) (same), cert. denied, 525 U.S. 967 (1998).[9]  The privilege extends to protect information that, on its face, may appear innocuous, but which in a larger context could reveal sensitive classified information:

> It requires little reflection to understand that the business of foreign intelligence gathering in this age of computer technology is more akin to the construction of a mosaic than it is to the management of a cloak and dagger affair.  Thousands of bits and pieces of seemingly innocuous information can be analyzed and fitted into place to reveal with startling clarity how the unseen whole must operate.

Halkin v. Helms ("Halkin I"), 598 F.2d 1, 8 (D.C. Cir. 1978).

The state secrets privilege "belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party." Reynolds, 345 U.S. at 7; see also Kasza, 133 F.3d at 1165.  The privilege is properly invoked when the government makes [1] a "formal claim of privilege, [2] lodged by the head of the department which has control over the matter, after [3] actual personal consideration by that officer." Reynolds, 345 U.S. at 7-8 (footnotes omitted); Black, 62 F.3d at 1118.  Thus, the responsible agency head must personally consider the matter and formally assert the claim of privilege.

---

[9] See also Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 400-402 (D.C. Cir. 1984) (Department of Defense documents containing national security information, including communications with foreign governments and intra-government letters, were privileged); Halkin v. Helms ("Halkin II"), 690 F.2d 977, 990, 993 (D.C. Cir. 1982) (Information concerning diplomatic relations with foreign governments and intelligence-gathering methods and capabilities was privileged).

In deciding a state secrets privilege assertion, the proper standard of review is whether the United States has put forward reasonable grounds to conclude that disclosure or confirmation of the information at issue would harm national security. See Kasza, 133 F.3d at 1166 (the sole determination for the court is whether, "under the particular circumstances of the case, 'there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged,'" quoting Reynolds, 345 U.S. at 10); see also In re United States, 872 F.2d 472, 475-76 (D.C. Cir. 1989); Tilden v. Tenet, 140 F. Supp. 2d 623, 626 (E.D. Va. 2000). An assertion of the state secrets privilege "must be accorded the 'utmost deference' and the court's review of the claim of privilege is narrow." Kasza, 133 F.3d at 1166 (quoting Reynolds, 345 U.S. at 10); see also Halkin I, 598 F.2d at 9; Black, 62 F.3d at 1119.

The privilege may be invoked only by the government and may be asserted even when the government is not a party to the case." Zuckerbraun v. General Dynamics Corp., 935 F.2d 544, 546 (2d Cir. 1991) (citing Fitzgerald v. Penthouse Int'l, Ltd., 776 F.2d 1236 (4th Cir. 1985)). The role of the court is to assess the validity of the claim of privilege, satisfying itself that there is a reasonable danger that disclosure will harm national security. Zuckerbraun, 935 F.2d at 546-47. "[T]he government need not demonstrate that injury to the national interest will inevitably result from disclosure; a showing of 'reasonable danger' that harm will ensue is sufficient." Ellsberg, 709 F.2d at 58 (footnote omitted). In this regard, courts have been "willing[] to credit relatively speculative projections of adverse consequences [of disclosure]." Id. at 58 n.35.

In considering the claim of military and state secrets privilege, the court should not "force a disclosure of the thing the privilege was meant to protect," Reynolds, 345 U.S. at 8, although, where a party shows substantial need for the information, it is appropriate for the court to consider

-8-

*in camera* and *ex parte* declarations or other submissions of the Government explaining why a matter should be protected, Al-Haramain, __F.3d __, * 11.  See also, Black, 62 F.3d at 1119.  See, e.g., Kasza, 133 F.3d at 1169; Farnsworth Cannon, Inc. v. Grimes, 635 F.2d 268, 281 (4th Cir. 1980) (en banc); Maxwell v. First National Bank of Maryland, 143 F.R.D. 590, 595 (D. Md. 1992).[10]  Likewise, a judicial opinion on a claim of military and state secrets privilege "should not strip the veil from state secrets even if ambiguity results in a loss of focus and clarity."  Black, 62 F.3d at 1119; see also Ellsberg, 709 F.2d at 59 n.41 (Open, detailed discussion by a court of the application of general principles to particular facts is impossible in this area of the law).

A properly invoked claim of privilege is an absolute bar to disclosure, no matter how compelling the need for the information, or relevance thereof, to a proper resolution of the case. Reynolds, 345 U.S. at 11; Black, 62 F.3d at 1119; Fitzgerald, 776 F.2d at 1240; Halkin II, 690 F.2d at 990.  In other words, in assessing whether to uphold a claim of privilege, the court does not balance the respective needs of the parties for the information.  Rather, "[o]nce the privilege is properly invoked and the court is satisfied as to the danger of divulging state secrets, the privilege is absolute[.]" Kasza, 133 F.3d at 1166; see also Reynolds, 345 U.S. at 11 (if the court determines

---

[10] However, "[i]t is well settled that a trial judge called upon to assess the legitimacy of a state secrets privilege claim should not permit the requester's counsel to participate in an *in camera* examination of putatively privileged material.  The rational for this rule is that our nation's security is too important to be entrusted to the good faith and circumspection of a litigant's lawyer (whose sense of obligation to his client is likely to strain his fidelity to his pledge of secrecy) or to the coercive power of a protective order." Ellsberg, 709 F.2d at 61; see also In re Eisenberg, 654 F.2d 1107, 1112 (5th Cir. 1981) ("Our adversarial legal system generally does not tolerate ex parte determinations on the merits of a civil case. . . . An exception to this principle is made when countervailing government interests dictate that information sought to be discovered should remain secret.  Privilege questions are determined on the basis of in camera, ex parte examinations of the evidence."); In re Under Seal, 945 F.2d 1285 (4th Cir. 1991) (classified *in camera* affidavit reviewed by both the district court and court of appeals without being disclosed to plaintiff's counsel).

that there exists a showing of harm which might reasonably flow from disclosure, the privilege cannot be overcome by "even the most compelling necessity."); In re Under Seal, 945 F.2d at 1288 n.2 ("Upon proper invocation by the head of the affected department, the privilege renders the information unavailable regardless of the other party's need in furtherance of the action"); Northrop, 751 F.2d at 399 (state secrets privilege "cannot be compromised by any showing of need on the part of the party seeking the information.").[11] In short, the court may consider the necessity of the information to the case only in connection with assessing the sufficiency of the Government's showing that there is a reasonable danger that disclosure of the information at issue would harm national security.

B.     The United States Has Properly Invoked the State Secrets Privilege

The United States has properly asserted the state secrets privilege in this case. The Director of National Intelligence, J. Michael McConnell, after personal consideration of the matter, has formally invoked the privilege on behalf of the United States with respect to the information described in his declaration. See Reynolds, 345 U.S. at 7-8; McConnell Decl. ¶¶ 2, 10, & 13 (Exh. 1).[12] The information subject to the privilege, as described in Paragraph 13 of the McConnell

---

[11] "[I]n some circumstances sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters." Fitzgerald, 776 F.2d at 1241-42; Farnsworth, 635 F.2d at 281 ("[A]ny attempt on the part of the plaintiff to establish a prima facie case would so threaten disclosure of state secrets that the overriding interest of the United States and the preservation of its state secrets precludes any further attempt to pursue this litigation").

[12] The public declaration is sufficient to establish the United States' state secrets privilege claim in this case. See Reynolds, 345 U.S. at 8 (the court should not "forc[e] a disclosure of the very thing the privilege is designed to protect"). However, more detailed descriptions of the national security concerns at issue in this case are contained in classified declarations which the United States has lodged for the Court's *in camera*, *ex parte* consideration should the Court decide to review them. Because those declarations are classified, they can only be presented for the Court's *in camera*, *ex parte* review, and the Department of Justice Security Office is prepared

Declaration, includes any material responsive to the defendants' requests for information that would reveal the identities of the agencies with which Qwest had classified contracts and potential contracts, the identities of the government officials with whom Qwest officials (and specifically defendant Joseph Nacchio) discussed classified contracts and potential contracts, the underlying purpose of, or work to be performed under, the classified contracts, and any other classified contacts and communications of any kind that involved Qwest, defendant Nacchio, and any other current or former executive or employee of Qwest.  McConnell Decl. at ¶ 13; see also Classified Declarations.  After personal consideration of the matter, the Director of National Intelligence concluded that disclosure of information described generally in Paragraph 13 of his declaration, and more specifically detailed in the accompanying classified declarations submitted for *in camera*, *ex parte* review, "reasonably could be expected to cause damage to the foreign relations and the national defense of the United States."  McConnell Decl. ¶ 14[13]; see also Classified Declarations.  He further explains that

> "any inquiry into the information described in paragraph 13 . . . would risk unauthorized disclosure of intelligence sources and methods. . . . Disclosure of classified information related to intelligence sources or methods informs hostile foreign intelligence agencies about specific ways that the United States collects intelligence, and results in a loss of valuable intelligence when our adversaries are able to take countermeasures."

McConnell Decl. ¶ 15.

Based on the conclusion by the Director of National Intelligence, upon personal

---

to arrange for this Court's review of the classified declarations in a secure setting at the Court's convenience.

[13] Any unclassified document that was made available on the public record or produced during the criminal proceedings against Joseph Nacchio, United States v. Nacchio, 05-cr-005450EDN (D. Colo.), may be requested by any party to this action and disclosed by the United States, if relevant.

consideration, that damage to the national security reasonably could be expected to result from any disclosure of information that would reveal any classified relationship, contract, or contact between the U.S. Intelligence Community and Qwest (and any of its subsidiaries, current or former officers or employees), the United States' assertion of the state secrets claim meets the narrow standard of review to which the state secrets claim is subject and should be upheld.  It is the nation's intelligence experts who are in a position to determine what particular fact or bit of information may compromise national security in a particular context.  If there is no reason to question the credibility of the experts, a court should hesitate to substitute its judgment of the sensitivity of the information for that of the agencies or the Director of National Intelligence. See Frugone v. Central Intelligence Agency, 169 F.3d 772, 775 (D.C. Cir. 1999) ("Mindful that courts have little expertise in either international diplomacy or counterintelligence operations, we are in no position to dismiss the CIA's facially reasonable concerns" about the harm that disclosure could cause to the national security); see also Halkin I, 598 F.2d at 9; Black, 62 F.3d at 1119.[14]

In view of the United States' showing with respect to national security interests, any disclosure of the information described in Mr. McConnell's Declaration, whether in response to the parties' requests for discovery or otherwise, must be completely barred, no matter how compelling

---

[14]  For that same reason, none of the parties can contribute informed opinions as to the validity of the assertion of the state secrets privilege.  See Snepp v. United States, 444 U.S. 507, 512 (1980) ("When a former agent relies on his own judgment about what information is detrimental, he may reveal information that CIA – with its broader understanding . . . could have identified as harmful."); see also ACLU v. U.S. Dep't of Justice, 548 F.Supp. 219, 222, 223 (D.D.C. 1982) (The Court does not "perceive any way in which the adversary proceedings in connection with plaintiff's participation in the in camera review could assist [the court], even if adequate security precautions could be arranged."); Gardels v. Central Intelligence Agency, 689 F.2d 1100, 1106 (D.C. Cir.1982) ("[P]laintiff's material does no more than differ from the Agency's informed position which we must accept if plausible and reasonable.").

any party's alleged need for the information.  Reynolds, 345 U.S. at 11; Northrop, 751 F.2d at 399; Halkin II, 690 F.2d at 990.

## II. A CLAIM OF STATUTORY PRIVILEGE HAS ALSO BEEN PROPERLY RAISED IN THIS CASE

In addition to the state secrets privilege, Congress has provided statutory protection against disclosure of the type of national security information requested by Defendants Nacchio, Woodruff, Mohebbi, and Kozlowski in this case.  Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638 (Dec. 17, 2004), codified at 50 U.S.C. § 403-1(i)(1), amending the National Security Act of 1947 (hereinafter "National Security Act of 1947"), requires the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure."  The authority to protect intelligence sources and methods from disclosure is rooted in the "practical necessities of modern intelligence gathering," Fitzgibbon v. CIA, 911 F.2d 755, 761 (D.C. Cir. 1990), and has been described by the Supreme Court as both "sweeping," CIA v. Sims, 471 US. 159, 169 (1985), and "wideranging."  Snepp, 444 U.S. at 509.  Sources and methods constitute "the heart of all intelligence operations," Sims, 471 U.S. at 167, and "[i]t is the responsibility of the [Intelligence Community], not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the . . . intelligence-gathering process."  Id. at 180.

This statutory privilege has been properly asserted as to any intelligence-related information, sources and methods implicated by defendants' discovery requests, and the information covered by this statutory privilege is at least co-extensive with the assertion of the state secrets privilege by the Director of National Intelligence.  See McConnell Decl. ¶¶ 11, 15.

Moreover, the statutory protection afforded pursuant to the National Security Act of 1947, as amended, reinforces the conclusion that the assertion of the state secrets privilege here is valid, and provides an additional, independent basis for that conclusion. The fact that intelligence sources and methods, including information concerning activities and capabilities of the U.S. Intelligence Community, are subject to an express statutory prohibition on disclosure underscores that the need to protect such information does not reflect solely a policy judgment by the Executive Branch, but the judgment of Congress as well.

Because the information requested by the defendants concerns intelligence sources and methods and is subject to the state secrets privilege, as well as statutory protection, that information must be excluded from this litigation. That the assertion of the statutory and state secrets privileges might leave a party to litigation "in the dark" is nothing extraordinary or unusual. Such was the case in <u>Farnsworth</u>, 635 F.2d at 281, where the plaintiff's counsel was left unaware of the scope of excluded information, as well as in <u>Maxwell</u>, 143 F.R.D. at 599-600, where one of the parties' counsel was rebuffed in his attempts to discover matters with respect to which the state secrets privilege had been asserted. In such instances, the United States simply has an "overriding interest." See <u>Farnsworth</u>, 635 F.2d at 281. Accordingly, the Court should issue a protective order prohibiting the disclosure of the protected information at issue in this case.

## **CONCLUSION**

For the foregoing reasons, the United States' assertion of state secrets and statutory privileges should be upheld, and its accompanying motion for a protective order should be granted.

Dated: November 19, 2007

                                                    Respectfully submitted,

                                                  PETER D. KEISLER
                                                  Assistant Attorney General

          /s/ Karen Richardson
          JOSEPH H. HUNT
          VINCENT M. GARVEY
          KAREN K. RICHARDSON
          Attorneys, U.S. Department of Justice
          Civil Division, Room 6126
          Post Office Box 883
          Washington, DC  20044
          Tele. No.:  (202) 514-3374
          Attorneys for the United States of America

      I hereby certify that on November 19, 2007, I electronically filed the foregoing with the Clerk of Court using the ECF system, which will send notification of such filing to the following e-mail addresses:

**Polly Arlene Atkinson**, atkinsonp@sec.gov; \
**Patricia E. Foley**, foleyp@sec.gov;
**Thomas J. Krysa**, krysat@sec.gov;
**Barbara Wells**, WellsB@SEC.gov;
**Alain Leibman**, aleibman@sgklaw.com;
**Edward S. Nathan**, enathan@sgklaw.com;
**Herbert J. Stern,** hstern@sgklaw.com;
**Jeffrey Speiser,** jspeiser@sgklaw.com,
**Joel M. Silverstein,** jsilverstein@sgklaw.com;
**Terry Trantina**, ttrantina@sgklaw.com;
**David Lawrence Cook**, david.cook@cliffordchance.com;
**David Meister**, david.meister@cliffordchance.com;
**James D. Miller**, james.miller@cliffordchance.com;
**Richard B. Caschette**, rcaschette@starrslaw.com;
**Dean Steven Neuwirth**, deanneuwirth@comcast.net;
**Patrick J. Burke**, Patrick-J-Burke@msn.com;
**Paul R. Grand**, pgrand@maglaw.com;
**Jennifer Achilles**, jachilles@maglaw.com;
**Kristy Watson Milkov**, kmilkov@maglaw.com;
**Kevin D. Evans**, kdevans@s-elaw.com;
**Phillip Douglass**, pdouglass@s-elaw.com;
**Forrest W. Lewis**, flewispc@aol.com

      I also hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand delivery, etc.) indicated by the nonparticipant's name: Wesley Railey Powell, Clifford Chance, US LLP-New York, 31 West 52nd Street, New York, NY 10019.

                            /s/ Karen Richardson