IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 05-cv-00480-MSK-CBS

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.

JOSEPH P. NACCHIO,
ROBERT S. WOODRUFF,
AFSHIN MOHEBBI,
JAMES J. KOZLOWSKI, and
FRANK T. NOYES,

     Defendants.

_____

## OPINION AND ORDER DENYING MOTIONS TO DISMISS AND OVERRULING OBJECTIONS TO MAGISTRATE JUDGE'S ORDER

_____

**THIS MATTER** comes before the Court pursuant to Defendant Woodruff's Motion to Dismiss Certain Claims Due to the Governments' Invocation of State Secrets[1] (**# 369**), Plaintiff Securities and Exchange Commission's ("the SEC") response (**# 393**), and Mr. Woodruff's reply (**# 400**); Defendant Nacchio's Motion to Dismiss Certain Claims Based obn the Government's Invocation of State Secrets (**# 379**), the SEC's response (**# 393**), and Mr. Nacchio's reply (**#**

---

[1] Defendants Mohebbi (**# 371**) and Noyes (**# 376**) have filed "Joinders" in Mr. Woodruff's motion. For a variety of reasons, many of them relating to administrative and procedural difficulties posed by such a practice, the Court discourages parties from filing "joinders" in other parties' motions. A party who seeks the same relief for the same reasons reflected in another party's motion should file an independent motion, specifically identifying the relief requested and simply incorporating by reference the arguments made by the other party. For purposes of this Order only, the Court will treat Mr. Mohebbi and Mr. Noyes' "joinders" as motions and deny them for the same reasons articulated with regard to Mr. Woodruff's motion.

**403**); Defendant Mohebbi's Motion to Dismiss From the Second Amended Complaint a New

and Uncognizable Claim for Relief **(# 447)**, the SEC's response **(# 459)**, and Mr. Mohebbi's

reply **(#461)**; and Defendant Kozlowski's Objections **(# 510)** to the December 9, 2008 Orders **(#**

**509)** of United States Magistrate Judge Craig B. Shaffer granting the SEC's Motion to Quash **(#**

**482)** Mr. Kozlowski's Notice of Rule 30(b)(6) Deposition and denying Mr. Kozlowski's Motion

for Protective Order **(# 483)**, the SEC's response **(# 527)**, and Mr. Kozlowski's reply **(# 545,**

**551)**.

## <u>FACTS</u>

The current operative pleading in this case is the SEC's Second Amended Complaint

**(#432)**. Greatly summarized, the Second Amended Complaint alleges that, from 1999 to early

2002, the Defendants, as officers and employees of Qwest Communications International, Inc.

("Qwest"), engaged in a variety of actions constituting securities fraud. Most prominently, the

SEC alleges that all five Defendants were involved in a scheme to misrepresent and conceal the

nature of Qwest's revenue from the sale of "IRUs" – contracts for access to Qwest's fiber optic

network – as recurring "services revenue" rather than the "one-time sales" that the IRUs actually

represented. These misrepresentations allowed Qwest to meet revenue and growth targets that it

would not have otherwise been able to reach from recurring sources of revenue, resulting in

artificial inflation of the value of Qwest's stock. (In addition, the SEC alleges that Mr. Nacchio

and Mr. Woodruff separately inflated Qwest's stock price by causing Qwest to improperly

recognize revenue from its telephone directory publishing subsidiary, and that these Defendants

also engaged in unlawful insider trading.) The Second Amended Complaint alleges seven causes

of action: (i) securities fraud against all Defendants in violation of 15 U.S.C. s 77q(a)(1); (ii)

securities fraud against all Defendants in violation of 15 U.S.C. s 77q(a)(2) and (3); (iii) securities fraud against all Defendants in violation of 15 U.S.C. s 78j(b) and 17 C.F.R. s 240.10b-5; (iv) falsification of books and records against all Defendants in violation of 15 U.S.C. s 78m(b)(5) and 17 C.F.R. s 240.13b2-1; (v) deceit of auditors, against Mr. Nacchio, Mr. Woodruff, and Mr. Mohebbi, in violation of 17 C.F.R. § 240.13b2-2; (vi) false SEC filings, against all Defendants, in violation of 15 U.S.C. s 78m(a) and 17 C.F.R. § 240.12b-20 and § 240.13a-1, 13a-11, and 13a-20; and (vii) false books and records, against all Defendants, in violation of 15 U.S.C. § 78m(b)(2).

The Court will address additional substantive or procedural facts as relevant in the analysis of each issue.

## ANALYSIS

### A. Motions to dismiss on state secrets grounds

Both Mr. Woodruff (# 369) and Mr. Nacchio (# 379) move to dismiss the bulk of the Second Amended Complaint based on the SEC's invocation of the state secrets privilege.

During discovery, many of the Defendants sought to obtain information pertaining to security-classified contracts, potential contracts, and other communications between Qwest and various components of the U.S. intelligence community. These Defendants were pursuing a theory that Qwest's ongoing contracts with the U.S. intelligence community for the sale of IRUs would demonstrate that the IRU sales provided a reliable revenue stream, contrary to the SEC's characterization of IRU sales as unreliable, "one-time" revenues. The SEC moved for a protective order (# 328) to prevent such discovery, contending that communications between

3

Qwest and the intelligence community involved confidential issues of national security, thus giving rise to the State Secrets Privilege under 50 U.S.C. § 403-1(i)(1).

Discussions between the Magistrate Judge and the parties suggested that the SEC's successful invocation of the state secrets privilege might adversely affect the Defendants' ability to present a complete defense to the claims then pending. Mindful of these concerns, the Magistrate Judge provisionally granted **(# 362)** the SEC's motion to protect the classified information from disclosure, but also invited the Defendants to move to dismiss those claims implicated by the SEC's invocation of the State Secrets Privilege and, simultaneously, encouraged the SEC to consider amending the complaint to minimize the extent to which the claims would implicate issues of national security. On May 7, 2008, the SEC moved for leave **(#363)** to file a Second Amended Complaint, which, among other things, revised the pleading of the claims involving IRUs to focus strictly on a limited number of specified IRU transactions, none of which, the SEC claimed, implicated national security concerns.

Two weeks later, contemporaneously with their responses to the SEC's request for leave to amend the complaint, Mr. Kozlowski and Mr. Nacchio filed the instant motions to dismiss the IRU claims due to the SEC's invocation of the State Secrets Privilege. Both motions assert essentially the same argument: (a) the SEC has framed the IRU issue as presenting the question of whether the IRU revenue should have been designated as "recurring" or "one-time"[2]; (b) some of Qwest's IRU transactions involved the sale of IRUs to intelligence agencies; and (c) if the details of these classified transactions could be disclosed, the Defendants would be able to show

---

[2]The Court understands that the Defendants dispute some or all of the assumptions underlying the SEC's "recurring"/"one-time" revenue distinction as it relates to IRU sales. For purposes of this motion, however, the Court treats the SEC's allegations as true.

that they believed that "future government demand for Qwest IRUs was . . . recurring and robust." *Docket* # 381 at 4.

The State Secrets Privilege is a common-law evidentiary privilege that permits the Government to bar the disclosure of information where there is a reasonable possibility that disclosure will expose sensitive national security interests. *Al-Haramain Islamic Foundation, Inc. v. Bush*, 507 F.3d 1190, 1196 (9th Cir. 2007). When the Court approves the invocation of the privilege – which the Court understands the Magistrate Judge to have done, at least provisionally, by the operation of the May 1, 2008 Order **(# 362)** – the Court must turn to the question of how the privilege affects the litigation. The effect of a successful invocation of the privilege is to render the protected evidence "unavailable" or "as though a witness had died". In such event, the Court must determine the consequences that flow from the "loss of" the evidence. *Id.* at 1204. Typically, the question presented at this stage is whether the plaintiff can prove the essential facts of its claims without resorting to the material shielded by the privilege. *Id.*; *see In re Sealed Case*, 494 F.3d 139, 145 (D.C. Cir. 2007) ("dismissal of the relevant portion of the suit would be proper only if the plaintiff was manifestly unable to make out a prima facie case without the requested information"). The same principles apply where the invocation of the privilege prevents defendants from obtaining "materials they would need to mount possible defenses." *Sealed Case*, 494 F.3d at 148.

Thus, where a defendant will be deprived of a valid defense based on the invocation of the privilege, the court may dismiss the affected claims against that defendant. *Id.* at 149. However, to warrant dismissal, the defense affected by the claim of privilege must be more than merely colorable; it must be "valid" in the sense that the privileged materials, if revealed, would

show that judgment for the defendant was appropriate, and that allowing the case to be tried without that information would likely cause the factfinder to reach an erroneous result.[3] *Sealed Case*, 494 F.3d at 149-151.

This Court's task is to ascertain whether the Defendants possess a meritorious defense to the claims asserted in the Second Amended Complaint – a defense that is compromised by the Government's invocation of the privilege. To do so, the Court first notes the nature of the IRU claims as narrowed by the SEC in the Second Amended Complaint. Rather than attacking the accounting related to the IRU transactions categorically, as prior iterations of the complaint did, the Second Amended Complaint specifically identifies a list of particular IRU transactions that the SEC contends were improperly booked and reported by Qwest.[4] Thus, the focus of the Second Amended Complaint is not on Qwest's treatment of IRU transactions generally, but on Qwest's actions with regard to particular, publicly-discloseable IRU transactions. There is no apparent reason why the loss of evidence relating to IRU transactions with intelligence agencies, transactions which the Second Amended Complaint does not challenge, compromises the

---

[3]The Defendants argue that the exacting "valid defense" standard of *In re Sealed Case* is anomalous, and that cases such as *El-Masri v. U.S.*, 479 F.3d 296, 306 (4th Cir. 2007) and *Tennenbaum v. Simonini*, 372 F.3d 776, 777 (6th Cir. 2004), permit dismissal of claims even when a meritorious defense has not been shown, but where the defendants "could not properly defend themselves without using privileged evidence." To the extent there is a genuine difference between the standards, *compare* 494 F.3d at 149 (harmonizing the "valid defense" standard with *El-Masri*), and the Defendants are correct that dismissal is appropriate when only the more lenient standard of *El-Masri* is satisfied, the result here would be the same. For the reasons discussed herein, the Court finds that the invocation of the privilege will not have any meaningful effect on the Defendants' ability to defend themselves against the claims as framed in the Second Amended Complaint.

[4]The Court assumes, and the Defendants have not argued otherwise, that all of the listed transactions fall outside the scope of the State Secrets Privilege.

Defendants' ability to defend the <u>particular</u> transactions listed in the Second Amended Complaint. The Defendants do not argue, for example, that the existence of the classified IRU transactions somehow compelled Qwest to account for the revenue from <u>non-classified</u> IRU sales differently than it otherwise would have, or that the nature of the classified transactions somehow modified the inherent nature of the non-classified transactions. Accordingly, there is no need for dismissal of the IRU claims as a result of the Government's invocation of the privilege.

The Defendants argue that the concealment of the classified IRU transactions in this case prevents them from showing that the "totality" of Qwest's business operations, thereby compromising their ability to challenge the SEC's showing that any misrepresentations or omissions relating to IRU sales were material. The SEC bears the burden of showing that the Defendants' misrepresentations or omissions were "material." *SEC v. C. Jones & Co.*, 312 F.Supp.2d 1375, 1379 (D. Colo. 2004). A misrepresentation or omission is "material" if "a reasonable investor would consider it important in determining whether to buy or sell stock." *Id.* Materiality is examined in the light of "the total mix of information available" to investors, and thus, assessment of the materiality of a particular piece of misrepresented or omitted information is considered with regard to "the totality of the company activity." *See generally City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1265 (10th Cir. 2001).

The Defendants' argument is without merit. Admittedly, the invocation of the privilege will prevent the Defendants from discussing, at least in specific detail[5], the nature of Qwest's

---

[5]As Mr. Nacchio's brief notes, some information relating to Qwest's contracts with intelligence agencies has been publicly disclosed in other proceedings or in unclassified materials submitted in this case. The Court expresses no opinion as to the extent to which such

actual and anticipated IRU sales to intelligence agencies, but this does not prevent the

Defendants from arguing that the specific transactions challenged by the SEC are immaterial in

light of the totality of Qwest's overall operations. For example, proof consistent with the

allegations in the Second Amended Complaint would establish that in 1999, Qwest reported

company-wide revenues of $ 3.9 billion. *Docket* # 432, ¶ 47(a). The SEC contends that $ 900

million of that sum was attributable to certain specific IRU transactions that the Defendants

misrepresented. *Id.* In determining whether such misrepresentations were material, the jury will

consider whether $ 900 million in falsely reported revenue is significant when viewed in the

light of the "totality" of Qwest's operations – namely, the $ 3 billion of revenue that the SEC

implicitly concedes was properly recognized.[6] The fact that IRU sales to intelligence agencies

may have made up some unspecified portion of the $ 3 billion in revenue is of no significance,

any more than evidence that uncashed rebate checks or lawsuit proceeds or other types of

unchallenged revenue make up a part of the $ 3 billion figure would be relevant. In this sense,

proving the "totality of the company activity" does not require (much less entitle) either party to

itemize every dollar derived from every particular corporate product, service, or activity. Rather,

---

unclassified material concerning Qwest's contacts with intelligence agencies could be admissible at trial.

[6]The Court does not expect the Defendants to argue at trial that the SEC's failure to challenge the manner in which revenue from classified IRU transactions was categorized operates as a concession that all non-classified IRU revenue categorized in the same manner must therefore be proper. To do so would allow the Defendants to turn the State Secrets Privilege from a shield to a sword, attacking the SEC for choosing to narrow the case so as to avoid treading on classified matters. As the court explained in *In re Sealed Case*, "neither party may rely upon the stricken evidence to its advantage." 494 F.3d at 148.

because the SEC has chosen not to challenge Qwest's recognition of classified IRU revenue as being

the "totality of the company activity" is simply the aggregate of all corporate activities that are not alleged to be improper. Thus, the Defendants need not broach the subject of the classified IRU transactions in arguing that the allegedly misleading accounting relating to the specified IRU transactions was immaterial in light of Qwest's overall revenue during the particular periods.

The Defendants argue that, to show that the challenged IRU transactions were properly accounted for, they must necessarily refer to the classified IRU transactions to show that "IRU revenue was recurring, predictable, and qualitatively the same as other revenue with which it was grouped." *Docket* # 400 at 7. They contend that they would confront the SEC's accounting experts with questions as to whether the experts "kn[e]w that Qwest had IRU contracts with the Government and anticipated many more" and whether the experts "consider[ed] the impact of the Government contracts" on the issue of whether IRU revenue should be separately accounted for. The Court finds these arguments unavailing. The Defendants are free to show that the IRU transactions challenged by the SEC were "recurring" or "predictable" by their own nature; it is entirely unclear how proof of the character of the classified transactions is probative in establishing the character of the unlcassified transactions actually challenged by the SEC. Similarly, the questions the Defendants anticipate asking expert witnesses may have been appropriate under the SEC's prior theory of the case, which categorically attacked Qwest's practices with regard to IRU revenue, but now that the SEC's theory is limited to showing that certain specific transactions were not properly accounted for, the proffered questions appear to be irrelevant. For purposes of trial, the question of materiality is informed by the juxtaposition of the revenues attributable to the specific transactions challenged by the SEC against all other

revenues earned by Qwest. Whether that latter category consists of revenue from classified IRU transactions or other sources is largely immaterial[7] to the question of whether the challenged transactions comprise a material portion of Qwest's business operations.

Accordingly, the Court finds that dismissal is not necessary to preserve the Defendants' right to a fair trial. The motions to dismiss on the grounds of the State Secrets Privilege are denied.

**B. Mr. Mohebbi's motion**

Mr. Mohebbi moves to dismiss **(# 447)** a portion of the SEC's third[8] claim for relief as alleged against him, arguing that these claims assert an uncognizable theory of aiding and abetting. Specifically, he argues: (i) these claims fail under Fed. R. Civ. P. 12(b)(6); (ii) the claims are not pled with particularity as required by Fed. R. Civ. P. 9(b); and (iii) that the claims are time barred.

---

[7]The Court does not intend this Order to reflect any binding evidentiary rulings for purposes of trial. Rather, the Court simply observes that careful presentation of unclassified evidence at trial, coupled with appropriate limiting instructions to the jury, will allow both parties a sufficient and fair opportunity to address the elements of the SEC's claims.

[8]Although Mr. Mohebbi's motion also makes reference to seeking dismissal of the sixth claim for relief against him, the Court is unable to harmonize the assertions and arguments in Mr. Mohebbi's motion with the sixth claim for relief as pled in the Second Amended Complaint. Accordingly, the Court assumes that Mr. Mohebbi's reference to seeking dismissal of the sixth claim for relief is in error or surplusage.

The third claim in the Second Amended Complaint alleges securities fraud in violation of 15 U.S.C. § 78j(b)[9] and 17 C.F.R. § 240.10b-5.[10] The Court understands the Second Amended Complaint to assert these claims both directly against Mr. Mohebbi[11], and, "alternatively," that Mr. Mohebbi "aided and abetted Qwest's violations by knowingly and substantially assisting those violations." [12] The Court reads Mr. Mohebbi's motion to only challenge the sufficiency of the SEC's alternative theory – that he aided and abetted the other Defendants in committing such violations.

To plead a claim against Mr. Mohebbi under an aiding and abetting theory, the SEC must allege facts which, if true, would establish that: (i) another person committed a primary violation of the relevant securities laws; (ii) Mr. Mohebbi provided substantial assistance to that person's commission of that violation; and (iii) Mr. Mohebbi did so with scienter, that is, with knowledge or recklessness as to whether he was aiding or abetting such a violation. *SEC v. Autocorp Equities, Inc.,* 292 F.Supp.2d 1310, 1331-32 (D. Utah 2003), *citing Graham v. SEC*, 222 F.3d 994, 1000 (D.C. Cir. 2000). Mr. Mohebbi contends that the Second Amended Complaint fails to

---

[9]"It shall be unawlful for any person, directly or indirectly, . . . to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."

[10]"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, to employ any device, scheme, or artifice to defraud; to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." (Internal structure omitted.)

[11]See *Docket* # 432 at ¶ 153.

[12]*Id.* at ¶ 155.

adequately allege the second element: that he provided substantial assistance to those engaging in the fraud.

The Second Amended Complaint alleges that, during the time period at issue, Mr. Mohebbi was Qwest's President and/or Chief Operating Officer.[13]    It states that Mr. Mohebbi directed the business unit that sold the IRUs, that he was aware of the magnitude of IRU transactions by Qwest and the non-recurring nature of the revenue gained by doing so, and that he was responsible for obtaining fiber optic capacity to be sold as IRUs[14].   It contends that Mr. Mohebbi knew that IRU sales were one-time or non-recurring sources of revenue and knew that investors would discount such revenues in favor of recurring ones,[15] and further, that he knew that Qwest was hiding and misrepresenting the nature of IRU revenue in order to meet its revenue targets.[16]   It states that, when Qwest's ability to meet its revenue projections was in jeopardy, officials at Qwest "relied on Mohebbi to fill the gap between current revenues and targets with one-time revenue from IRUs. It alleges that, despite his knowledge of the Defendants' scheme, Mr. Mohebbi "continued to substantially assist the fraud by providing the IRUs necessary to meet Qwest's targets."[17]

In addition, the Second Amended Complaint alleges that Mr. Mohebbi failed to advise Qwest's accountants of agreements Qwest had made to "port" (i.e. swap one IRU for another at a

---

[13]See *Docket* # 432, ¶ 3.

[14]*Id.*, ¶ 97.

[15]*Id.*, ¶ 46.

[16]*Id.*, ¶ 98.

[17]*Id.*, ¶ 104.

later date) IRU sales.[18]  It contends that Mr. Mohebbi knew that, if disclosed, the porting

agreements would prevent Qwest from being able to recognize the full amount of an IRU sale in

a given financial quarter, and thus, Mr. Mohebbi concealed the porting agreements from Qwest's

accountants to ensure that the IRU revenue could be improperly recognized earlier.  *Id.*  The

Second Amended Complaint also alleges that Mr. Mohebbi backdated IRU contracts so as to

allow Qwest to recognize the revenue from them in a prior financial quarter than when the

contracts were actually completed.[19]

    The Court assumes, for purposes of this Order, that the allegations in the Second

Amended Complaint are sufficient to state the third claim, sounding in securities fraud, against

the other Defendants (and further, to the extent that it purports to do so, that it states a direct

claim of securities fraud against Mr. Mohebbi).  The first argument by Mr. Mohebbi is that these

allegations are insufficient to show that he "substantially assisted" the other Defendants in

committing securities fraud.  He argues that, with regard to the "disclosure" claims,[20] the Second

Amended Complaint's only allegations of "substantial assistance" are references to Mr. Mohebbi

engaging in his ordinary, lawful business activities: obtaining fiber optic capacity for Qwest to

sell as IRUs.

---

[18]*Id.*, ¶ 117-19.

[19]*Id.*, ¶ 123.

[20]Mr. Mohebbi views the allegations in the Second Amended Complaint as being
divisible into two separate categories: "disclosure" fraud, in which Defendants allegedly
concealed the non-recurring nature of IRU revenue from investors; and "accounting" fraud, in
which Defendants alleged concealed or misrepresented facts to Qwest's accountants, thereby
allowing Qwest to book revenue at times or in manners it would not otherwise be permitted to
do.  The Court need not necessarily adopt that dichotomy for purposes of analyzing this issue.
For the reasons stated herein, the Court finds sufficient allegations arising solely under the
"disclosure fraud" paradigm to support the aiding and abetting claim.

Mr. Mohebbi contends that a person's conducting of normal, lawful business activities cannot give rise to aiding and abetting liability. *Citing Seattle-First Nat. Bank v. Carlstedt*, 800 F.2d 1008, 1011 n. 2 (10th Cir. 1986) (aiding and abetting claim would not be stated by "bare allegations seeking to impose liability on [lender] merely because, in the course of normal banking functions, [it] lent money to the defendants" who were engaging in securities fraud). The SEC, on the other hand, argues that even a party who acts in good faith can be found liable for aiding and abetting securities fraud. *Citing S.E.C. v. Fehn*, 97 F.3d 1276, 1294 (9th Cir. 1996).

The Court finds that both parties' positions are incomplete. The SEC misreads *Fehn*, in which the court affirmed a finding that an attorney aided and abetted his client's fraud, finding that the attorney's actions were <u>not</u> done in good faith.[21] *Id.* ("We reject Fehn's argument because we find that his efforts were not "reasonable" in light of the well-established disclosure requirements"). Mr. Mohebbi, on the other hand, ascribes too much significance to an item of dicta in *Seattle-First*. Certainly, aiding and abetting liability does not lie "merely because" a party performs some normal business act that allows another person to commit securities fraud; obviously, the alleged abettor's knowledge and intent are critical factors as well.

This Court finds the discussion in *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 96 (5th Cir. 1975), a case on which the 10th Circuit relied in *Seattle-First*, to be persuasive. *Woodward* couples the "knowledge" and "substantial assistance" elements of the aiding and abetting test in an inverse relationship, such that the more acute a party's knowledge of the

---

[21]Indeed, in the previous sentence, the court cites *In Re Carter & Johnson*, 1981 Fed. Sec. L. Rptr. (CCH) ¶ 82,847 (Feb. 28, 1981), for essentially the proposition that actions done in good faith could be sufficient to avoid aiding and abetting liability. 97 F.3d at 1294.

ongoing fraudulent scheme, the less substantial the acts constituting substantial assistance need be, and *vice-versa*. 522 F.2d at 97 ("the degree of knowledge required should depend on how ordinary the assisting activity is in the business involved. If the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find 10b-5 liability without clear proof of intent to violate the securities laws. Conversely, if the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability"). This test springs from a compelling logic: one who goes about their ordinary business activities largely ignorant that those activities are furthering a fraud should not be subjected to liability. But where an actor knows that his everyday business activities are assisting others to perpetrate a fraud, it is not difficult to infer the actor's complicity in the fraud by him continuing to perform those actions mindful of the consequences of doing so. Without necessarily adopting the analogy wholesale, this rule harmonizes with the SEC's metaphor of the driver who may be acting perfectly lawfully in transporting a friend, but becomes an aider and abettor when he knows that the friend has just robbed a bank and is attempting a getaway. In short, this Court agrees with *Woodward* in that what constitutes "substantial assistance" necessarily turns in part on the knowledge of the actor.

In this regard, the Second Amended Complaint adequately alleges Mr. Mohebbi's full knowledge of the scheme to fraudulently characterize Qwest's IRU sales.[22] In such circumstances, the SEC's burden of showing that Mr. Mohebbi "substantially assisted" that scheme is quite low, and the Second Amended Complaint adequately overcomes that burden. It alleges that Mr. Mohebbi "frequently complained about having to fill Qwest's revenue gaps with

---

[22] *Docket # 432, ¶ 46, 98.*

IRU sales," and, that on at least one occasion, he despaired that "we can't mortgage our future every damn quarter by selling stupid IRUs."[23]  On one occasion, Mr. Mohebbi recognized that "[b]usiness is in bad shape" and that Qwest would "need a ton of one-time items to make the quarter."[24]  One could reasonably infer from these allegations that Mr. Mohebbi overcame any reluctance or objections he may have had to the Defendants' fraudulent practice and expended additional effort to further the scheme by obtaining the "ton of one-time items" necessary to permit the Defendants misrepresentations to continue.[25]  The fact that this behavior, had it been accompanied by a different state of mind, might be entirely legal (or even laudable) is irrelevant; even where the challenged conduct reflects merely "the daily grist of the mill," aiding and abetting liability can still attach with "clear proof of intent to violate the securities laws." *Woodward*, 522 F.2d at 97.  The allegations in the Second Amended Complaint are sufficient to arise to this level of "clear proof of intent," rendering Mr. Mohebbi's regular business activities "substantial assistance" to the scheme.

The Court summarily rejects Mr. Mohebbi's remaining arguments.  Although allegations of fraud must be pleaded with particularity under Fed. R. Civ. P. 9(b), the rule is directed only at the averments of the fraudulent statement itself and does not require particularized pleadings as to other issues, such as the intent, knowledge, or state of mind of the person making a fraudulent

---

[23]*Id.*, ¶ 99, 102.

[24]*Id.*, ¶ 102, 103.

[25]This finding is also sufficient to dispose of Mr. Mohebbi's argument that the Second Amended Complaint fails to allege facts showing that his assistance was a proximate cause allowing the scheme to proceed.  Mr. Mohebbi's efforts to obtain sufficient IRUs to meet each quarter's revenue targets provided the other Defendants with the very *res* – IRU revenue – upon which the scheme depended.

statement.  *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997).

Because the aiding and abetting claim does not accuse Mr. Mohebbi of making any false

statements, Rule 9(b) does not require those allegations to be particularized.   In any event, the

Court finds that the allegations are sufficiently specific as to the extent to which Mr. Mohebbi

assisted the scheme to grant him "fair notice" of the grounds upon which the aiding and abetting

claim is based.  *Koch v. Koch Industries, Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000).

The Court also rejects Mr. Mohebbi's statute of limitations argument.  No statute of

limitations constrains the SEC's general ability to bring a civil enforcement action. The only

statutory limitation, 28 U.S.C. § 2462, supplies a five-year statute of limitations only for actions

that seek particular remedies - a "civil fine, penalty, or forfeiture."  *U.S. v. Telluride Co.*, 146

F.3d 1241, 1244 (10th Cir. 1998).  The SEC seeks a variety of remedies in this action, including a

prospective injunction against further violations, disgorgement, statutory penalties, and an

injunction against further service as an officer or director of a public company.[26].  Although

some of the requested remedies fall within § 2462, others do not.  With regard to injunctive

relief, for example, the 10th Circuit has observed that "actions for equitable relief are not

typically actions for penalties or fines."  *Telluride Co.*, 146 F.3d at 1245.  Similarly, an action for

disgorgement falls outside § 2462.  *S.E.C. v. Calvo*, 378 F.3d 1211, 1218 (11th Cir. 2004).

Because the relief requested is not limited to the remedies specified in 28 U.S.C. § 2462,

the aiding and abetting claim against Mr. Mohebbi is not subject to dismissal based on such

statute of limitation.  Whether and to what extent the SEC can obtain punitive relief should it

---

[26]*Docket* # 432, Prayer for Relief.

prevail on the aiding and abetting claim against Mr. Mohebbi is an issue that can await further developments in this case, and upon which the Court makes no findings at this time.

Accordingly, Mr. Mohebbi's motion is denied.

### C. Mr. Kozlowski's objections

Mr. Kozlowski lodges Objections **(# 510)** to the December 9, 2008 Order **(# 509)** of Magistrate Judge Shaffer granting the SEC's Motion to Quash **(# 482)** a Fed. R. Civ. P. 30(b)(6) deposition notice issued on the SEC.

The record reflects that on September 17, 2008, Mr. Kozlowski served a Notice of Rule 30(b)(6) deposition upon the SEC, indicating his intention to take a deposition of an SEC representative with regard to the various "allegations against Mr. Kozlowski" in the Second Amended Complaint. The SEC sought to quash that notice, claiming that: (i) the information being sought was duplicative of information previously provided by the SEC in response to Mr. Kozlowski's interrogatories; (ii) Mr. Kozlowski had already taken a Rule 30(b)(6) deposition of an SEC representative, thus requiring him to obtain leave to take a second deposition of a party; (iii) the notice was insufficiently specific as to the topics to be addressed (and thus, failed to give an indication of which representative would be most knowledgeable on the subjects); and (iv) the nature of the topics identified indicated that the proposed deposition would intrude on matters protected by the SEC's attorney's work product privilege.

The Magistrate Judge orally granted the SEC's motion on December 9, 2008. That oral ruling spans more than 10 pages of text, but summarized, the Magistrate Judge found: (i) the

Notice "does . . . intrude on the Work Product Doctrine" by asking for mental impressions of the SEC and its counsel; (ii) although the Defendants have "a right to obtain the information necessary to prepare this case for trial[,] I am not necessarily convinced that a 30(b)(6) deposition is the most efficient, cost effective way to do it"; (iii) the Notice "was overbroad, unduly burdensome and an inefficient means through which to obtain otherwise discoverable information"; (iv) the SEC had provided "quite comprehensive" and "directly responsive" answers to Mr. Kozlowski's interrogatories; and (v) a Rule 30(b)(6) deposition would be inefficient in that it would "require one or more individuals of the SEC to spend large amounts of time educating themselves on a wide range of subjects."[27]

Mr. Kozlowski objects to the Magistrate Judge's ruling, arguing: (i) Rule 30(b)(6) expressly permits depositions to be taken of government agencies; (ii) he did not seek to obtain discovery of attorney work product, but only of facts alleged by the SEC; and (iii) caselaw in other jurisdictions refutes the proposition that "the SEC is immune from deposition under Rule 30(b)(6)."

Rulings on non-dispositive issues by a Magistrate Judge are reviewed by this Court pursuant to Fed. R. Civ. P. 72(a), and will be reversed only if they are "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); *Hutchinson v. Pfeil*, 105 F.3d 562, 566 (10th Cir. 1997); *Ariza v. U.S. West Communications, Inc.*, 167 F.R.D. 131, 133 (D. Colo. 1996). Accordingly, Mr. Kozlowski's Objections will be overruled unless the Court finds that the Magistrate Judge abused his discretion or, if after viewing the record as a whole, the Court is left

---

[27]*Docket* # 514 at 73-84.

with a "definite and firm conviction that a mistake has been made." *Ariza,* 167 F.R.D. at 133, *citing Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1464 (10th Cir.1988).

Most of Mr. Kozlowski's Objections attack a "finding" that the Magistrate Judge never made – that the SEC is "immune" from a Rule 30(b)(6) deposition. Nothing in the Magistrate Judge's ruling indicates that he quashed the Notice of Deposition on the grounds that he believed that the SEC could not be required to undergo such a deposition. Rather, it is clear that the Magistrate Judge's decision was predicated on two other findings: (i) that the proposed deposition was "inefficient" based on Mr. Kozlowski's identification of the issues to be addressed; and (ii) the matters to be addressed appeared to significantly intrude on the SEC's attorney work product privilege.[28] Mr. Kozlowski's arguments directed at findings actually made by the Magistrate Judge are found only in pages 8-12 of his Objections, and the Court thus addresses only those particular arguments.

First, Mr. Kozlowski argues that "the work product doctrine does not prevent the disclosure of facts . . . obtained [by an attorney] from independent sources." *Citing EEOC v. Caesars Entertainment, Inc.*, 237 F.R.D. 428, 433 (D. Nev. 2006). However, the Magistrate Judge found that Mr. Kozlowski sought more than just facts. He characterized Mr. Kozlowski's deposition notice as "essentially [seeking] to discover how the [SEC] intends to marshal the facts, documents, and statements in its possession and to discover the inferences that the [SEC] believes properly can be drawn from the evidence it's accumulated."[29] Mr. Kozlowski's

_____

[28]*Docket # 514 at 82.*

[29]*Docket # 514 at 81, quoting EEOC v. American International Group, Inc.*, 1994 WL 376052 (S.D.N.Y. 1994).

Objections do not offer any specific argument that this characterization of his Rule 30(b)(6) notice is clearly erroneous.

In any event, this Court would agree with the Magistrate Judge. Mr. Kozlowski's deposition notice did not specifically state that the inquiry would be limited to requesting "facts"; rather, it demanded an SEC representative be prepared to testify as to "[a]llegations against Mr. Kozlowski regarding" various matters.[30]

An "allegation" is not necessarily the same thing as a "fact." An allegation is "a party's formal statement of a factual matter as being true or provable, without having yet been proved." *Black's Law Dictionary*, 7th Ed. at 74. To convert an "allegation" into a proven fact, a party necessarily "marshals the facts . . . in its possession" or draws inferences from the evidence. As the Magistrate Judge correctly noted, when inquiring as to how the SEC assembled the <u>facts</u> it had obtained in its investigation into the set of <u>allegations</u> set forth in the Second Amended Complaint, Mr. Kozlowski would almost certainly cross into territory protected by the work product privilege. Thus, the Court cannot say that the Magistrate Judge's interpretation of Mr. Kozlowski's deposition notice as intruding upon the SEC's attorney work product privilege was clearly erroneous or contrary to law.

Next, Mr. Kozlowski argues that the SEC "can[not] . . . avoid a Rule 30(b)(6) deposition by contending that only an SEC lawyer . . . is able to testify about the topics." Once again, this argument misconstrues the Magistrate Judge's findings. Nowhere does the Magistrate Judge find that, because only the SEC's counsel could fully respond to the various areas of inquiry, the notice of deposition should be quashed. Rather, the Magistrate Judge expressed skepticism that

---

[30]*Docket* # 493, Ex. 3.

even attorney representatives of the SEC representative could effectively represent the agency in responding to the notice:

> . . . given the peculiar and unique elements of this case[,] to require the SEC to marshal facts would literally require some person in the SEC to spend untold weeks if not months learning this case. That's inefficient in the extreme.  And the only way to avoid that problem is to effectively depose SEC counsel, and I'm not even sure she would have all the facts immediately at her fingertips, so it almost becomes a quiz.  Can you recite by rote all of the facts in excruciating detail for the allegations in paragraph 132 or 147 or whatever number[?] That really is an inefficient way to conduct discovery.[31]

 Because there is no indication that the Magistrate Judge quashed the notice because a lawyer, rather than a layperson, was the only responsive representative,[32] Mr. Kozlowski's Objections on this ground are without merit.

Finally, Mr. Kozlowski makes a brief argument that the Magistrate Judge's ruling is contrary to 10th Circuit law that condemns "blanket objections on privilege grounds."  *Citing In re Grand Jury Subpoena*, 697 F.2d 277, 279 n.1 (10th Cir. 1983); *EEOC v. Albertsons, LLC.*, 2007 WL 1299194 (D. Colo. May 1, 2007) (unpublished).  Indeed, the Magistrate Judge expressly acknowledged his understanding of and agreement with that principle: "I agree with

---

[31]*Docket* # 514 at 83-84.

[32]In his Objections, Mr. Kozlowski makes a brief assertion, without supporting citation, that "SEC accountants were very much involved in all aspects of the SEC investigation . . . [and] already are very familiar with this case."  *Docket* # 510 at 10.  The Court finds this brief comment too insufficiently developed to constitute a specific objection to the Magistrate Judge's finding that <u>any</u> SEC representative would have to undertake extensive study before being capable of responding to the issues raised in the deposition notice.  In any event, because he has not identified evidence supporting the conclusory assertion that some SEC accountant could address the issues in the deposition notice without the need for extensive preparation, Mr. Kozlowski has not carried his burden of demonstrating that the Magistrate Judge's finding on this issue is clearly erroneous.

you, and as I said [in a previous hearing] you cannot invoke the privilege on a blanket basis."[33] However, the Court does not understand the SEC to have raised nor the Magistrate Judge to have adopted a "blanket objection on privilege grounds."  The Magistrate Judge's explanation of his ruling makes clear that he was not specifically making a finding that any particular information was privileged.  Rather, he expressed concern that the generalized nature of the issues listed in Mr. Kozlowski's notice indicated that, rather than being able to ask "plenty of questions . . . which would not intrude on a privilege," Mr. Kozlowski was requesting that the SEC "lay out [their] case chapter and verse," and thus, the questions he inteded to ask would constantly be intruding upon the work product privilege.  *Id.* at 74; *c.f. Albertson's* at * 2 ("The EEOC is free during the deposition to assert objections to specific questions, if necessary, to preserve a privilege").

Reduced to its essence, the Magistrate Judge's ruling was that Mr. Kozlowski's proposed deposition would be unduly burdensome on the SEC, both because it would require extensive preparation by the SEC's representative and because it was apparent to the Magistrate Judge that most of the areas of inquiry by Mr. Kozlowski would repeatedly tread upon arguably privileged grounds.[34]  Because the Magistrate Judge based his ruling primarily on a finding of undue burden, rather than a specific finding that material was categorically privileged, this Court cannot find that the Magistrate Judge endorsed a "blanket assertion of privilege" by the SEC.

---

[33]*Docket* # 514 at 73-74.

[34]*See id.* at 73 ("I can guarantee you that if this deposition goes forward, I can guarantee you that I will get a call from one lawyer or the other after every question. That is not an efficient use of your time and it's certainly not an efficient use of the court's time").

Rather, the Court finds that the Magistrate Judge was properly acting within his discretion to protect the parties from "undue burden or expense" under Fed. R. Civ. P. 26(c).

Accordingly, the Court overrules all of Mr. Kozlowski's Objections and affirms the Magistrate Judge's December 9, 2008 Order granting the SEC's Motion to Quash.[35]

## **CONCLUSION**

For the foregoing reasons, Mr. Woodruff's Motion to Dismiss Certain Claims Due to the Governments' Invocation of State Secrets **(# 369)** is **DENIED**.  Mr. Nacchio's Motion to Dismiss Certain Claims Based obn the Government's Invocation of State Secrets **(# 379)** is **DENIED**.  Mr. Mohebbi's Motion to Dismiss From the Second Amended Complaint a New and Uncognizable Claim for Relief **(# 447)** is **DENIED**.   Defendant Kozlowski's Objections **(# 510)**

---

[35]The prayer for relief in Mr. Kozlowski's Objections raises, for the first time, a request for alternative relief: that the Court "set aside the order of Magistrate Judge Shaffer denying Mr. Kozlowski's motion for protective order [**(# 438)**], and order that since Mr. Kozlowski cannot take a Rule 30(b)(6) deposition of the Commission . . . the SEC is precluded from taking a deposition of Mr. Kozlowski in this case."  The Court finds this alternative request to be insufficiently addressed to permit meaningful review, and thus denies it.  Moreover, the Court finds that Mr. Kozlowski has offered no persuasive argument that the Court should require (or constrain) parties to engage in precise mirror images of the discovery tools used by their opponent.  The Magistrate Judge found that Mr. Kozlowski could adequately discover the basis for the SEC's allegations by means of interrogatories, and the Court sees no grounds to upset that finding.

are **OVERRULED**, and the Magistrate Judge's December 9, 2008 Order **(# 509)** granting the

SEC's Motion to Quash **(# 482)** and denying Mr. Kozlowski's Motion for Protective Order

**(#483)** is **AFFIRMED**.

Dated this 12th day of March, 2009

**BY THE COURT:**

_Marcia S. Krieger_

Marcia S. Krieger
United States District Judge