IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 05-cv-00480-MSK-CBS

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.

JOSEPH P. NACCHIO,
ROBERT S. WOODRUFF,
AFSHIN MOHEBBI,
JAMES J. KOZLOWSKI, and
FRANK T. NOYES,

     Defendants.

---

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT AND SETTING HEARING

---

     **THIS MATTER** comes before the Court pursuant to Mr. Kozlowski's Fed. R. Civ. P.

72(a) Objection (**# 586,** as supplemented **# 601**) to the February 3, 2009 ruling (**# 585**) of the

Magistrate Judge regarding the scope of questionning at the deposition of Lee Wolfe,[1] Intervenor

United States Intelligence Community's response (**# 595**), the SEC's response (**# 600**), and Mr.

Kozlowski's reply (**# 591**); Mr. Kozlowski's Rule 72(a) Objection (**# 598**) to the January 29,

2009 Order (**# 571**) of the Magistrate Judge denying Mr. Kozlowski's Motion to Compel (**# 571**)

---

[1]Mr. Woodruff filed a "Joinder" (**# 596**) in Mr. Kozlowski's Objection. As noted in a prior Order (**# 604**) issued shortly after Mr. Woodruff's filing, a "joinder" is not a recognized procedural vehicle for obtaining relief. As the Court did previously, it treats Mr. Woodruff's joinder as a Rule 72(a) Objection by Mr. Woodruff that is identical in all respects to that asserted by Mr. Kozlowski, and overrules it for the same reasons discussed herein.

a Fed. R. Civ. P. 30(b)(6) deposition, the SEC's response (**# 603**), and Mr. Kozlowski's reply (**#608**); Mr. Kozlowski's Motion for Reconsideration[2] (**# 617**) of this Court's March 12, 2009 Order Denying Motions to Dismiss (**# 604**), the SEC's response (**# 623**), and Mr. Kozlowski's reply (**# 626**); Mr. Kozlowski's Motion for Summary Judgment (**# 638**), the SEC's response (**# 667**), and Mr. Kozlowski's reply (**# 680**); the SEC's Motion for Summary Judgment (**# 642**) as to Mr. Nacchio, Mr. Nacchio's response (**# 685**), and the SEC's reply (**# 687**); Mr. Nacchio's Motion for Summary Judgment (**# 643**), the SEC's response (**# 684**), and Mr. Nacchio's reply (**#721**); Mr. Noyes' Motion for Summary Judgment (**# 644**), the SEC's response (**# 668**), and Mr. Noyes' reply (**# 682**); Mr. Woodruff's Motion for Summary Judgment (**# 645**), the SEC's response (**# 677**), and Mr. Woodruff's reply (**# 689**); Mr. Mohebbi's Motion for Summary Judgment (**# 646**), the SEC's response (**# 669**), and Mr. Mohebbi's reply (**# 683**).[3]

----

[2]This motion is effectively superseded by Mr. Kozlowski's summary judgment motion. To the extent the SEC has adequate evidence to support a claim against Mr. Kozlowski but has failed to sufficiently allege that claim in the Second Amended Complaint, the Court would grant the SEC leave to amend that claim to conform to the evidence.

[3]Also pending on the Court's docket are joint motions by the parties seeking pretrial determination of the admissibility of certain expert testimony pursuant to Fed. R. Evid. 702 (**#639, 650**). The Court has begun holding a series of hearings on the evidentiary matters in these motions, and thus, the motion is granted insofar as a process for making the requested determinations is underway. For statistical purposes, these motions may be terminated.

# I. FACTS[4]

This securities fraud case involves allegations by the Securities and Exchange Commission ("SEC") that the Defendants, officers and employees of Qwest Communications International, Inc. ("Qwest"), engaged in a scheme to conceal from shareholders the true nature and source of the company's revenues between April 1999 and March 2002. That alleged concealment took several forms.

## A. Internal Accounting for IRU revenue

Qwest both provides telecommunications services to customers and also owns an extensive fiber-optic telecommunications network. It leases space on the fiber optic network to other users through selling contracts called "indefeasible rights of use" or "IRUs." Although IRUs are leases of specific fiber capacity, typically for periods of 20-25 years, it is undisputed that, when certain conditions are met, IRUs may be given accounting treatment similar to a sale transaction – *i.e.* that the full revenue from the IRU can be recognized "upfront," as a lump sum, rather than incrementally over the life of the lease.

The SEC alleges that, during the period at issue, Qwest entered into certain IRU sales that, for a variety of reasons, prevented those sales from being properly accounted for as sales-type transactions in Qwest's internal books. For example, the SEC alleges that Mr. Mohebbi

---

[4] The factual statements set forth in this Opinion and Order reflect a combination of facts which are undisputed and, where disputed, facts construed in the light most favorable to the overall non-movant, the SEC. Except to the extent the Court makes factual findings that result in summary judgment being granted to a Defendant with regard to a claim or part thereof, the Court does not intend this Order to deem any facts established for purposes of trial. Given the extensive briefing of these motions, the oral argument discussed herein will be limited to the specific issues remaining in this action, as discussed at the conclusion of the analysis.

entered into side agreements allowing buyers to unilaterally port,[5] groom,[6] or upgrade[7] the IRUs – agreements which required the IRU revenue to be accounted for on a periodic basis, rather than upfront – and that Defendants Kozlowski and Noyes nevertheless permitted Qwest to improperly account for that revenue upfront in its books. Moreover, the SEC alleges that Qwest allowed certain IRU contracts to be backdated, thus allowing revenue from that sale to be accounted for in Qwest's books in an earlier financial quarter.

### B. Public Reporting of IRU and equipment sale revenue

The SEC's primary focus in this action is on Qwest's public reporting of its IRU revenues. Up through 1998, Qwest reported revenues in two major business categories: "construction services" and "communications services." IRU sales were reported in the former category, while traditional telecommunications services were reported as the latter. As discussed in more detail herein, the Court understands that the core of the SEC's theory is that these two

---

[5]An IRU is "ported" when one of its endpoints is modified during the term of the lease. For example, a buyer may purchase an IRU between New York and Los Angeles, but later decide that changing to a circuit that ends in San Francisco is more advantageous. The SEC argues that because a ported IRU is not the same asset as the one Qwest originally sold, upfront recognition of an IRU subject to porting is inappropriate.

[6]An IRU is "groomed" when its routing between endpoints is changed. For example, an IRU that normally runs from New York, through Chicago, and on to Los Angeles may be re-routed to run through Dallas instead of Chicago. It appears that network operators frequently groom circuits on a temporary basis to route around malfunctioning locations or when unusually heavy network traffic warrants. The Court does not understand the SEC to contend that temporary grooming performed by Qwest of its own initiative presents any concern here. However, it contends that when the buyer of an IRU has the ability to unilaterally demand that its circuit be permanently re-routed, the change in the nature of that asset is one that would prevent revenue from that sale from being booked upfront.

[7]An upgradeable IRU is one in which Qwest agrees, at the time of the sale, to buy back the IRU should the customer later decide to purchase a similar route with greater capacity. It is undisputed that it is improper to recognize revenue upfront from an upgradeable IRU.

types of revenue are qualitatively different. Investors, the SEC contends, value "recurring" sources of revenue – *i.e.* that coming from services for which customers reliably make monthly payments – over "non-recurring" sources of revenue – *i.e.* one-time sales of products that cannot be expected to repeat or continue in the future.

Beginning in 1999, Qwest phased out its construction services business segment and began reporting its IRU revenue as part of the "communications services" category. That change was not accompanied by any announcement informing investors of the change, nor otherwise disclosing that the "communications services" category was showing large revenue gains due, in part, to the inclusion of a new type of revenue that had not previously been reported in that category. Nor did Qwest inform investors of the magnitude to which IRU sales contributed to gains each quarter in the communications services sector, even though IRU sales sometimes accounted for nearly a third of Qwest's quarterly revenues. Indeed, during conference calls with analysts and investors each financial quarter, Mr. Nacchio touted growth in various product segments, but never mentioned the significant role that IRU sales were playing in Qwest's finances. Thus, the SEC contends that the failure to disclose the shift of IRU revenues from "construction services" to "communications services," and the failure of Qwest to advise investors of the degree to which IRU sales contributed to Qwest's bottom line, constitute securities fraud by way of omission.

Similarly, Qwest periodically sold items of equipment to buyers. Although the SEC does not dispute that Qwest properly recognized this revenue as of the date of the sale, it contends that, as with the IRUs, Qwest reported equipment sale revenue as an undisclosed component of the "communications services" category of revenues. As with IRUs, the SEC contends that

Qwest's failure to advise investors that equipment sale revenue was being lumped in with monthly services revenue, and Qwest's failure to advise investors of the extent to which equipment sales revenue was driving Qwest's reported growth, constituted acts of securities fraud.

### C.  Dex  revenue

In late 2000, faced with the possibility that other underperforming business sectors would not allow Qwest to meet its ambitious growth targets, Mr. Nacchio and Mr. Woodruff arranged to have Qwest's Dex unit – a publisher of telephone directories and a source of associated advertising revenue – accelerate the publication of the 2001 Colorado Springs directory. Directories were normally published – and their associated revenues recognized – in January of each year.  The acceleration of the publishing schedule allowed Qwest to include revenue attributable to the 2001 directories as part of 2000's financial statements.  (The acceleration of the 2001 publishing also meant that no advertising revenue from the Colorado Springs directory would be realized in 2001.)  The Defendants did not disclose this change in the Dex publishing schedule nor otherwise advise investors that the 2000 financial statements included revenue that would not be available for 2001.

### D.  Insider trading

Finally, the SEC alleges that Mr. Nacchio and Mr. Woodruff also engaged in a form of securities fraud by making significant sales of Qwest stock on the basis of adverse, non-public information – namely, that Qwest was relying heavily on IRU revenues, rather than traditional telecommunications revenues, to meet its earnings projections.

The Second Amended Complaint asserts the following claims: (i) securities fraud in

violation of section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1), against each Defendant, in that each Defendant engaged in a scheme or artifice to defraud in connection with the sale of Qwest securities; (ii) securities fraud in violation of section 17(a)(2) and (a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(2), (3), against each Defendant, in that each Defendant made false representations or omissions in order to deceive Qwest investors; (iii) securities fraud in violation of section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, against each Defendant, or, in the alterative, that Qwest violated the Exchange Act and Defendant Mohebbi aided and abetted that violation; (iv) falsification of books and records in violation of section 13(b)(5) and Rule 13b2-1 of the Exchange Act, 15 U.S.C. § 78m(b)(5) and 17 C.F.R.§ 240.13b2-1, against all Defendants, in that they circumvented or failed to implement internal accounting controls or falsified Qwest's books; (v) deceit of auditors in violation of Rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2, against Defendants Nacchio, Woodruff, and Mohebbi; (vi) aiding and abetting false SEC filings in violation of section 13(a) and various rules of the Exchange Act, 15 U.S.C. § 78m(a), against all defendants; and (vii) aiding and abetting the keeping of false books and records in violation of section 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2), against all Defendants.

## II. PROCEDURAL CONTEXT

Each of the Defendants moves for summary judgment on all claims against them, as discussed in greater detail below. *Docket* **# 638** (Mr. Kozlowski), **# 643** (Mr. Nacchio), **# 644** (Mr. Noyes), **# 645** (Mr. Woodruff), and **# 646** (Mr. Mohebbi).  In addition, the SEC moves **(#642)** for summary judgment against Mr. Nacchio on Claim 3, arising under section 10(b) and Rule 10b-5 under the Exchange Act, based on Mr. Nacchio's cirminal conviction for insider

trading.  Separately, Mr. Kozlowski raises two matters **(# 586, 598)** relating to discovery and requests reconsideration **(# 617)** of a prior Order by the Court.

As discussed herein, the Court finds that the SEC's claims relating to public reporting of IRU and equipment sales revenues are somewhat unclear and require clarification.  This also affects, to some extent, the ability of the Court to address the insider trading claims against Mr. Nacchio and Mr. Woodruff, as those claims turn, in part, on the degree to which Mr. Nacchio and Mr. Woodruff were obligated to disclose the alleged insider information they had.  In addition, the contours of the claim regarding the Defendants' duties to disclose facts about the composition of Qwest's "communications services" revenue also inform the other causes of action against each Defendant.  However, the Court is fully apprised of the parties' positions regarding the claims to the extent they involve the internal accounting of certain IRU transactions and the acceleration of the Dex publishing schedule.  This Order addresses those claims with specificity.  In addition, the Court is fully apprised of Mr. Kozlowski's discovery motions and turns to those matters first.

### III. ANALYSIS

#### A.  Mr. Kozlowski's discovery matters

Mr. Kozlowski objects to a February 3, 2009 Minute Order **(# 585)** issued by the Magistrate Judge concerning the scope of questioning Mr. Kozlowski sought to pose at a deposition of Lee Wolfe.  Mr. Kozlowski contends that the Magistrate Judge erred in his determination that the line of questioning[8] Mr. Kozlowski wished to engage in would violate a

---

[8]Mr. Kozlowski does not provide the Court with a transcription of the proceedings before the Magistrate Judge, under seal or otherwise, and thus, the precise questions he proffered and the precise nature of the Magistrate Judge's ruling is unknown.  The Court's analysis is thus

previously issued Protective Order (**# 356**, incorporating **# 328**) and that the information sought was irrelevant.

Pursuant to Fed. R. Civ. P. 72(a), the Court will reverse a Magistrate Judge's Order only if it is clearly erroneous or contrary to law. Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A); *Hutchinson v. Pfeil*, 105 F.3d 562, 566 (10th Cir. 1997); *Ariza v. U.S. West Communications, Inc.*, 167 F.R.D. 131, 133 (D. Colo. 1996). Accordingly, objections will be overruled unless the Court finds that the Magistrate Judge abused his discretion or, if after viewing the record as a whole, the Court is left with a "definite and firm conviction that a mistake has been made." *Ariza,* 167 F.R.D. at 133, *citing Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1464 (10th Cir.1988).

The crux of Mr. Kozlowski's proposed inquiry to Mr. Wolfe concerns reasons why Mr. Wolfe and others at Qwest elected to remove certain proposed language regarding IRU transactions from Qwest's 1999 financial statements.[9] According to Mr. Kozlowski's proffer (**#554**) of how he believes Mr. Wolfe might testify, the reason for removing the language

_____

limited to that which can be logically inferred from Mr. Kozlowski's current filing and the previous briefing on this issue that he expressly incorporates by reference in the briefing of his Rule 72(a) Objection.

[9]In conjunction with Qwest beginning to report IRU revenue as part of communications services, Mr. Kozlowski and others proposed three potential disclaimers (of minimal, moderate, and maximum specificity) to be included in Qwest's 1999 year-end 10-K filing with the SEC. The disclaimers would have explicitly advised investors that IRUs comprised a portion of Qwest's reported revenue. Initially, Qwest executives appeared to favor including the minimally-specific disclaimer language, but just before the 10-K was finally approved, Mr. Wolfe and Mr. Woodruff decided that no disclaimer language should be included, and the proposed language was removed.

concerns IRU transactions that are no longer at issue in this case.[10]  Thus, the line of inquiry is

currently  irrelevant.[11]

Having reviewed the record that is before the Court, the Court cannot say that the

Magistrate Judge's decision to limit Mr. Kozlowski's examination of Mr. Wolfe – to the extent

the contours of that ruling are discernable on the instant record – was clearly erroneous or

contrary to law.  Thus,  Mr. Kozlowski's Objections are overruled and the Magistrate Judge's

ruling is affirmed.

Mr. Kozlowski also raises Rule 72(a) Objections **(# 598)** to a ruling by the Magistrate

Judge **(# 571)** denying Mr. Kozlowski's Motion to Compel **(# 396)** answers from an SEC

representative in a Fed. R. Civ. P. 30(b)(6) deposition to questions which the SEC had objected

to on the grounds of the deliberative process privilege.  Specifically, Mr. Kozlowski sought to

question SEC representatives concerning: (i) discussions between deponents and persons from

---

[10]The Court understands that Mr. Wolfe would testify that his reasons for removing the
disclaimer related to anticipated IRU transactions with the Government that the United States
Intelligence Community contends are now subject to the State Secret Privilege.  In reframing the
Second Amended Complaint to address this issue, the SEC abandoned any claims that relate to
the IRU sales to the Government.

[11]Admittedly, Mr. Kozlowski is correct that the reasons why that language – to the extent
it related to the IRUs at issue here – was removed from the financial statements would be
relevant.  *See Docket* # 430, ¶ 59, 60 (Second Amended Complaint's allegations regarding the
removal of the language).  However, Mr. Kozlowski's proffer indicates that the reasons Mr.
Wolfe would give as to why the language was removed relate to entirely different IRU
transactions.  Thus, Mr. Kozlowski could address the relevant issues in the case without
intruding upon matters covered by the Protective Order simply by inquiring of Mr. Wolfe
whether there was any reason why Qwest could not have disclosed the particular IRU
transactions at issue in this case (as opposed to IRU transactions generally) in the financial
statements.

the SEC's Office of the Chief Accountant regarding "matters pertaining to IRU accounting,"[12] (ii) communications between deponents, the SEC's Division of Corporate Finance, and the Office of the Chief Accountant regarding "the manner in which companies accounted for IRUs,"[13] (iii) communications between deponents and Mr. Casey, an individual with the Office of the Chief Accountant, regarding a speech on IRU accounting that Mr. Casey later gave as a private citizen; (iv) communications between the deponent and Mr. Morrisey, the SEC's Deputy Chief Accountant concerning testimony on IRUs that Mr. Morrisey would later give to Congress; and (v) several questions that were posed to another deponent concerning "whether . . . SEC staff came to general conclusions" about various characteristics of IRU accounting. The Magistrate Judge's Order addresses these issues in detail, finding that the deliberative process privilege was properly invoked with regard to each request, and that the Defendants had not shown that their need for the information outweighed the value of the SEC's privilege.

In his Objections, Mr. Kozlowski contends: (i) with regard to the discussions prior to Mr. Casey's speech, those discussions did not entail the SEC deliberating on any final policy or decision, and thus, the content of those discussions is not privileged; (ii) similarly, with regard to discussions in advance of Mr. Morrisey's testimony, the discussions and later testimony did not result in any agency decision or policy, and thus, could not be privileged; (iii) that all internal discussions sought to be inquired into did not ultimately result in any SEC policy, and thus, were

---

[12]Mr. Kozlowski contends that this information is not privileged because it as post-decisional – that is, that the SEC had already issued its guidance on the issue when the discussions in question occurred.

[13]Mr. Kozlowski argued, without elaboration, that "Communications about how companies were accounting for IRUs cannot be considered 'predecisional' or 'deliberative'."

discoverable; (iv) that the SEC waived any privilege by filing the instant action; (v) that the Magistrate Judge erred in finding that Mr. Kozlowski had not shown a need for the evidence that trumped the SEC's privilege.

The deliberative process privilege protects from discovery "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dept. of Interior v. Klamath Water Users Protective Assn.*, 532 U.S. 1, 8 (2001) (FOIA case).[14] The purpose of the privilege is to "enhance the quality of agency decisions" by preserving "open and frank discussion" among decisionmakers; discussion that might be cramped if "each remark is a potential item of discovery and front page news." *Id.* at 8-9. Moreover, the privilege prevents the premature disclosure of proposed policies and avoids misleading the public by documents "suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Trentadue*, 501 F.3d at 1226. Generally, invocation of the deliberative process privilege requires a showing that the documents at issue were both "predecisional" and "deliberative." *Id.* at 1227. A "predecisional" document is a "memoranda prepared in order to assist an agency decisionmaker in arriving at his decision," as contrasted with "postdecisional memoranda setting forth the reasons for an agency decision already made." *Id.*

The first three prongs of Mr. Kozlowski's Objections, as enumerated above, all share

---

[14]The deliberative process privilege often arises in FOIA cases, where a statutory exemption prevents disclosure of "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). In interpreting the statutory exemption, courts necessarily look to the contours of the deliberative process privilege as applied in non-FOIA cases. *Trentadue v. Integrity Committee*, 501 F.3d 1215, 1226 (10th Cir. 2007).

the same basic premise - that to be "predecisional," discussions must result in a "the formulation or revision of an SEC 'law' or 'policy'." *Docket # 598 at 3-4 & n.2, citing Cobell v. Norton,* 213 F.R.D. 1, 4-5 (D.D.C. 2003) ("to approve exemption of a document as predecisional, a court must be able to pinpoint an agency decision or policy to which the document contributed"). However, this statement is inconsistent with *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975). There, the Court explains that:

> Our emphasis on the need to protect pre-decisional documents does not mean that the existence of the privilege turns on the ability to identify a specific decision in connection with which a memorandum is prepared. Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process.

421 U.S. at 151 n. 18. Indeed, *Sears* drew the "predecisional" distinction as being one between "predecisional communications" as contemplated in the quote above, and "communications made after the decision <u>and designed to explain it</u>." *Id.* at 151-52 (emphasis added). The Court explained that there is "an increased public interest in knowing the basis for agency policy already adopted" and that the public is "vitally concerned with the reasons which did supply the basis for an agency policy actually adopted," but "the public is only marginally concerned with reasons supporting a policy which the agency has rejected, or with reasons it might have supplied, but did not supply, [as] the basis for a policy which was actually adopted on a different ground." *Id.* at 152. Indeed, the Court pointed out that "the prototype of the postdecisional document – the 'final opinion' – serves the dual function of explaining the decision just made and providing guidance for decisions of similar or analogous cases arising in the future. In its latter function, the opinion is predecisional," but its "disclosure poses a negligible risk of

denying to agency decisionmakers the uninhibited advice which is so important to agency action." *Id.* at 152 n. 19.

*Sears* makes clear that the term "predecisional" is not a particularly helpful label (and absolute statements regarding that element, such as *Cobell*'s insistence that the Court be able to "pinpoint" to the underlying decision the discussion related to are even less so). It misleadingly suggests that the test is primarily temporal (e.g. does the memo predate a decision?) when in actuality, the test is one that requires examination of the advice being given, its connection to an agency decision, and the purpose that advise is intended to serve. The fact that the discussion post-dates a particular decision does not automatically render that discussion discoverable. Indeed, *Sears* contemplates that the discussion may still be protected because, for example, it reflects a "continuing examination" of an existing policy, because the discussion addresses alternative reasons why a policy could have (or should not have) been adopted but which the agency elected not to put forward as its justifications, or because it is not intended to be explanatory in nature. *See also Casad v. U.S. Dept. of Health and Human Servs.,* 301 F.3d 1247, 1252 (10th Cir. 2002) ("the essential question is whether the requested summary statement is . . . the final opinion 'explaining the reasons' for a funding decision already made or, instead, a predecisional memorandum"). Ultimately, this Court believes that the more reasonable approach to defining the "predecisional" element is one that is informed by the very purpose of the deliberative process privilege – that is, an approach that examines whether disclosure of the communication in question would be the type that is likely to chill intra- and inter-agency discussion and decisionmaking. *See Sears*, 421 U.S. at 152 n. 19.

Viewed in this light, this Court finds that the Magistrate Judge's conclusion that all of the

requested material was privileged as "predecisional" is not clearly erroneous or contrary to law. With regard to the discussion of Mr. Casey's speech, the Magistrate Judge correctly noted that although Mr. Casey was nominally speaking as a private citizen and made clear that his remarks reflected only his personal opinions,[15] his speech made several references to matters which would appear to implicate future SEC decision making. For example, he observed that "the SEC staff has not objected to" certain contractual arrangements in the past, but that the arrangements "raise[ ] a number of questions which the staff has not yet addressed"; that "the staff has not seen [a particular] hypothetical transaction in a live fact pattern"; and that "the staff is seeing [certain types of contractual problems] with increasing frequency." Each of these observations places Mr. Casey's other remarks in a context in which he is discussing concerns that might be implicated in SEC decisionmaking on future registration matters. Thus, comments from SEC officials about that aspect of his speech could easily be characterized as predecisional, anticipating those issues being raised in future matters. The Order observes that Mr. Casey's speech "clearly implied that the Commission's staff was still developing positions on many of the issues raised in the speech," and thus, comments by the SEC staff with regard to those areas would undoubtedly be predecisional.

Similarly, the Court finds no error in the finding that SEC comments concerning Mr. Morrisey's anticipated Congressional testimony were predecisional. Mr. Morrisey testified

---

[15]It is somewhat difficult to accept the notion that Mr. Casey's speech was entirely severable from his function as an SEC employee. The very fact that he consulted SEC staff for comments on a draft of his speech suggests that he was not speaking purely as a private citizen. If Mr. Casey wanted to ensure that his speech reflected only his personal opinions and could not be perceived as reflecting SEC opinion or policy, one might expect him to avoid preliminary review by SEC staff.

generally regarding accounting issues relating to IRU transactions, the complexity of current accounting rules relating to that issue, and "other issues on the [Financial Accounting Standards Board's Emerging Issues Task Force's] current agenda [that] could have an impact on the industry's accounting practices."

Mr. Kozlowski points out that this testimony occurred after the SEC had already promulgated a policy that it would defer to generally-accepted accounting principles as promulgated by the Financial Accounting Standards Board, and thus, Mr. Morrisey's testimony was post-decisional. However, this misconstrues the notion of "post-decisional." Mr. Morrisey was not going before Congress to explain why the SEC had chosen that policy – explanation being the most common type of post-decisional commentary. Indeed, Mr. Morrisey's testimony reflects the fact that, notwithstanding the SEC's policy decision to adopt generally-accepted accounting principles, various accounting issues remained complex or uncertain. The implication of that testimony was that the SEC is continuing to reconsider and reexamine these issues on an ongoing basis, and, as such, commentary by the SEC on Mr. Morrisey's remarks would be predecisional with regard to that reconsideration and reexamination.

Finally, for similar reasons, the Court finds no error in the finding that general communication among SEC staff regarding accounting issues was predecisional. As with comments on Mr. Morrisey's testimony, these comments do not seek to offer an explanation for the SEC's past policy decisions, but rather, discuss difficulties in implementing that policy and the need for further reconsideration and refinement of that policy. These communications, too, would be protected as predecisional. Thus, the Court finds that the Magistrate Judge did not err in finding the requested material to be encompassed by the deliberative process privilege.

The Court also rejects Mr. Kozlowski's arguments that the SEC waived the privilege by bringing this action and his contention that his need for the information outweighs the SEC's privileged interests, for the same reasons articulated by the Magistrate Judge. But more importantly, this Court also finds that the requested material appears to be irrelevant to the issues in this case in any event.[16]

For the reasons previously stated, the Court overrules Mr. Kozlowski's Objections and affirms the Magistrate Judge's ruling.

### B. Defendants' summary judgment motions

#### 1. Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proven for a given claim or defense, sets the standard of proof and identifies the party

---

[16] Mr. Kozlowski explains that the thrust of these discovery requests is to reveal that the SEC itself believed that "the accounting issues were complex and/or required the exercise of subjective judgment, [etc. and] the SEC knew of the complexity and uncertainty and yet did not provide guidance." In essence, Mr. Kozlowski is urging a peculiar *ad hominem* type of argument: if the experts at the SEC find these issues complex and confusing, how could he be expected to understand it?

Mr. Kozlowski's scienter is an essential element of the claims against him, but the knowledge or beliefs of the SEC – or, more accurately, individual employees of the SEC – is not probative of Mr. Kozlowski's thought process. If Mr. Kozlowski wishes to assert a defense that the accounting principles at issue here are ill-defined or that he did not (or could not) understand them, he may do so through his own testimony and the testimony of experts who will opine as such. What opinions SEC staffers may have on this point, however, is irrelevant.

with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual

dispute is "genuine" and summary judgment is precluded if the evidence presented in support of

and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion,

a court views all evidence in the light most favorable to the non-moving party, thereby favoring

the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish

every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P.

56(e).  Once the moving party has met its burden, to avoid summary judgment the responding

party must present sufficient, competent, contradictory evidence to establish a genuine factual

dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry

v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material

fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.

The court then applies the law to the undisputed facts and  enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence

of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.

If the respondent comes forward with sufficient competent evidence to establish a *prima facie*

claim or defense, a trial is required.  If the respondent fails to produce sufficient competent

evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of

law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

This case involves both the SEC and the Defendants moving for summary judgment.

"Because the determination of whether there is a genuine dispute as to a material factual issue turns upon who has the burden of proof, the standard of proof and whether adequate evidence has been submitted to support a *prima facie* case or to establish a genuine dispute as to material fact, cross motions must be evaluated independently."  *In re Ribozyme Pharmaceuticals, Inc., Securities Litig.*, 209 F. Supp. 2d 1106, 1112 (D. Colo. 2002); *see also Atlantic Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir. 2000); *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another").

As stated above, the Court turns first to the claims relating to specific instances in which the SEC contends that Qwest improperly booked revenue from IRU transactions that were subject to porting, grooming, upgrading, or were the result of backdated contracts, and the SEC's allegations relating to Dex revenue.  The Court will then address the remaining issues concerning the SEC's claims of improper reporting of IRU and equipment sales revenues and insider trading.

## 2.  IRU accounting

The SEC alleges that each Defendant, other than Defendant Nacchio, engaged in certain specific transactions in which Qwest recognized revenue from IRUs on an upfront, sales-type basis when, in fact, those IRUs were subject to side agreements or other restrictions that made upfront revenue recognition impossible, or where individuals backdated IRU contracts to allow the revenue to be recognized improperly in an earlier quarter.  Having reviewed the SEC's responses to each Defendant's motions, the only incidents at issue are as follows: (i) Mr. Mohebbi entered into a side agreement with IRU customer Cable & Wireless ("C&W") on or about December 29, 2000, in which he promised that C&W could upgrade their IRU purchase to a

higher-quality fiber within the following year, but concealed the existence of this agreement from Qwest's accounting staff so as to ensure that revenue from that IRU could (improperly) be recognized immediately in Q4 2000; (ii) Mr. Mohebbi encouraged others to recognize revenue in Q1 2001 from an IRU sold to C&W on April 12, 2001, but for which the sale contract was backdated to March 31, 2001; (iii) Mr. Kozlowski and Mr. Noyes allowed the upfront recognition of an IRU sold to ICG in December 1999, and did not rescind the recognition of that revenue after learning in February 2000 that Qwest had promised to make that purchase upgradeable (by buying back the IRU in exchange for ICG purchasing greater capacity); (iv) Mr. Kozlowski and Mr. Noyes allowed immediate recognition of an IRU sold to C&W in March 2000, knowing that that sale included a promise allowing C&W to later port or groom the IRU from an Atlanta-Miami routing to a more complex routing including Jacksonville, Orlando, and Tampa; (v) Mr. Noyes allowed revenue from an IRU sale to Enron to be recognized in Q3 2001 as if it had been completed on September 30, 2001, when he knew that the contract for that IRU had not been signed until October 1, 2001; and (vi) a generalized allegation that Qwest engaged in grooming unspecified IRUs, an act of which all Defendants (other than Mr. Nacchio) were aware but for which none took action to modify the manner in which the affected IRUs were accounted. The Court will address each of these contentions in turn.

### a. December 2000 C&W upgrade

There is no factual dispute that Qwest entered into an agreement with C&W in December 2000 to permit Q&W to upgrade the IRU it was purchasing. Nor is there any dispute that the existence of that agreement should have prevented Qwest from accounting for that IRU's revenue upfront. The question presented on this record is whether the SEC can show support for its

contention that Mr. Mohebbi concealed the upgrade agreement from Qwest's accountants, so as to deceive them into allowing the revenue from IRU to be booked immediately.

Mr. Mohebbi, who is not an accountant and not involved in decisions as to how IRU revenue is booked, contends that two days before finalizing the agreement with C&W, he sent a draft[17] of the agreement's language to Martha Pye (sometimes Martha Heywood), the Director of the Pricing and Offer Management ("POM") group. The POM group is responsible for collecting information relating to any non-standard contract language and submitting that information to Qwest's accountants in order to obtain accounting approval of the proposed transaction. Mr. Mohebbi contends that Ms. Pye forwarded the language to Andrew Glassman, Qwest's Assistant Comptroller, with the request that he "review this side letter for the C&W deal." In addition, Mr. Mohebbi contends that, on the day the deal was signed, the final contract language was provided by another employee to Roger Hoaglund, Vice-President of the POM group, with a request to "please approve . . . the attached so we are ready to go." Mr. Hoaglund responded with a message that "this looks good." Thus, argues Mr. Mohebbi, there is no evidence that he attempted to conceal the existence of the C&W agreement from Qwest's accountants.

The SEC disputes that Mr. Mohebbi provided the contract language to Ms. Pye and Mr. Hoaglund for approval. The SEC is correct that the deposition transcript upon which Mr. Mohebbi relies for the assertion that he provided the contract language to Ms. Pye does not address that issue, but the SEC runs into more difficulty refuting the significance of Exhibit A-14, the e-mail from Ms. Pye to Mr. Glassman containing the draft contract language for Mr.

---

[17]The Court does not understand the SEC to contend that the draft language differed materially from the final language of the C&W agreement.

Glassman's review.[18]  The SEC's response to this exhibit does not dispute the e-mail's contents or significance, but rather, invokes a technical argument that the e-mail "is hearsay that is not admissible pursuant to any exception."  This argument is without merit.

Only an assertion of fact can constitute hearsay, and the hearsay rule only operates to exclude such assertions when they are offered to prove the matter being asserted.  *See U.S. v. Cuevas-Juarez*, 139 Fed.Appx. 945, 947-48 (10th Cir. 2005) (unpublished).  Ms. Pye's e-mail to Mr. Glassman is not an assertion of fact. At most, it poses a question or a request – "Can you please review this side letter for the C&W deal?"[19]  As the 10th Circuit explained in *Cuevas-Juarez*, "a question could not reasonably be construed to be an intended assertion."  More importantly, the Court does not understand Mr. Mohebbi to offer the e-mail as proof of any "assertion" contained within it.  Rather, he offers it as evidence that Mr. Glassman, as one of Qwest's accountants, did indeed receive information about the agreement before concluding that the C&W sale could be recognized as upfront revenue.  This is a non-hearsay purpose.[20]  *See*

_____

[18]The SEC argues that both Ms. Pye and Mr. Glassman testified at depositions that they had no recollection of this e-mail exchange.  This is true.  However, both also testified that they had no reason to believe that the exchange shown on the e-mail did not occur.

[19]Arguably, contained within Ms. Pye's question is an assertion that the attached text is indeed "th[e] side letter for the C&W deal," but the mere fact that a declarant conveys a message within the predicate of a question does not render the question itself hearsay.  *Id., citing U.S. v. Jackson*, 88 F.3d 845, 847 (10th Cir. 1996).

[20]The same logic compels the Court to reject the SEC's argument that the e-mail chain in which Mr. Hoaglund was provided with and approved the C&W agreement language is inadmissible hearsay.  The employee's statement to Mr. Hoaglund, "please approve this e-mail and the attached so we are ready to go," is a command, not an assertion of fact, and thus, cannot be offered for the truth of any factual assertion.  *See U.S. v. Rodriguez-Lopez*, 565 F.3d 312, 314-15 (6th Cir. 2009) ("if the statements were questions or commands . . . they would not be assertive speech at all. They would not assert a proposition that could be true or false").  Rather, the e-mail is being offered to demonstrate Mr. Hoaglund's receipt of, and thus awareness of, the agreement with C&W regarding upgradeability.

*Rupp v. Transcontinental Ins. Co.*, 627 F.Supp.2d 1304, 1310 n. 8 (D.Ut. 2008) (e-mail from counsel to client concerning settlement offer, submitted to establish client's receipt and knowledge of counsel's opinion concerning settlement offer, admissible over hearsay objection as being offered for non-hearsay purpose).

Because the e-mail itself is properly before the Court for summary judgment purposes, it stands as unrefuted evidence that Mr. Mohebbi (or, more accurately, one of his subordinates) advised Ms. Pye (and indirectly, Qwest's accountants) of the agreement with C&W concerning the upgradeability of the IRU. To the extent that IRU revenue was improperly recognized, it was not due to any misconduct on Mr. Mohebbi's part. Thus, the Court finds that the SEC has failed to come forward with evidence in support of its contention that Mr. Mohebbi concealed information relating to the December 2000 C&W IRU, and judgment in favor of Mr. Mohebbi on any claim premised upon that contention is appropriate.

### b. Backdating of C&W contract

The SEC alleges that Mr. Mohebbi concealed from Qwest's accountants the fact that the agreement with C&W for an IRU that was signed on April 12, 2001 had been backdated to March 31, 2001, thus allowing the revenue from that agreement to be recognized in Q1 2001 instead of Q2.

Mr. Mohebbi contends that on March 31, 2001, he was contacted by Mr. Hoaglund and William Eveleth, another Qwest official, and advised that the POM group did not have a signed contract for the C&W IRU in question. On April 1, 2001, Mr. Mohebbi and Mr. Eveleth contacted Robin Szeliga, Qwest's Chief Financial Officer, to discuss the situation. The parties informed Ms. Szeliga that although Qwest and C&W had reached an agreement on the IRU and

C&W had tendered payment on the contract, the contract itself had not been signed.  Mr.

Mohebbi does not detail any instructions given by Ms. Szeliga, but states that when the contract

was signed on April 12, 2001, Kevin Baird, a Qwest lawyer, and Daniel Nimtz, a member of the

POM group, backdated the contract to March 31, 2001.  Mr. Mohebbi contends that he was not

involved in the decision to direct the backdating of the contract, nor in the decision to

nevertheless recognize the C&W IRU revenue in Q1 2001.

  The SEC does not dispute any of these contentions.  Instead, it asserts simply that, despite

being aware of the contract having been backdated, Mr. Mohebbi "pushed those reporting to him

to finish the transaction so that the revenue could be reported" in Q1, and that once Mr. Mohebbi

learned that the IRU revenue had indeed been recognized in Q1, he "took no action to have it

removed" from Qwest's financial statements.

  This is insufficient to show that Mr. Mohebbi engaged in any misconduct or deceit of

Qwest's accountants on this issue.  The mere fact that Mr. Mohebbi "pushed" his subordinates "to

finish the transaction" does not suffice as proof that he deceived or conspired with Qwest's

accountants to improperly recognize the C&W IRU in Q1.  Indeed, the evidence cited by the SEC

does not indicate that Mr. Mohebbi had any ability to influence the decision by Qwest's

accountants as to how the C&W revenue would be recognized.  Mr. Hoaglund testified that he

was aware that the C&W contract remained unsigned at the end of Q1, and that in early April

2001, Mr. Mohebbi called him repeatedly, urging Mr. Hoaglund to  "you know, get together,

come up with an opinion [as to whether the revenue could be recognized]" and pleading with him,

asking "what's it going to take [to get the IRU recognized]?"  Mr. Hoaglund testified that Mr.

Mohebbi "assumed that we were going to . . . count that transaction, the IRU transaction, with

C&W for first quarter of 2001," but the SEC points to no evidence that Mr. Mohebbi's entreaties had the ability to – much less that they actually did – influence Qwest's accountants to improperly recognize the revenue in Q1. The fact that Mr. Mohebbi may have cajoled, urged, or pleaded with Mr. Hoaglund or others responsible for deciding how to recognize the revenue does not suffice to make Mr. Mohebbi responsible for the accountants' decisions to permit the revenue to be improperly recognized in Q1. The record indicates that Qwest's accountants were fully aware of the situation regarding the backdated C&W contract and nevertheless made the decision to improperly recognize the revenue in Q1. The fact that this was an outcome Mr. Mohebbi desired or pushed for does not, however, make Mr. Mohebbi complicit in the accountants' misjudgment. Moreover, the SEC cites to no authority from the proposition that Mr. Mohebbi had the ability or responsibility to correct Qwest's financial statements once they were issued.

Under these circumstances, the Court finds that the SEC cannot show that Mr. Mohebbi is liable for Qwest's improper recognition of the C&W revenue in Q1 2001. Accordingly, judgment in Mr. Mohebbi's favor on any claim based on this contention is appropriate.

### c. December 1999 ICG IRU

The SEC contends that Mr. Noyes and Mr. Kozlowski are liable for Qwest's recognition of revenue from an IRU sold to ICG in December 1999 as upfront revenue, when it was revealed in February 2000 that that IRU had been accompanied by an agreement making that IRU upgradeable, and thus unsuitable for upfront revenue recognition.

In June 1999, Qwest entered into an agreement with ICG for the sale of an IRU. In December 1999, Qwest modified that contract to provide that "upon mutual agreement of the parties, Customer may . . . sell back to Qwest . . . any IRU segment provisioned hereunder in

exchange for Customer's simultaneous purchase of a new IRU segment." Qwest employee Deb

Petrie notified Mr. Kozlowski of that amendment in February 2000. Her e-mail states "this file

shows the buyback for ICG for the 2d phase of the IRU we did last quarter. I want everyone to be

aware of the outstanding commitment that requires us to buyback circuits for upgrade purposes."

Mr. Kozlowski and Mr. Noyes contend that the modification to the agreement does not affect the

accounting treatment to be given to the IRU because any upgrade must be based upon "mutual

consent," and that different accounting treatment is required only when the customer is given the

unilateral ability to demand an upgrade.

The SEC does not respond directly to Mr. Kozlowski and Mr. Noyes' argument on this

point. It recites roughly the same set of facts described above, and states simply that "Because

Qwest made a commitment to ICG to later exchange routes sold to them, Qwest should not have

recognized revenue on the December 1999 contract." The SEC does not point to evidence

supporting this contention. Rather, in a footnote, it states that "Sally Hoffman is expected to

testify at trial that Qwest improperly recognized revenue on the ICG transaction," and cites to a

joint Rule 702 motion **(# 639)** by the parties.

A party responding to a summary judgment motion must support its factual assertions by

reference to evidentiary material, such as affidavits, deposition transcripts, or specific exhibits.

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). A motion is not an affidavit,

nor is it evidentiary material sufficient to oppose summary judgment. The bare assertion that Ms.

Hoffman will testify as to a particular issue, without an affidavit from Ms. Hoffman to that effect

or citation to some other item of evidentiary significance, is insufficient to carry the SEC's burden

in responding to Mr. Kozlowski and Mr. Noyes' motions.

Even if the Court were to treat the Rule 702 motion as the equivalent of an affidavit by Ms. Hoffman, it would still find that submission, without more, insufficient to carry the SEC's summary judgment burden. The Rule 702 motion states that Ms. Hoffman's opinion # 8 is that "Qwest's recognition of revenue upfront from five specific IRU transactions [including] ICG June 1999 through June 2000 . . . violated GAAP, including SEC rules and regulations." This is nothing more than a conclusion, and were the SEC to have submitted an affidavit by Ms. Hoffman containing no more than this statement, the Court would reject it as insufficient. *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134, 1143 (10th Cir. 2005), *citing Morgan v. Willingham*, 424 F.2d 200, 201 (10th Cir. 1970) ("summary judgment cannot rest on purely conclusory statements either in pleading or affidavit form"). A conclusory assertion by Ms. Hoffman that the accounting for the ICG IRU was improper gives the Court no basis to understand the reasons for Ms. Hoffman's opinion.

It may be that Ms. Hoffman disagrees that the "mutual consent" language in the December 1999 amendment is sufficient to rescue the IRU from being considered "upgradeable" (and thus unsuitable for upfront recognition), or Ms. Hoffman may have some other reason for believing that the IRU was not properly booked. In the latter case, Ms. Hoffman's opinion would not be responsive to the arguments raised by Mr. Kozlowski and Mr. Noyes, and thus, would not carry the SEC's burden of demonstrating a genuine issue of fact as to their liability for the improper recognition of the IRU. Although the Court views the evidence in the light most favorable to the non-movant – here, the SEC – it cannot deem a genuine issue for trial to exist simply because the non-movant has supplied a purely conclusory and ambiguous assertion in support of its position.

Because the SEC has failed to come forward with specific factual assertions, supported by

suitable evidence, that demonstrate a genuine material fact as to whether the ICG IRU was improperly accounted for, the Court finds that Mr. Kozlowski and Mr. Noyes are entitled to summary judgment on any claim against them predicated on that assertion.

### d. Porting of C&W's March 2000 IRU

The parties do not delve into factual detail regarding this allegation; an e-mail chain submitted as an exhibit provides the only explanation. On March 31, 2000, an individual named Darryl Caprio wrote to Steven Lawrence, with copies to several other Qwest employees, discussing the contract underlying an IRU that had been sold to C&W. Mr. Caprio stated that, upon reviewing the agreement, he ascertained a discrepancy between mileage and revenue numbers in the agreement and numbers that an individual named Matthew Scott "had figured." Mr. Caprio speculates that "This may be because the IRU from Atl-Mia is lower mileage than the way it will be eventually routed which is Atl-Jacksonville-Orlando-Tampa-Miami," and that "we are still talking to them about how this needs to be engineered and routed." A few minutes later, Mr. Scott e-mailed Greg Casey, stating "We will have to buy back the Atlanta-Miami circuit and sell them the Atlanta-Jacksonville-Orlando-Tampa-Miami next quarter," and warning that if Qwest insists on the higher mileage figure, "we will end up buying back a circuit and selling a new one for the exact same prices. No revenue will be recognized." Some time later, Mr. Scott again wrote to Mr. Casey, stating "Just spoke with Frank Noyes. The Accountants REALLY would prefer the lower number this quarter and the incremental next quarter." A few minutes later, Mr. Scott again wrote to Mr. Casey, stating "Kozlowski just called to make his position clearer. He says it must be at the lower mileage. He cannot book revenue that we cannot deliver."

Based on this e-mail chain, the SEC contends that "because Qwest knew that C&W would be porting IRU routes at the time the IRU contract was completed, it was improper to recognize revenue upfront on the transactions." The SEC supports this assertion with only the same footnote discussed above, in which it indicates that Ms. Hoffman "is expected to testify at trial" that the IRU was improperly recognized, and cites to the Rule 702 motion. For the reasons discussed above, the SEC's reliance on the Rule 702 motion as its sole evidence in support of the contention that the IRU was improperly booked is itself sufficient to warrant a conclusion that the SEC has not carried its burden of demonstrating a genuine issue of fact with regard to this transaction. Moreover, as with the ICG IRU discussed above, the SEC has failed to come forward with evidence that shows that the C&W IRU could not have been properly recognized as upfront revenue. Whether one characterizes the C&W IRU as a portable one (as the SEC does), a groomed one (as the anticipated re-routing would appear to suggest), or an upgradeable one (as the reference to a "buy back" suggests), it is undisputed that so long as Qwest delivered a fixed, unchanging asset, the revenue could properly be recognized as upfront revenue. The e-mail chain gives no indication that Qwest did not deliver the Atlanta-Miami IRU that was promised, and indeed, the e-mail chain indicates that Mr. Kozlowski was firm in his instructions that Qwest "cannot book revenue that we cannot deliver."

Thus, the only impediment to the upfront recognition of this IRU was the reference to Qwest having to "buy[ ] back" the IRU in favor of a more elaborate routing later. As discussed above, the Court understands the SEC to concede that agreements to upgrade an IRU prevent upfront recognition of the IRU revenue only when that agreement gives the buyer the unilateral ability to insist upon an upgrade; the SEC has not put forward (much less supported with

evidence) the assertion that a subsequent, mutually-agreed upon upgrade of an existing IRU implicates the upfront recognition of that IRU's revenue. But the e-mail chain quoted above gives no indication that Qwest's agreement with C&W granted C&W the unilateral ability to upgrade the IRU. At best, Mr. Scott tells Mr. Casey that "we will end up buying back a circuit," but that statement gives no indication that Mr. Scott was referring to a legal obligation to do so at C&W's unilateral request or whether he was referring to a pragmatic recognition that if C&W offered to pay Qwest more money later for an upgraded circuit, Qwest would agree to upgrade the IRU. Without some evidence that Qwest indeed granted C&W the unilateral right to upgrade the IRU, the SEC has not demonstrated a genuine issue of fact that Qwest's upfront recognition of this IRU's revenue was improper.[21] Thus, judgment in favor of Mr. Kozlowski and Mr. Noyes on any claim premised on this IRU is appropriate.

### e. Backdating of September 2001 Enron IRU

The SEC contends that Mr. Noyes improperly allowed Qwest to recognize revenue from an IRU sold to Enron. Qwest recognized the revenue in Q3 2001, a reporting period that ended on September 30, 2001. However, the IRU agreement with Enron was not actually signed until sometime early in the morning of October 1, 2001.

---

[21]In addition, as Mr. Kozlowski points out, the e-mail chain gives no indication that Mr. Scott specifically advised Mr. Kozlowski and Mr. Noyes of any promise to upgrade the IRU. Were the Court to construe Mr. Scott's statement to Mr. Casey to mean that Qwest had promised C&W the unilateral right to upgrade the IRU, nothing in the e-mail chain indicates that Mr. Scott specifically advised Mr. Noyes or Mr. Kozlowski of that fact. Rather, Mr. Scott's communications with Mr. Casey indicate only that he spoke to Mr. Noyes and Mr. Kozlowski about the particular question of which set of mileage and revenue figures to use. Without evidence that Mr. Kozlowski and Mr. Noyes were (or even that they should have been) specifically aware of any agreement with C&W to upgrade the IRU, the SEC has not shown via this exhibit that Mr. Noyes and Mr. Kozlowski are culpable for any mistake by Qwest in recognizing this IRU's revenue upfront.

The parties do not disagree that the Enron contract was not formally executed until approximately 5:00 a.m. on October 1, 2001. They disagree, however, on whether the parties had effectively reached that agreement in all material respects by midnight on September 30, 2001. Mr. Noyes cites to the testimony of Kevin Baird, one of Qwest's lawyers, who stated that he believed there had been a "meeting of the minds," actual payment of funds to Qwest, and "substantial performance" of the agreement by September 30, 2001, and that there were "no material changes" to the contractual language occurring in the early hours of October 1, 2001. (Mr. Noyes argues that the delay in obtaining formal signatures on the contract was due to technical problems in transmitting drafts between Qwest's offices and Enron's.) Mr. Baird testified that "there were no material negotiations that needed to occur following midnight . . . It was just a matter of cleanup and final read of the documents to find other typographical errors."

In response, the SEC points to evidence that appears to indicate that there was some substantive negotiation taking place after midnight. The SEC points to an e-mail from Mr. Baird to individuals at Enron, sent at 12:17 a.m. on October 1, 2001, that attaches a document referred to as Exhibit D and states "This Exhibit D incorporates changes requested by Evan [Betzer, an Enron employee]." The record does not squarely indicate what the "changes" to Exhibit D were being discussed at 12:17 a.m., but there is an indication that another change was made to Exhibit D at 1:25 a.m. Mr. Baird testified that at 1:25 a.m., Mr. Betzer requested a version of Exhibit D that changed a "cure period" of 30 days (instead of an existing duration that the record does not reveal). At 1:29 a.m., Mr. Baird responded with an e-mail stating "Evan, please review. I made the change to a 30-day cure period per your request." The record further indicates that at 1:49 a.m., Mr. Baird sent another e-mail to Mr. Betzer and others, saying "hold that thought – another

change is coming shortly!," along with an indication that the change related to terms of the co-location agreement, one of the components of the IRU contract. Other evidence in the record indicates that changes to the co-location agreement were being discussed as late as 3:54 a.m. on October 1. Thus, the SEC has come forward with evidence that raises a genuine dispute of fact as to whether the Enron agreement was completed by September 30, 2001.

In reply, Mr. Noyes contends that the SEC has not shown that any of the post-midnight negotiations were "material," but, as quoted above, these exchanges clearly involved something more than, as Mr. Baird testified, "cleanup" of the documents "to find typographical errors."

The SEC has carried its burden of coming forward with evidence that indicates that apparently significant matters such as cure periods and details concerning co-location remained unresolved by midnight on September 30, 2001. Whether, in the entire scope of the agreement, those terms were "material" or not is a matter for resolution by a jury. Mr. Noyes also contends that the evidence indicates that "both parties were amenable to executing the actual contracts before midnight, if necessary," but that assertion proves little. The fact is, the agreement was <u>not</u> executed before midnight, and although the parties might have been willing at one point to execute one version of the agreement before midnight, once that deadline passed, the parties continued to negotiate different terms, rendering their prior willingness to sign a different version of the agreement irrelevant. Mr. Noyes does not dispute that he was aware that the contracts were not actually executed until October 1, 2001, nor does he dispute that, "in general," that delay would prevent Qwest from recognizing the Enron revenue in Q3 2001. Nevertheless, it is undisputed that Qwest did so with Mr. Noyes' approval.

Thus, the Court finds that the SEC has demonstrated a genuine issue of fact with regard to

whether Mr. Noyes knowingly permitted Qwest to improperly recognize the Enron revenue in Q3 2001. This is sufficient to permit a securities fraud claim premised on that improper recognition of revenue to proceed to trial.[22]

---

[22]Mr. Noyes' briefing on this issue primarily challenges the factual, not legal, sufficiency of a securities fraud claim premised upon the Enron IRU. Nevertheless, the Court finds that the facts cited by the SEC, if proven at trial, could support a securities fraud claim against Mr. Noyes. In general, a securities fraud claim under the more exacting Exchange Act requires the SEC to show: (i) a misrepresentation, (ii) of a material fact, (iii) made with scienter, (iv) in connection with the sale of securities, and (v) using requisite jurisdictional means. *SEC v. Wolfson*, 539 F.3d 1249, 1256 (10th Cir. 2008). (A claim under the Securities Act does not require a showing of scienter. *Id.*)

To the extent Mr. Noyes would challenge the SEC's ability to show materiality and scienter with regard to the Enron IRU, the Court notes that the Enron IRU amounted to $112 million in revenue for Q3 2001, a quarter in which Qwest publicly reported "communications services" revenue (a sector which included IRUs) of $2.373 billion. Thus, the allegedly improperly-recognized Enron IRU accounted for 4.7% of Qwest's reported "communications services" revenue for Q3 2001.

As the 10th Circuit panel explained in *U.S. v. Nacchio*, 519 F.3d 1140, 1162-63 (10th Cir. 2008), *vacated on rehearing on other grounds*, 555 F.3d 1234 (10th Cir. 2009) (*en banc*), a rough 5% "rule of thumb" on questions of materiality is whether the "deviation . . . with respect to a particular item on the registrant's financial statement" is material. Although the 4.7% deviation in communications services revenue as a result of recognition of the Enron IRU falls slightly below that 5% rule of thumb, it does so only slightly, the 10th Circuit has observed that "special factors might make a smaller miss material." *Id.* at 1163. Under the circumstances presented here, the Court cannot find that the 4.7% deviation is immaterial as a matter of law, and thus, the question of materiality is one for the jury.

Likewise, the Court finds that there is adequate evidence of Mr. Noyes' scienter with regard to the Enron IRU. Scienter may be shown by either evidence of an actor's intention to deceive or defraud, or by a showing of recklessness – that is, conduct for which the actor "knew or must have known of its propensity to mislead." *C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429, 1435 (10th Cir. 1988). Here, the evidence indicates that Mr. Noyes was aware that the Enron contracts remained unexecuted at midnight on September 30, 2001. Indeed, an e-mail from Mr. Baird specifically states that he consulted with Mr. Noyes as to whether the ongoing discussions with Enron would prevent Q3 recognition of the revenue, and that Mr. Noyes stated that it would not. Moreover, there is evidence that Mr. Noyes knew that there were ongoing negotiations of a substantive nature past the midnight deadline, as he was copied on various e-mails sent between Mr. Baird and Mr. Betzer in the early hours of October 1, 2001, and he knew that revenue could not ordinarily be recognized in Q3 in such circumstances, but he approved the recognition of that revenue in Q3 nonetheless.

**f. General allegations of grooming**

In response to Mr. Woodruff and Mr. Mohebbi's motions, the SEC generally alleges that Qwest engaged in grooming unspecified IRUs, thus making upfront recognition of their revenue improper. The SEC's evidence on this point consists of entirely of testimony by Bruce Iacovelli, a Project Manager in Qwest's network operations group.

Mr. Iacovelli testified that he "was aware of circuits that were IRUs that were groomed," but he could not identify when or how he became aware of that fact. He testified that grooming of IRUs occurred both before a September 2001 directive from the accounting department that IRUs should not be groomed, as well as after that instruction, although he testified that any grooming of IRUs occurring after that instruction were done by subordinates without his knowledge. He testified that he did not think anyone at Qwest was "trying to keep [grooming] a secret," but acknowledged that there may have been "poor communications between departments, all information just not being shared," such that others might not have known of grooming activities. When asked to indicate what percentage of IRU circuits were groomed in each of 1999, 2000, and 2001, Mr. Iacovelli repeatedly indicated that he was unable to state any percentage. However, he testified that, prior to September 2001, "it was not uncommon to look to see if we can groom an IRU to make room for another IRU."

The Court finds that this vague testimony is insufficient to satisfy the SEC's burden of demonstrating a triable issue of fact as to whether any Defendant engaged in securities fraud by allowing the upfront recognition of IRU revenue. Mr. Iacovelli's testimony establishes no more than the fact that some IRUs at Qwest were groomed, but that sole fact is not necessarily probative here. The SEC has admittedly limited its allegations in this action to certain specified

IRUs, not to all IRUs generally.  Thus, to the extent that it wishes to rely on Mr. Iacovelli's testimony regarding grooming, it must show that the IRUs specified in the Second Amended Complaint were among those that were groomed.  Mr. Iacovelli's testimony is insufficient to do so, as he was unable to specifically identify any IRU that was groomed.[23]  The mere fact that Mr. Iacovelli testified that <u>some</u> IRUs were groomed is insufficient because it is entirely plausible that the IRUs that were improperly groomed are not the IRUs at issue in this case.

Even assuming that one or more of the IRUs in this case were indeed groomed, the SEC's theory on this point suffers from numerous other defects.  The SEC does not explain the circumstances in which grooming might or might not implicate recognition of IRU revenue.[24]  Thus, it is not clear to the Court whether <u>any</u> grooming of IRUs is fatal to upfront revenue recognition, or whether there may be circumstances in which temporary grooming of an IRU – say, for maintenance or repair purposes – is permitted.  The distinction is potentially significant, as Mr. Iacovelli testified that "Many times . . . if they had to move an IRU customer because of a maintenance issue, they would automatically put those customers back because it was part of their protocol."

Even if the SEC had shown that Qwest indeed groomed IRU circuits in ways that made upfront revenue recognition improper, it has not come forward with any evidence that any of the Defendants were actually aware of that practice.  Mr. Iacovelli's testimony indicates that (at least

---

[23]Mr. Iacovelli testified that Qwest maintained records that would show which particular IRUs were groomed at a given time, but the SEC has not offered such records as evidence here.

[24]Once again, the SEC offers only the conclusory assertion that Ms. Hoffman would testify that grooming resulted in improper recognition of IRU revenue, but cites only to the Rule 702 motion in support.

up until September 2001), grooming practices were not kept secret at Qwest, but he also acknowledges that communication issues might have prevented other business units from knowing of that practice. Without evidence that the Defendants here were actually aware that IRU circuits were indeed being improperly groomed, the Court cannot speculate that the Defendants had such knowledge. Thus, any claim against the Defendants predicated on generalized allegations of improper recognition of groomed IRU revenue warrants judgment in favor of the Defendants.

### 3. Dex revenue

The SEC alleges that Mr. Nacchio and Mr. Woodruff committed securities fraud by failing to advise investors of a change to the Dex publishing schedule that allowed Qwest to recognize approximately $ 30 million in 2000 by publishing the 2001 Colorado Springs directory early (albeit at the cost of having no Colorado Springs directory revenue for 2001). Mr. Nacchio and Mr. Woodruff do not dispute any of the facts underlying this contention; they dispute only whether the change in the publishing schedule can give rise to legal liability.

Mr. Nacchio and Mr. Woodruff contend that any improper omission of the Dex publishing schedule from Qwest's public statements is not actionable for several reasons: (i) because the amount of revenues involved – $ 30 million, which represents .2% of Qwest's total Q4 2001 revenues – is immaterial as a matter of law; (ii) that there was no misstatement, as Qwest informed investors that its revenue growth in the Dex unit that quarter was the result of "higher advertising rates, an increase in the number of directories published, and an increase in the number of premium quality advertisements" (emphasis added); (iii) that the public was aware of the schedule change, both because the 2001 directories were distributed in Colorado Springs in

2000, and because analysts specifically commented on the publishing schedule change[25]; and (iv) that there is insufficient evidence to indicate that either Mr. Nacchio or Mr. Woodruff knew how the accounting department had dealt with the publishing schedule change, thus preventing a showing of scienter.

The SEC's responses address only one aspect of the materiality argument, arguing simply that Qwest's 2000 10-K touted $ 100 million of revenue growth in the Dex unit, of which the publishing schedule change would have amounted to 30%. The SEC responds to the Defendants' scienter arguments by asserting that the Defendants "offer[ ] no evidence that [they] consulted with anyone about the disclosures concerning Dex . . . nor [do they] deny knowing that the statement made about Dex was false." In reply, the Defendants address this latter contention, observing that it is the SEC's burden to show that they harbored the requisite scienter, not their burden to show that they did not.

Again, the Court finds that the SEC has failed to carry its burden of demonstrating a triable issue of fact with regard to claims predicated on the Dex revenue. As discussed above, the key elements of any securities fraud claim are: (i) a misrepresentation or omission, (ii) of a material fact, (iii) made with the appropriate scienter. *Wolfson*, 539 F.3d at 1256. An omission is actionable only when the person speaking has a duty to disclose the omitted information. *Geman v. SEC*, 334 F.3d 1183, 1192 (10th Cir. 2003). There is no duty to disclose information – even adverse information – that is already known to the public. *Jensen v. Kimble*, 1 F.3d 1073, 1079 (10th Cir. 1993).

---

[25]Mr. Nacchio and Mr. Woodruff point out that the SEC's own designated expert, Anjan Thakor, acknowledges that market analysts were aware of the schedule change.

Here, the Defendants have come forward with evidence that indicates that a stock analyst published a report on January 18, 2001,[26] anticipating Qwest's reporting of Q4 2000 revenues. The analyst stated "We expect 4Q Directory services revenue of $ 469 million . . . but up 34% sequentially on timing shifts in the publishing of the company's directory books." In a report predicting Qwest's Q1 2001 earnings, issued on April 6, 2001 – only days after Qwest's 2000 10-K was filed, the analyst wrote "We expect 1Q Directory services revenue of $ 350 million . . . down 30% sequentially owing to timing shifts in the publishing of the company's directory books." This is significant evidence that the publishing schedule adjustment was known to the public before the 2000 10-K was filed.

Moreover, the Court agrees with the Defendants that Mr. Thakor, the SEC's expert, effectively concedes the point that the schedule change was known by the public prior to Qwest's 2000 10-K. Mr. Thakor acknowledges the analyst reports quoted above, and concludes that "if market participants did indeed understand that Qwest's results for 2000 included the second printing of the Colorado Springs directory, it was in spite of, not because of, Qwest's communications with investors."[27] The test, however, is not whether the public knowledge can or cannot be attributed to actions by Qwest; the test is whether any source disclosed the true facts to the public before the time the disclosure should have been made. Here, Mr. Thakor implicitly concedes that the public had somehow become aware of the publishing schedule change by the

_____

[26]This report predates Qwest's 2000 10-K, which the SEC appears to contend was the document in which the Dex disclosure should have been made, by nearly two full months. The 2000 10-K was filed on March 15, 2001.

[27]Although Mr. Thakor phrases his statement as a conditional – "if market participants did indeed understand" the schedule change – nothing in the record indicates that Mr. Thakor has offered an opinion that market participants actually did not know of the schedule change.

time of the 2000 10-K, and regardless of how the public obtained that knowledge, that public knowledge is sufficient to ameliorate any duty that Mr. Nacchio or Mr. Woodruff had to disclose that fact.

Because the SEC has failed to come forward with evidence sufficient to demonstrate a genuine issue of fact as to whether the change in the Dex publishing schedule was already known to the public, it has not shown that it can establish a duty by Mr. Nacchio or Mr. Woodruff to disclose that fact in the 2000 10-K. Because the SEC has not shown an actionable omission on this point, the Court need not reach questions of materiality or scienter. The Defendants are entitled to summary judgment on any claim premised on the change in the Dex publishing schedule.

### C. Remaining issues

The Court has not – and on the current record, cannot – address the major thrust of the SEC's case against all Defendants. The parties' briefing did not squarely meet on this issue, and the parties' understanding of the scope of this claim do not seem to match. In an effort to ensure that the parties and the Court share a common understanding of this claim, and to ensure that the Court is fully informed of the parties' positions, the Court will set forth its understanding of the SEC's remaining theory, invite the parties to address that understanding at oral argument, and, if appropriate, permit additional briefing to squarely address that issue.

The Court understands that, as initially pled, this case closely paralleled the criminal prosecution of Mr. Nacchio. In essence, the SEC's primary theory was that the Defendants set revenue growth targets that could not have been obtained with ordinary operational revenue. Thus, the SEC alleged that the Defendants made large (and ultimately unsustainable) amounts of

39

one-time IRU sales, improperly booking that revenue upfront, and failing to advise investors that Qwest was only able to meet its revenue targets by relying on these "non-recurring" sorts of revenues.

In the course of the pretrial process in this case, a dispute then arose that implicated the SEC's theory that Qwest's growth predictions were unsustainable. The Defendants contended that they believed Qwest could continue to enjoy a steady rate of growth in IRU sales because governmental entities had expressed an intention to purchase significant amounts of IRU capacity, and indeed, negotiations of some of these purchases were underway. Because some of these potential purchases involved intelligence agencies, the U.S. Intelligence Community intervened in this action and sought to invoke the State Secrets Privilege to prevent discovery and dissemination of information about the type and quantity of IRU purchases contemplated by intelligence entities. *See generally Docket* # 328 at 5 (motion by Intervenor U.S. Intelligence Community, publicly discussing issue and background).

In an attempt to avoid dismissal compelled by the State Secrets privilege, the SEC elected to reframe its allegations in this action. In seeking leave to file the Second Amended Complaint, the SEC explained that it "has also eliminated allegations that forward looking statements were improper . . . The Commission has focused its case entirely on historic events, statements and filings." *Docket* # 363 at 4. It identified certain specified IRUs to which the allegations in the Second Amended Complaint related, implicitly abandoning claims as to wrongdoing regarding any other IRUs. *Id.* ("Although defendants may argue that they require discovery concerning IRU transactions not identified in the complaint . . . that information is not relevant to the Commission's claims").

It is clear from the parties' briefing that the SEC and the Defendants have ultimately come to different understandings as to what the SEC's current claim entails. For example, Mr. Nacchio seizes on the SEC's language above in explaining that "The Commission has focused its case entirely on historic events," understanding that to mean that the Court is examining Qwest's filings solely for their historical accuracy, not with regard to what inferences investors might draw from them about Qwest's future. *See e.g. Docket* # 721 at 7 (the SEC "failed to adduce any evidence that demonstrates <u>why</u> any reasonable investor would care about historical revenue recognition for history's sake"). Likewise, Mr. Nacchio's reply highlights a dispute between the parties here about the significance of the terms "recurring" and "non-recurring," and whether those terms are synonymous with the words "continuing" and "not continuing." *Id.* at 3; *see also Docket* # 689 at 4 (Mr. Woodruff's reply brief stating that "the SEC now insists it never even claimed that Qwest improperly represented its IRU revenues as 'continuing'").

It appears to the Court that much of this confusion stems in part from the parties' (and, admittedly, the Court's) use of accounting terminology for its lay definitions. The concept of "recurring revenue" means one thing to accountants, and may mean something entirely different to lawyers – even lawyers and judges involved in cases involving accounting. For example, as Mr. Woodruff's reply brief points out, this Court has previously stated that it understood the SEC's current theory to contend that "certain specific transactions were not properly <u>accounted</u> for." In retrospect, the Court meant "accounted for" in a generic sense, rather than in the sense of "recorded in Qwest's internal books in compliance with generally-accepted accounting standards."

Having had the opportunity to review the parties' summary judgment briefs and the

pleadings and other filings in this case, the Court takes this opportunity to state, in plain, non-technical terms, what it understands the SEC's primary theory underlying its claims against each Defendant. During the time period at issue, Qwest had two major sources of revenue: payments from customers for telecommunications services, and money from sales of IRUs.[28] In large part, customers were billed for telecommunications services on a monthly basis. Revenue from an IRU sale, on the other hand, were received by Qwest as a lump sum at the time the IRU agreement was signed. The SEC alleges that, to investors, these two kinds of revenue are qualitatively different – that investors believe that companies with more monthly-type revenue are preferable to companies with more lump-sum revenues. Thus it mattered to investors how much revenue was attributed to each category.

It is apparently undisputed that, beginning in Q1 1999, Qwest's public filings began reporting both kinds of revenue in a single revenue "bucket," entitled "communications services." The SEC's theory is that while Qwest may not ordinarily have been under an obligation to separately break out revenue sources in its public filings, once it began mixing qualitatively different types of revenue in a single bucket, its public filings became susceptible to misleading investors who had been led to believe that the "communications services" bucket mostly consisted of monthly-type revenues. Thus, the SEC's theory concludes, the Defendants were under on obligation to advise investors that a substantial amount of the revenue reported in the "communications services" bucket was actually lump sum payments received by Qwest for IRUs,

---

[28]There is some indication that some Defendants believe that the term "IRU" relates only to sales of "dark fiber," and that sales of "lit fiber" are not properly characterized as IRU sales. The Court anticipates that the parties are capable of either resolving this dispute or squarely presenting it for resolution in future briefing.

not monthly-type revenues.

It may be helpful to observe several issues that are <u>not</u> part of what the Court understands to be the SEC's theory. The theory is unconcerned with <u>any</u> statements that Qwest officials might have made projecting corporate growth. With the exception of the claim that Mr. Noyes was responsible for Qwest improperly recognizing the Enron IRU in Q3 2001 instead of Q4 2001, the SEC's theory does <u>not</u> allege (or at least, for the reasons set forth in this Order, the SEC is unable to prove) that the manner in which Qwest recorded IRU revenue in its internal books (*c.f.* how it <u>described</u> that revenue in its public filings) was improper in any way, or that those reporting decisions did not comply with generally-accepted accounting principles. Beyond the question of whether the SEC is correct in its assertion that investors ascribe significant qualitative differences between monthly-type revenue and lump sum revenue (such that it becomes important to place them in separate buckets for purposes of public filings), allegations that Qwest unwisely relied too heavily on IRUs in its revenue mix or that certain individuals may have "pushed" Qwest staff to more aggressively seek out IRUs are irrelevant. In short, the Court understands the SEC's theory underlying the securities fraud claims against each Defendant[29] to present these, and only these questions:

- Was Qwest required to advise investors in its public filings (and through its comments thereupon) that the "communications services" revenue bucket mixed monthly-type and lump sum revenues together?

- If so, was the failure to give such advisement material?

- If so, was any Defendant sufficiently cognizant of that fact, such that his mental state

---

[29]The Court understands the SEC to also assert a separate and independent suite of securities fraud claims against Mr. Noyes based on the recognition of revenue from the Enron IRU in Q3 2001.

satisfies the sciential requirement of the applicable claim?

With regard to the claims concerning false books and records and deceit of auditors, the Court understands that those claims relate only to allegations that the Defendants falsified Qwest's public SEC filings – again, by failing to advise investors that revenue figures in Qwest's public filings mixed both types of revenue in a single bucket – and that the Defendants deceived Qwest's auditors into endorsing those public filings by failing to disclose to the auditors that Qwest was mixing of qualitatively-different revenues in one bucket. In addition, the SEC asserts insider trading claims against Mr. Nacchio and Mr. Woodruff. The Court understands that the "insider information" upon which this allegation is premised is that Mr. Nacchio and Mr. Woodruff knew that a significant portion of Qwest's "communications services" revenue bucket was lump-sum revenue from IRUs, not monthly services-type revenue.[30]

It is essential that the Court and Defendants understand the SEC's current theory. To ensure that all parties are on the same page regarding the claims that remain and the contours of those claims, the Court will hold oral argument on the remaining aspects of the summary judgment motions at **3:30 p.m.** on **Wednesday, April 14, 2010** (or at the conclusion of currently-scheduled proceedings in this case on that date). It is the Court intention at that time, having

---

[30]For this reason, the Court denies the SEC's motion seeking summary judgment against Mr. Nacchio on collateral estoppel grounds. To invoke collateral estoppel, a party must show that the factual issues in dispute in the instant action are identical to those previously litigated. *Moss v. Kopp*, 559 F.3d 1155, 1161 (10th Cir. 2009). The Government's factual theory in the insider trading case against Mr. Nacchio focused on Mr. Nacchio's knowledge that Qwest would be unable to meet its own growth projections in early 2001. As discussed above, growth projections are no longer at issue in this case, and there is no indication that the criminal case against Mr. Nacchio required the jury to make factual findings concerning the issue presented here: whether Mr. Nacchio's knowledge that IRU revenues had been mixed into the "communications services" bucket was non-public and material. Thus, the factual issues presented in the two cases are not identical.

clarified the remaining issues in the case, to deny without prejudice the remaining aspects of the Defendants' summary judgment motions and to grant a short period of time for the filing of new motions that squarely and concisely address the remaining issues.

## CONCLUSION

For the foregoing reasons, Mr. Kozlowski's Fed. R. Civ. P. 72(a) Objections **(# 586,** as supplemented **# 601)** are **OVERRULED** and the Court **AFFIRMS** the February 3, 2009 ruling **(#585)** of the Magistrate Judge regarding the scope of questionning at the deposition of Lee Wolfe.  Mr. Kozlowski's Rule 72(a) Objection **(# 598)** are **OVERRULED**, and the Court **AFFIRMS** the January 29, 2009 Order **(# 571)** of the Magistrate Judge.  Mr. Kozlowski's Motion to Compel **(# 571)** is **DENIED**.  Mr. Kozlowski's Motion for Reconsideration **(# 617)** is **DENIED,** as moot.  Because evidentiary hearings are underway with regard to the parties' Joint Rule 702 motions **(#639, 650)**, the Clerk of the Court shall terminate those motions for statistical purposes.

Mr. Kozlowski's Motion for Summary Judgment **(# 638)**, Mr. Nacchio's Motion for Summary Judgment **(# 643)**, Mr. Noyes' Motion for Summary Judgment **(# 644)**, Mr. Woodruff's Motion for Summary Judgment **(# 645)**, and Mr. Mohebbi's Motion for Summary Judgment **(# 646)** are **GRANTED IN PART**, insofar as the Court finds that the SEC has failed to demonstrate a genuine issue of fact with regard to those specific allegations discussed above, and **DENIED IN PART**, insofar as the Court reserves ruling on the remainder of those motions pending oral argument.

The SEC's Motion for Summary Judgment **(# 642)** is **DENIED**.  The Court will hear oral argument on the remaining issues as addressed herein at **3:30 p.m.** on **Wednesday, April 14,**

**2010** (or at the conclusion of currently-scheduled proceedings in this case on that date). In anticipation that the matter will not be sufficiently prepared to permit a Final Pretrial Conference as currently scheduled for June 29, 2010, that Conference is **VACATED** and will be reset at a later date.

Dated this 31th day of March, 2010

BY THE COURT:

Marcia S. Krieger
United States District Judge