IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 05-cv-00480-MSK-CBS

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

ROBERT S. WOODRUFF,
AFSHIN MOHEBBI,
JAMES J. KOZLOWSKI, and
FRANK T. NOYES,

    Defendants.

_____

**OPINION AND ORDER GRANTING, IN PART,
MOTIONS FOR SUMMARY JUDGMENT**
_____

**THIS MATTER** comes before the Court pursuant to Mr. Kozlowski's Motion for

Summary Judgment (**# 638**), the SEC's response (**# 667**), and Mr. Kozlowski's reply (**# 680**);

Mr. Noyes' Motion for Summary Judgment (**# 644**), the SEC's response (**# 668**), and Mr. Noyes'

reply (**# 682**); Mr. Woodruff's Motion for Summary Judgment (**# 645**), the SEC's response

(**#677**), and Mr. Woodruff's reply (**# 689**); Mr. Mohebbi's Motion for Summary Judgment

(**#646**), the SEC's response (**# 669**), and Mr. Mohebbi's reply (**# 683**).[1]

The Court resolved some of the issues presented by these motions in its March 31, 2010

Order (**# 735**), and reserved ruling on the remaining issues pending further argument by the

_____

    [1]The Court's records also show that Mr. Nacchio's Motion for Change of Venue (**# 732**)
remains pending.  The Court has entered judgment against Mr. Nacchio, and this motion is
therefore denied as moot.

parties.  The Court heard additional argument by the parties at a hearing on April 14, 2010 (# 752).  At that hearing, the parties were granted the opportunity to submit supplemental briefs on the issues in question, and the Defendants did so (# 762, 763, 764, 765,  804, 809).  The SEC has responded to the Defendants' supplemental briefs (# 805, 806, 808, 811).  The SEC also moved (#830) for leave to file a surreply to Mr. Mohebbi's supplemental filing, to which Mr. Mohebbi responded (# 835), and the SEC replied (# 836).

Also pending before the Court are separate Motions to Sever by Defendants Kozlowski, Mohebbi, and Noyes (# 770, 802, 821, 826), and Mr. Kozlowski's Motion for Sanctions (# 774).

## FACTS

The Court has previously addressed the complex and evolving factual background of this matter, most recently in its March 31, 2010 Opinion and Order (# 735), and that discussion is deemed incorporated herein.

The Court will summarize the general outlines of the issues in dispute here, and elaborate as necessary in its analysis.  The SEC alleges that each of the Defendants, acting as an officer or employee of Qwest Communications International, Inc. ("Qwest"), engaged in acts of securities fraud between April 1999 and March 2002.  Although the SEC originally posited a wide range of fraudulent conduct by the Defendants, the SEC's case has steadily been refined and streamlined, such that the alleged fraudulent scheme can be described in fairly simple terms.

As relevant here, Qwest derived significant amounts of revenue from two types of business operations: (i) providing telephone (and related) services to residential and business customers, for which those customers pay Qwest on a monthly basis; and (ii) selling access to Qwest's fiber-optic telecommunications network, for periods of 25-30 years, through contracts

called "Indefeasible Rights of Use" or "IRUs."  Telephone services revenue is received on a month-to-month basis and is booked and accounted for accordingly.  IRU revenue, on the other hand is accounted for by Qwest "upfront," with Qwest obtaining and booking the full amount of the sales price of the IRU upon the signing of the IRU contract, even though Qwest is thereafter obligated to continue providing the network capacity for a period of 25-30 years.

Prior to 1999, Qwest reported monthly services revenue and IRU sales revenue in its public filings as different revenue categories (or, as the Court colloquially uses, "buckets"): monthly services revenue was reported as part of the "communications services" bucket, and IRU revenues were included as part of the "construction services" bucket.  Beginning in Q1 1999, with revenues relating to network construction declining, Qwest notified investors that it was phasing out reporting of the "construction services" revenue bucket in its public filings. IRU revenues still remained significant however, and without advising investors of this fact, Qwest began including IRU sales revenue in the "communications services" bucket, along with monthly services revenue.

The SEC does not contend that the decision to start reporting IRU revenue as part of the "communications services" bucket was improper or inherently misleading, in and of itself. However, the SEC contends that reasonable investors would believe that the two types of revenues are qualitatively different, in that investors would especially value evidence of increasing monthly services (which investors would view as evidence that Qwest's subscriber base was increasing, and thus suggesting that that increasing customer base would continue to purchase Qwest telephone services and related products), and would somewhat devalue revenue from IRU sales (which investors would view as "one-time" transactions, such that a given IRU

sale, unlike a monthly service customer, would not continue to generate revenue for Qwest from quarter-to-quarter and year-to-year).

Qwest did not formally announce that change in practice or otherwise expressly advise investors that, beginning in the second financial quarter (Q2)[2] of 1999, the undifferentiated sum reported in public filings as "communications services" revenue reflected an aggregation of both monthly services and IRU revenues.  Indeed, although upfront IRU revenue was silently migrated to the "communications services" bucket beginning in Q2 1999, Qwest continued to note in its financial statements that "communications services" revenue was "generally recognized monthly as the services are provided."  In addition, when discussing Qwest's performance in public statements to analysts, investors, and others, Qwest's executives touted the performance and growth of the "communications services" category, and frequently highlighted the growth or revenues obtained from certain components of the "communications services" bucket, but never touted IRU revenues as a growth component of that bucket or even disclosed that IRU revenues were a significant part of the bucket's contents. The failure of the Defendants to advise the public of the fact that the "communications services" bucket contained both monthly services and IRU revenues[3] is the heart of the SEC's contention that the

---

[2]Hereafter, the Court identifies Qwest's financial quarters as "Q _," with a numeral 1-4 indicating the first, second, third, or fourth financial quarter of the designated year.

[3]The SEC also contends that Qwest periodically sold off some of its equipment, and, like IRU sales, reported revenue from equipment sales as part of its "communications services" bucket without disclosing that fact to investors.  The analysis of claims relating to the Defendants' failure to separately disclose equipment sales revenue is essentially the same as the analysis of the Defendants' failure to separately disclose IRU sales revenue, and thus, except where the Court expressly notes otherwise, discussion of the claims relating to misstatements and omissions involving IRU sales applies with equal force to claims relating to equipment sales.

4

Defendants engaged in securities fraud.[4]

The Second Amended Complaint (**# 430**) asserts the following claims: (i) securities fraud in violation of section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1), against each Defendant, in that each Defendant engaged in a scheme or artifice to defraud in connection with the sale of Qwest securities; (ii) securities fraud in violation of section 17(a)(2) and (a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(2), (3), against each Defendant, in that each Defendant made false representations or omissions in order to deceive Qwest investors; (iii) securities fraud in violation of section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, against each Defendant, or, in the alternative, that Qwest violated the Exchange Act and Defendant Mohebbi aided and abetted that violation; (iv) falsification of books and records in violation of section 13(b)(5) and Rule 13b2-1 of the Exchange Act, 15 U.S.C. § 78m(b)(5) and 17 C.F.R.§ 240.13b2-1, against all Defendants, in that they circumvented or failed to implement internal accounting controls or falsified Qwest's books; (v) deceit of auditors in violation of Rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2, against Defendants Woodruff and Mohebbi; (vi) aiding and abetting false SEC filings in violation of section 13(a) and various rules of the Exchange Act, 15 U.S.C. § 78m(a), against all Defendants; and (vii) aiding and

---

[4]In this regard, it may be helpful to again observe what the SEC's claims do <u>not</u> allege. The SEC has voluntarily abandoned any contention that Qwest made misleading statements about its growth targets or engaged in any other misconduct in discussing its intentions and ability to meet such targets. As the parties have noted, the case is focused purely on alleged improprieties in the way Qwest reported its "historical" revenue performance.

With a single exception (involving an Enron IRU in 2001, as specifically addressed in the Court's March 31, 2010 Opinion), the SEC does not allege that Qwest's decision to recognize and book the entire amount of any IRU sale as upfront revenue in the financial quarter that the IRU sale contract was signed was improper. Nor does the SEC contend that the actual revenue figures in Qwest's filings or public statements were inaccurate – in other words, the SEC admits that Qwest did indeed earn all of the revenue it reported.

abetting the keeping of false books and records in violation of section 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2), against all Defendants.  Each of the Defendants seeks summary judgment in their favor on the SEC's remaining theory of securities fraud.  This Opinion addresses what the Court understands to be the SEC's only remaining theory of fraud – the failure to disclose that IRU revenue was being placed in the "communications services" bucket.[5]

## ANALYSIS

### A.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby

---

[5]The Court's March 31, 2010 Opinion and Order addressed the SEC's remaining theories of securities fraud relating to specific instances of conduct by individual Defendants.  This Opinion does not revisit those findings.

favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P. 56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and  enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B.  Securities fraud claims

The SEC's first three claims assert different varieties of securities fraud.  Claim One, brought under section 17(a)(1) of the Securities Act,  15 U.S.C. § 77q(a)(1), and Claim Three, brought under section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), share effectively identical elements.  To prove these claims, the SEC must show: (i) that each Defendant made a

misrepresentation or omission, (ii) of a material fact, (iii) in connection with the sale of securities, (iv) with scienter, and (v) using the requisite jurisdictional means.[6] *SEC v. Wolfson*, 539 F.3d 1249, 1256 (10th Cir. 2008).  The scienter required to satisfy these elements is a showing of either an intent to defraud or recklessness with regard to the risk that investors would be misled by Qwest's statements  – that is "conduct that is an extreme departure from the standards of ordinary care and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Dronsejko v. Thornton* 632 F.3d 658, 665 (10th Cir. 2011).

Claim Two asserts a claim of securities fraud under section 17(a)(2) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(2), (3).  Unlike Claims One and Three, which require the SEC to prove that each Defendant engaged in a "scheme or artifice to defraud," claims under section 17(a)(2) and (3) require only that the Defendant "obtain[ed] money or property by the means of any untrue statement . . . or any omission [of a material fact]" or that the Defendant "engaged in any transaction . . . which operate[d] or would operate as a fraud or deceit on the purchaser." This claim has effectively identical elements as the section 17(a)(1) and 10(b) claims, with the exception that no showing of specific scienter is required.  *Id.*, *citing Aaron v. S.E.C.*, 446 U.S. 680, 697 (1980).

The Defendants do not dispute that the SEC can establish the third and fifth elements of a section 17(a)(1) or 10(b) claim – it is undisputed that Qwest's public filings and statements relate

---

[6]With regard to Mr. Mohebbi, Claim Three offers an alternative theory of liability: if Mr. Mohebbi did not directly engage in securities fraud, he nevertheless aided and abetted securities fraud committed by others.  15 U.S.C. § 78t(e).

to the sale of securities[7] and that the statements were made using interstate means.  Thus, the Court limits its inquiry to whether the SEC can show, for each Defendant, that the Defendant is responsible for a misstatement or omission concerning Qwest's inclusion of IRU revenues in the "communications services" bucket or the amount of such revenues, that such misstatement or omission was material, and, for purposes of Claims One and Three, that the misstatement or omission was accompanied by the Defendant's culpable mental state.

      1.  <u>Misstatements and omissions</u>

Before turning to the acts of each individual Defendant, the Court pauses to describe, in admittedly limited detail, the nature and type of public statements that Qwest made about its revenues and the extent to which IRU transactions factored into those statements.

In Qwest's 1998 10-K filing, it explained that "the Company has two distinct business segments: communications services and construction services."  It described "communications services" as "traditional telecommunications, Internet protocol communications, web-based multimedia services and other data products and services to customers."  It explained that these services were usually billed to customers on a monthly basis.

By contrast, the filing described Qwest's "construction services" activities as "construct[ing] and install[ing] fiber optic systems for other communications provides, as well as for the Company's own use."  Among other things, "construction services" included "agreements with other communications providers and government agencies for the sale of dark

---

[7]Because the alleged misrepresentations and omissions were made in public filings and other communications that were clearly intended to reach investors, this element is satisfied. *Wolfson*, 539 F.3d at 1262.

fiber along the Company's network" – in other words, IRU sales.[8]  Similarly, Qwest's Q1 1999

10-Q filing expressly states, under the "construction services" section, that "the Company has

entered into various agreements to provide indefeasible rights of use of multiple fibers along the

network. . . . Construction services revenue relating to the contracts with these major customers

was approximately $ 43.0 million and $ 106.5 million for the three months ended March 31,

1999 and 1998, respectively."[9]

---

[8]The Court understands all parties to agree that, for practical purposes of this analysis, the concept of "IRU sales" included sales of both "dark fiber" and "lit fiber."

[9]The Court admits some confusion over apparent inconsistencies between representations made by the SEC in its brief and the evidence in the record with regard to Q1 1999.

In the SEC's response to Mr. Woodruff's summary judgment motion, the SEC states that "In the first quarter 1999, Qwest included upfront revenue of $31.7 million from IRU sales and $2.2 from equipment sales in its communications services revenue, but  did not disclose the existence or magnitude of that revenue . . . .For the period, that undisclosed revenue comprised 4.6 percent of communication services revenue."  *Docket* # 677 at 12-13.  The sole evidence cited by the SEC in support of this contention is a chart that was attached as an appendix to the report of Sally Hoffman.  The chart is not particularly self-explanatory, but does show that in Q1 1999, Qwest reported $ 31.7 million in a category called "Lit capacity" and $ 2.2 million in a category called "COBRA/other equipment," both of which Ms. Hoffman has grouped under the general heading "Upfront Revenue."  *Docket* # 677, Ex. 109. This total of $ 33.9 million in "upfront revenue" is indeed 4.6% of the $ 737.2 million listed in the chart as "communications services" revenue.

However, as noted above, Qwest's Q1 1999 10-Q report expressly states that Qwest "has entered into various agreements to provide [IRUs] . . . Construction services revenue relating to the contracts . . . was approximately $ 43.0 million . . . for the three months ended March 31, 1999."  *Docket* # 677, Ex. 110 at 5.  Thus, this Court senses a discrepancy between the SEC's contention that Qwest reported IRU revenue as "communications services" in its Q1 1999 10-Q and the contents of that 10-Q that actually discusses IRU revenue as "construction services" revenue, as well as a discrepancy as to whether IRU sales amounted to $ 31.7 million in that quarter or whether it was $ 43 million.

Although the Court is troubled by these and other apparent inconsistencies, it is not necessarily to squarely resolve them.  As discussed herein, questions of materiality are only loosely informed by the precise dollar amounts of IRU revenue or the percentages of revenue that IRU sales entail, and unless noted otherwise, the Court finds that any discrepancy between the numbers tendered by the parties' briefing and the evidence in the record is largely immaterial.

However, beginning with the Q2 199910-Q, Qwest began reporting IRU revenue as part of its "communications services" revenue, without disclosing the shift of IRU revenues from the "construction services" bucket to the "communications services" bucket.  Nor did Qwest modify language that it continually reincorporated into its financial reports, which stated that "communications services" revenue was "generally recognized on a monthly basis."

In Q2 1999, Qwest included $100 million in IRU sales as part of "communications services" revenue, accounting for more than 12% of all "communications services" revenue ($790.4 million) and 50% of all "IP and Data Services"[10] revenue during that period.  Qwest's financial and public statements gave no indication that IRU revenue was now being included in "communications services" revenue, rather than as part of the $83 million reported on the Q2 1999 10-Q as "construction services" revenue.

At the end of each financial quarter, Qwest would issue a press release touting its earnings for that quarter and highlighting particular areas of business growth and performance. In addition, Mr. Nacchio and Mr. Woodruff would hold telephone conference calls with investors and analysts, in which they would again highlight certain aspects of Qwest's earnings and performance and, at times, respond to questions and concerns from investors and analysts. In each of the press releases and conference calls during the period at issue, Qwest never disclosed the fact that its IRU revenue was being reported as part of the "communications services" bucket, nor did it disclose the amount of IRU revenue for the quarter. Indeed, IRU revenue was never mentioned in these press releases and conference calls, even though it

---

[10] Apparently, IRU revenues were included in the "IP and Data Services" sub-bucket, which itself was one of the components of the larger "communications services" revenue bucket.

11

accounted for a significant (and sometimes growing) source of Qwest's revenues.

For example, when Mr. Woodruff discussed Qwest's Q2 1999 results in a July 27, 1999 conference call, he emphasized that "we see minimal amounts of construction revenue over the rest of the year . . . I would anticipate maybe $ 20 million of construction revenue over the rest of the year.  We have made the pivot from relying on the construction services revenue to communications services."  Mr. Woodruff's statement did not acknowledge that IRU revenues, which previously had been considered "construction revenue" (and which any student of Qwest's filings would assume were still being included in the "construction services" bucket, as no statement attesting to a change in policy was ever issued) were still being generated in significant amounts – approximately $ 100 million in Q2 1999 – but were now classified as "communications services" revenue.

In Q3 1999, IRU sales accounted for $175 million in revenue, representing more than half[11] of all IP and Data Services revenue and 17% of all "communications services" revenue. The Q3 1999 10-Q continued to describe Qwest as having two distinct lines of business – "communications services" and "construction services," but it noted that "with the substantial completion of the Company's network during 1999, Construction Services has become

---

[11]The SEC's briefing states that IRU sales accounted for "almost 50% of IP and data revenue" for this period, although the Court's calculations put that figure closer to 63%.  It is not clear what causes the Court's calculation to differ from the SEC's.  For all future instances in which the Court describes IRU revenue as a percentage of IP and Data Services revenue or of all communications services revenue, the Court derives its figures from the data on the chart accompanying Ms. Hoffman's report.  *See Docket* # 677-7.  For percentages, the Court divides the total amount of "upfront revenue" (IRUs and equipment sales) for the particular quarter by the total amount reported by Ms. Hoffman for the "IP and Data Services" or "communications services" categories for the quarter.   The Court recognizes that its calculations vary from those described by the SEC by a few percentage points in most instances, and in no event does this discrepancy alter the analysis.

incidental to the Company's business."  But for the undisclosed shift of IRU revenues from the

"construction services" bucket to the "communications services" bucket, this assertion would be

plainly false, given that 17% of Qwest's revenues in Q3 1999 were attributable to IRU sales that

investors previously (and still) understood to be reported in the "construction services" bucket.

Throughout the remainder of 1999 and 2000, and into 2001, Qwest continued to derive a

significant portion of its overall revenue from IRU sales.

| Quarter | IRU sales[12] (millions) | IP and Data revenue (millions) | IP/Data revenue attributable to IRUs | Total communications services revenue (millions) | Total communications services revenue attributable to IRUs |
|---|---|---|---|---|---|
| Q4 1999 | 343 | 436 | 78% | 1,157 | 29% |
| Q1 2000 | 353 | 459 | 75% | 1,216 | 29% |
| Q2 2000 | 366 | 570 | 64% | 1,282 | 28% |
| Q3 2000[13] | 329 | 1,078 | 30% | 2,421 | 13% |
| Q4 2000 | 254 | 1,165 | 21% | 2,544 | 10% |
| Q1 2001 | 492 | 1,363 | 36% | 2,749 | 17% |

Beginning in Q3 2000, after its merger with US West, Qwest began describing its

business operations as consisting of four sectors: "retail," "wholesale," "network," and

"directory services," with IRU sales apparently falling into the "network" category (*i.e.*

"provid[ing] access to our telecommunications network . . . primarily to our retail and wholesale

---

[12]The Court understands that this figure reflects only those particular IRU sales specifically listed by the SEC in the Second Amended Complaint, not all IRU sales made by Qwest.

[13]In Q2 2000, Qwest completed a merger with US West, a traditional telecommunications provider.  This merger accounts for a significant increase in post-merger revenue from traditional telecommunications services.

services segments").  Because of this change in how revenues were reported, the SEC's complaints that Qwest should have disclosed the shift of IRU sales from "construction services" to "communications services" seems to no longer be material; for Q3 2000 and beyond, the most the SEC can complain of is that Qwest was not disclosing to investors the magnitude of its IRU sales in relation to Qwest's revenues in IP and Data Services revenue and total "communications services" revenues.

Qwest's 2000 year-end 10-K made the first mention of IRUs since the Q1 1999 10-Q. After describing various business units, the 2000 10-K stated "To a lesser extent, the Company sells capacity under indefeasible rights of use contracts.  Revenues from these contracts are included in commercial services [a.k.a. "communications services"] and were not significant in either fiscal 2000 or 1999."  By all appearances, the representation that IRU sales were "not significant in either fiscal 2000 or 1999" is outright false, as IRU revenue accounted for 17% of Qwest's revenue in 1999 and 7% of its revenue in 2000.

Qwest finally made a full disclosure of the nature and extent of its IRU sales in August 2001.  At a conference, Mr. Nacchio, Qwest's CEO, revealed that IRU sales had accounted for about 20% of Qwest's overall revenues for 1999, about 5% of Qwest's overall revenues for 2000, and that they would ultimately account for 8-10% of overall revenues for 2001.  Shortly thereafter, Qwest filed its Q2 2001 10-Q, expressly reporting $ 430 million in IRU sales for that quarter[14] and $ 427 million in IRU sales for Q1 2001.

As clarified by the SEC at the April 14, 2010 oral argument, the Court understands that

---

[14]The SEC contends that this sum omitted an additional $150 million in IRU sales that were realized in Q2 2001, but it is not clear whether the SEC believes this omission is itself actionable.

the SEC alleges that the securities fraud claims against all Defendants are premised only on the Defendants' failure to disclose the "nature" and "magnitude"[15] of its means of reporting IRU revenue.  According to the SEC, disclosure as to the "nature" of the IRU revenue policy required acknowledging that Qwest "disclose its up-front revenue recognition policy" – in other words, to disclose that a portion of the "communications services" bucket included IRU revenues, recognized "upfront," as opposed to monthly services revenue being recognized on a periodic basis.  The SEC's attempt to define "magnitude" was somewhat circular, but the Court understands that the SEC simply contends that Qwest was required to disclose either the "total" amount of IRU revenues each quarter or to disclose the "percentage" of revenues attributable to IRU sales.

### 2. Materiality

Where a securities fraud claim is premised on a defendant's omission or failure to disclose certain information, the omitted information is considered "material" if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"

---

[15]The SEC also contended that Qwest had a duty to disclose the "impact" that the use of IRUs had on its financial condition – *i.e.* that "Qwest was using the up-front [IRU] revenue to meet its revenue targets and growth targets and it was using that revenue as gap fillers when services, when monthly services revenue fell short."  This Court has profound concerns that this aspect of the SEC's theory – one examining Qwest's meeting of its "targets" – can coexist with the SEC's decision to confine its claims to "historical" concerns in order to avoid running afoul of state secrets issues.

In any event, it is difficult to see how disclosure of the "impact" of IRU sales would add anything material to investors' knowledge.  If, as the SEC insists was required, Qwest disclosed that IRU revenues were being reported in the "communications services" bucket and that those revenues accounted for $ X in a given quarter.  An investor armed with this knowledge could readily determine the extent to which Qwest would have met its publicly-announced growth targets if IRU revenue had not been included.

about the security.  *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988), *quoting TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  Materiality is usually a matter for the trier of fact; only in unusual circumstances will the Court be able to say that the information at issue is immaterial as a matter of law.  *ACA Financial Guaranty Corp. v. Advest, Inc.*, 512 F.3d 46, 65 (1st Cir. 2008), *citing Basic*, 485 U.S. at 236.

The SEC has come forward with sufficient evidence to demonstrate at least a genuine dispute of fact requiring trial with regard to whether Qwest's misstatements and omissions were material.  Most notably, the SEC relies on the opinion of its tendered expert, Ms. Hoffman.  Ms. Hoffman opines that "in each quarter from the second quarter of 1999 to the first quarter of 2001, the upfront revenue Qwest recognized from IRU . . . and equipment transactions was quantitatively and qualitatively material."  She goes on to offer a detailed explanation of her reasoning in reaching that conclusion, noting, among other things: (i) that IRU revenues ranged from about 10% to 29% of Qwest's "communications services" revenue during the time period at issue, making the IRU revenues quantitatively material even under a commonly-invoked "rule of thumb" that treats a 5% disparity in revenue reporting as being "material," *U.S. v. Nacchio*, 519 F.3d 1140, 1162-63 (10th Cir. 2008) (describing 5% "rule of thumb" as being "a sensible starting place for assessing the materiality" of omissions), *vacated en banc on other grounds*, 555 F.3d 1234 (10th Cir. 2009); *see also Higginbotham v. Baxter Intern., Inc.*, 495 F.3d 753, 759 & n.1 (7th Cir, 2007); (ii) qualitative materiality is determined by examining a variety of factors, such as whether the misstatement masks a change in earning or trends, whether it hides a failure to meet analysts' expectations, whether it changes a loss into income, and whether it concerns a significant portion of the company's operations or profitability; (iii) Qwest relied upon the IRU

revenues to meet analyst expectations, and that without such revenue, Qwest would not have met the analysts' targets; and (iv) the IRUs were counted as revenue in "business sectors analysts favored" (what Ms. Hoffman refers to, without elaboration, as "up the value chain revenue in Internet and data services"), the very same business sectors that "Qwest management emphasized growth in."  In a ruling under Fed. R. Evid. 702, this Court determined that Ms. Hoffman's opinion – that the misstatements and omissions were material – satisfied the foundational requirements of the rule, and absent other evidentiary objection would be admissible at trial.[16]  Because the Court must construe all admissible evidence in the light most favorable to the SEC for purposes of the Defendants' motions, Ms. Hoffman's opinion, of itself, is sufficient to carry the SEC's burden of showing a triable issue of fact as to materiality.

The Defendants offer several arguments contending that, as a matter of law, Qwest's misstatements and omissions could not be considered material.

Some Defendants argue that there was nothing misleading in Qwest's representations that "communications services" revenue was "generally recognized monthly" because the term "generally" connotes that some amount of revenue was not being recognized on a monthly basis. For example, Mr. Woodruff cites to cases such as *Glassman v. Computervision Corp.*, 90 F.3d 617, 634 (1st Cir. 1996), for the proposition that a statement that "shipments are generally made within thirty days" was not materially misleading where the 39% of the company's shipments in a particular timeframe took longer than 30 days.  *Glassman* is not persuasive in this context.  The

---

[16]The Court expressed some doubt as to whether Ms. Hoffman considered sufficient information regarding the qualitative factors, and stated that "were I the factfinder, I might well distrust Ms. Hoffman's conclusions."  Nevertheless, the Court noted that this concern was "one of weight and not methodology," and thus, Ms. Hoffman's opinions were matters for the jury to consider.

language that Mr. Woodruff relies upon is essentially *dicta*, as the court found that the evidence of the shipment timeframes was based on a single report from one week in one financial quarter, and thus "fail[ed] to allege anything meaningful about Computervision's general practice." *Id.* at 634.  In *dicta*, the court proceeded to address the underlying argument in a hypothetical sense, explaining that "even if one portion of one quarter could be taken as representative," the reality that 61% of shipments were made within the timeframe is "perfectly consistent with the statement that orders were generally shipped within thirty days." *Id.*  The court's analysis of this question is not especially rigorous, consisting largely of the observation that "Computervision's statement said that shipments were generally made within thirty days of receiving an order, not that they were always made within thirty days." *Id.*

To the extent that this analytical approach is intended to lay down a rule that statements couched in general terms or with mild terms of disclaimer cannot be materially misleading unless they are patently false – a rule this Court does not understand *Glassman* to be advocating – such a rule is inconsistent with the flexible, fact-dependent inquiry into materiality.  There may be times where the subject matter of the statement is of minor relevance – *e.g.* shipping timeframes in *Glassman* – such that a moderate disclaimer like "generally" or "mostly" is sufficient to render acknowledgment of the more unusual situation to be immaterial.  Other times, the subject of the statement may be so important – *e.g.* a statement that "most" of an automaker's vehicles have performed satisfactorily, even though 30% of its products had to be recalled – that a generic disclaimer provides insufficient protection against investors being misled by a failure to acknowledge the minority situation.  Here, the Court cannot say that, by acknowledging that "communications services" revenue was "generally recognized monthly,"

18

Qwest was not obligated to disclose that as much as 30% of that revenue was recognized upfront from IRU transactions was immaterial as a matter of law.

Several Defendants argue that, notwithstanding the SEC's current focus on historical revenue reporting, the omissions at issue here are rendered immaterial by the general rule that corporate officials are not required to disclose "contingencies that might alter the revenue picture in the future." *Citing McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002).  In *McDonald*, the 10th Circuit explained that "the accurate reporting of historic successes does not give rise to a duty to further disclose contingencies that might alter the revenue picture in the future." *Id.*  The Defendants contend that the SEC's theory is precisely that rejected in *McDonald* – that uncertainty that IRU revenues would continue apace is the reason why, as the SEC contends, investors view monthly services revenue more favorably than "one-time" revenues like IRU sales.  But *McDonald* is inapplicable, at least under the SEC's current theory, in which the omitted information concerns how Qwest allocated and reported its revenues, not the possibility that such revenues would not recur in the future.  In this sense, the SEC contends that Qwest did not make an "<u>accurate</u> reporting of historic successes" under *McDonald*, because it misled investors into believing that the "successes" were coming from growth in monthly services, not in IRU sales.[17]

---

[17]By means of analogy, imagine a business that owns a large parking lot, on which a small hamburger stand is located, and the company obtains most of its revenue from parking cars and a small amount from selling hamburgers.  The business announces that it intends to expand the hamburger stand and phase out the business of parking cars.  Investors who are interested in owning part of a large hamburger stand (but not particularly interested in owning part of a parking lot), buy into the business.

The expanded hamburger stand is not a success, and, mindful of this fact, the company continues to park cars on the remaining property.  Rather than reporting that hamburger stand's failure to investors, the company instead includes the car-parking revenue into the hamburger

Some Defendants contend that, because Qwest's stock price did not fall dramatically immediately after Qwest disclosed the nature of its IRU revenues in 2001, the market did not consider the information to be material. *Citing e.g. In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1425 (3d Cir. 1997). In *Nacchio*, the 10th Circuit considered this very argument in the context of the facts of this case, and concluded that because information about IRU revenues "trickled out . . . in phases," the lack of significant stock price movement did not necessarily establish that the information was immaterial. 519 F.3d at 1164. This Court sees no reason to deviate from that finding in this case.

The Defendants also urge an argument that does not find its origin in precedent, but rather, in a bit of *dicta* casually delivered by the Court. As the Court has previously noted, the SEC initially pled claims contending that Qwest made public statements and projections of future growth that were intentionally misleading. In response, certain Defendants invoked the State Secrets doctrine, contending that they were aware of impending and contemplated purchases of IRUs by governmental intelligence agencies that would justify the optimistic revenue forecasts. However, those intelligence agencies intervened in the case to seek to prohibit the Defendants from disclosing information about IRU purchases or negotiations concerning such purchases involving intelligence agencies. As a result, the SEC was forced to alter course, abandoning claims that Qwest's projections were misleading and instead relying entirely on its allegations that Qwest's "historical" reporting of revenues was misleading.

---

stand's books, making it appear that the hamburger stand is growing (and that, as promised, the parking business has been phased out). As a result, investors who believed they were buying into a successful hamburger stand (and not a parking lot) are instead left with an investment in an unsuccessful hamburger stand and a successful parking lot – exactly the opposite of what they wanted to invest in.

It was in this context that, at the April 14, 2010 hearing, the Court made the gratuitous, offhand observation that, because the Defendants were prevented by the State Secrets doctrine from addressing the extent of governmental demand for IRUs, "the assumption will have to be at trial that the demand for IRUs was essentially unlimited."  Seizing on the artificial notion that Qwest had unlimited demand for IRUs (along with evidence that technology gave Qwest an effectively unlimited supply of IRU capacity to sell), the Defendants contend that their "unlimited" ability to sell IRUs defeated any notion that "upfront" revenue from IRUs was qualitatively different from recurring "monthly services" revenue – as Mr. Woodruff argues, "the continuing stream of IRU revenues can be considered the equivalent of one large long term ratably-recognized contract."

The Court clarified this import of its comment in a hearing on June 28, 2010.  The Court explained that: (i) its comment was not a finding of fact or an evidentiary ruling, but rather, was simply an offhand observation; (ii) that demand for IRUs was not relevant to the SEC's claims, which essentially alleged that the failure to disclose the mixing of IRU and monthly services revenue in the same bucket was required, as was disclosure of the amount of IRUs actually sold; (iii) the effect of the State Secrets doctrine was to remove the issue of IRU demand from the case entirely, and that it would be equally proper to observe that the demand for IRUs was "unquantifiable."  This is sufficient to dispose of any argument arising out of the Court's comment.[18]

---

[18]Returning to the hamburger stand analogy, the fact that the business may have had the ability to generate tremendous amounts of revenue from parking cars is little consolation to investors who bought into the company because they wanted to own part of a hamburger stand. The Defendants' argument assumes that investors are only concerned with the bottom line that revenue is being produced, and that a dollar of revenue generated from parking cars is no more

Accordingly, the Court finds that the SEC has demonstrated a genuine issue of triable fact concerning whether the alleged misstatements and omissions by the Defendants were material.

### 3. Personal participation/scienter

Mr. Mohebbi, Mr. Kozlowski, and Mr. Noyes all contend that they did not cause any misleading statement or omission to occur, and thus, that they cannot be held responsible for Qwest's misstatements in any event. All Defendants contend that the SEC cannot show that they harbored the requisite scienter for claims under 15 U.S.C. § 77q(a)(1) or15 U.S.C. § 78j(b). Because the facts applicable to each Defendant are distinct, the Court will address them individually.

### a. Mr. Woodruff

Mr. Woodruff was Chief Financial Officer at Qwest during the time period at issue. He reviewed, approved, and electronically signed each of the Form 10-Qs and 10-Ks at issue in this case (with the exception of the 200010-K form, which Mr. Woodruff helped prepare and "signed off on," but which was formally issued after Mr. Woodruff's departure from the company). Mr. Woodruff also participated in reviewing and approving written earnings releases and participated in conference calls, wherein Qwest executives discussed the company's earnings with analysts

---

or less desirable to an investor than a dollar of revenue generated from selling hamburgers. The SEC has produced evidence demonstrating that this is not the case, and the Court must credit that evidence on summary judgment.

Taken to its logical limit, the Defendants' argument also raises the question of why Qwest shifted IRU revenue from one bucket to another and why it purposefully refused to mention IRU revenue growth in earnings releases and conference calls. If investors cared only that revenue was being generated, regardless of the business sector generating it, one would expect Qwest to trumpet the its success in selling IRUs, not hide from it.

and investors.  Thus, there is no dispute that misstatements in Qwest's public filings or earnings releases are attributable to Mr. Woodruff, as are any misleading comments or omissions made by Mr. Woodruff in conference calls.  Accordingly, the Court turns to the question of Mr. Woodruff's scienter.

Taken in the light most favorable to the SEC, several items of evidence make a colorable showing that Mr. Woodruff either intentionally sought to defraud investors with regard to the "communications services" bucket's makeup, or that Mr. Woodruff acted recklessly with regard to the possibility that investors would be misled with regard to that issue.  Most prominent is the fact that, in Q4 1999, Mr. Woodruff asked Mr. Noyes and Mr. Kozlowski to draft language for a disclosure statement that would be used in Qwest's 1999 10-K to explain Qwest's policies regarding IRU revenue.  Mr. Kozlowski and Mr. Noyes drafted three separate disclosure statements, described as providing "minimum," "moderate," and "maximum" disclosure.[19]  Mr. Noyes and Mr. Kozlowski recommended that the "minimum" disclosure be included in a paragraph describing "communications services" revenue, thus correcting any misapprehension that would result from the statement in Qwest's filings that "revenue from communications services is generally recognized monthly as the services are provided."  Immediately prior to

---

[19]The "minimum" statement stated that Qwest "enters into agreements whereby customers can obtain capacity on the Company's network," and that, where the criteria are met, "revenue is recognized when the capacity is made available for activation and the customer becomes responsible for operations and maintenance charges."  The "medium" statement was similar to the "minimum" statement, but specifically referenced IRUs by name, and explained that they were typically 20-25 year contracts, among other things.  The "maximum" disclosure included the entire "medium" statement, plus a sentence stating that IRU transactions represented specific percentages of Qwest's revenues for 1997-1999, and would add discussion regarding what portion of Qwest's increases in revenue from previous years would be attributable to IRU sales.

Qwest's issuance of the 1999 10-K in March 2000, Mr. Woodruff instructed Mr. Kozlowski to remove the disclosure in its entirety.  Mr. Woodruff's decision to remove information from Qwest's filings that would have explained the fact that IRUs were included in the "communications services" bucket is powerful evidence that Mr. Woodruff did not wish to have investors become aware of this fact.

Additional evidence of Mr. Woodruff's scienter comes from the deposition of Lee Wolfe, Qwest's Director of Investor Relations.  Mr. Wolfe testified that, "beginning in [Q1 1999] and continuing throughout the year" and into 2000, he was involved in discussions with Mr. Woodruff and others about "the impact of IRUs and equipment sales on the meeting of financial targets at Qwest."  Mr. Wolfe stated that he "suggested that these transactions needed to be publicly disclosed," and that he "asked, weren't we going to do that?"  Although the record does not reveal Mr. Woodruff's response to Mr. Wolfe's question, the fact that Mr. Wolfe inquired of Mr. Woodruff as to whether Qwest had an obligation to disclose the impact of IRU transactions on Qwest's revenues, and the fact that Qwest ultimately did not make such a disclosure, strongly suggests that Mr. Woodruff intended, contrary to Mr. Wolfe's suggestion, that no disclosure be made.

The record also contains evidence indicating, at the very least, Mr. Woodruff's recklessness with regard to misleading investors.  As noted above, in a July 27, 1999 conference call, Mr. Woodruff emphasized that Qwest anticipated "minimal amounts of construction revenue over the rest of the year," perhaps no more than $ 20 million.  At that time, Mr. Woodruff was aware of the fact that Qwest was continuing to sell hundreds of millions of dollars in IRUs each quarter, and that historically, IRU revenue had been reported as "construction

revenue."   Mr. Woodruff was aware (or at least should have been aware) that Qwest had never

formally disclosed to investors that it had shifted IRU revenue from the "construction services"

bucket to the "communications services" bucket.  Thus, when Mr. Woodruff stated that Qwest

did not anticipate meaningful amounts of "construction revenue" in the future, he should have

been aware of the strong likelihood that such a statement would mislead investors into believing

that IRU sales were no longer a meaningful part of Qwest's revenue mix.

Accordingly, the Court finds that the SEC has come forward with sufficient evidence of

Mr. Woodruff's scienter, such that all of the securities fraud claims against Mr. Woodruff may

proceed to trial.

### b.  Mr. Mohebbi

Mr. Mohebbi argues both that he did not personally participate in drafting or issuing any

of the statements containing misrepresentations or omissions as discussed above,[20] nor that he

aided or abetted the issuance of such statements.

To be responsible for a primary violation of securities laws, an individual must have

"made" a misleading statement that would reach investors.  *Wolfson,* 539 F.3d at 1258.  It is not

necessary that the statement be expressly attributed to the individual – *i.e.* the mere fact that the

individual prepared a misleading communication to be signed by another does not necessarily

defeat primary liability.  *Id.* at 1259-60.  Likewise, it is not sufficient to show simply that the

individual "substantially participated" in the creation of the misleading document.  *Id.* at 1261 n.

---

[20]The Court's March 31, 2010 Opinion rejected contentions by the SEC that Mr. Mohebbi
allegedly caused misleading statements to be made by Qwest with regard to certain individual
IRU transactions.  Thus, the remaining securities fraud claims against Mr. Mohebbi are premised
upon the alleged misrepresentations and omissions discussed previously in this Order.

18.  Rather, the test is whether the individual "caused" the company to issue the misleading

statement.  *Id.* at 1260.  Thus, the drafter of a document for another's signature can be liable for a

primary violation where that person creates the misleading statement or omission and that

misstatement or omission survives the drafting process without modification, even though the

document is ultimately neither signed nor issued by the drafter.  *Id.* at 1261.

By contrast, to establish liability for securities fraud under an aiding and abetting theory,

the SEC must show: (i) another individual committed a primary violation of securities laws; (ii)

Mr. Mohebbi knew of the primary violation by that person; and (iii) Mr. Mohebbi offered

"substantial assistance" to that individual in achieving that violation.  *Anixter v. Home-Stake*

*Production Co.*, 77 F.3d 1215, 1225 (10th Cir. 1996).  As this Court has previously noted, the

"knowledge" and "substantial assistance" elements are linked in a somewhat inverse relationship

– the more knowledgeable the alleged aider and abettor is of the fraudulent conduct, the less

blatant the conduct assisting that scheme must be in order to amount to "substantial assistance."

*SEC v. Nacchio*, 614 F.Supp.2d 1164, 1173-74 (D. Colo. 2009), *citing Woodward v. Metro Bank*

*of Dallas*, 522 F.2d 84, 86 (5th Cir. 1975).

It is undisputed that Mr. Mohebbi did not, himself, sign or otherwise issue any of

Qwest's public filings or press releases, nor did he participate in any conference calls.  Rather,

according to the SEC, Mr. Mohebbi's culpability for Qwest's misstatements and omissions arises

out of Mr. Mohebbi: (i) "participat[ing] in setting targets" for IRU sales and supervising the

employees responsible for making such sales; (ii) "kn[owing] the importance of IRU revenues in

the reported financial results of Qwest," including the fact that Qwest was relying on IRU sales

to meet its revenue targets; and (iii) "kn[owing] what information was and was not being

provided to investors and potential investors about Qwest's revenues."  In this final respect, the

SEC contends that Mr. Mohebbi "was familiar with the contents of Qwest's public filing"; he

"made presentations to and had meetings with the investment community" in which he "spoke

about revenues and revenue growth"; he "was familiar with the presentations to the investment

community made by others at Qwest"; he "was involved in the preparation of Qwest's press

releases"; and he "was involved in the preparation of the information used in conference calls

occurring in conjunction with Qwest's public announcements of quarterly earnings."  From this,

the SEC argues that Mr. Mohebbi aided and abetted a primary violation.

The Court finds these allegations insufficient to demonstrate a triable claim for aiding

and abetting liability under the SEC's narrowed conception of its case.  Unlike the original

version of its claims, the SEC no longer contends that Qwest's reliance on IRU revenues to meet

revenue projections was improper.  The sole remaining contention by the SEC is that Qwest

executives committed fraud by not disclosing that IRU revenue was being reported in the

"communications services" bucket and for not disclosing how much revenue was involved.

Thus, to show that Mr. Mohebbi aided and abetted fraudulent conduct based on the failure to

disclose the commingling of revenues in the "communications services" bucket or the failure to

disclose the magnitude of IRU revenue, the SEC must show that Mr. Mohebbi: (i) knew that

Qwest was failing to disclose the required information; (ii) knew that such conduct was

deceptive, and thus, a violation of securities laws[21]; and (iii) performed acts that assisted other

---

[21]Logically, the aider and abettor must not only know of the underlying <u>conduct</u> comprising the primary violation, but must also be aware of the <u>impropriety</u> of that conduct. Otherwise, a person of innocent intentions who assisted a business practice he or she had no reason to question could be held liable for aiding and abetting a fraudulent activity.

officials in failing to make such disclosure.  The Court has some doubt that the SEC can prove Mr. Mohebbi's knowledge that Qwest's reporting practices were deceptive, but in any event, the Court finds that the SEC has come forward with no evidence demonstrating Mr. Mohebbi's substantial assistance to Qwest's failure to disclose details of the IRU revenue.

The Court summarily rejects the SEC's first two contentions enumerated above: that Mr. Mohebbi is somehow liable for aiding and abetting simply because he oversaw and encouraged the business unit that sold IRUs or because he knew that Qwest was relying upon IRU sales to meet analysts' expectations.  These facts might have been of import under a prior iteration of the SEC's theory in this case, but because the focus of the SEC's current case is on how Qwest actually reported its IRU revenue, and these facts do not bear on that issue, they are no longer relevant.  Thus, the Court is left with the question of whether Mr. Mohebbi's familiarity with Qwest's public filings, his participation in preparing information for press releases and conference calls, and his participation in investor conferences is sufficient to demonstrate his assistance to a primary violation.

With regard to Qwest's SEC filings, the SEC contends only that Mr. Mohebbi "was familiar with the contents."  The evidence cited by the SEC in support of this proposition – Mr. Mohebbi's own deposition testimony – reveals that Mr. Mohebbi "do[es]n't have a specific role in preparing the documents," and that he is "not responsible for reviewing the filings [or any part thereof[22]] before they go to the Commission."  Mr. Mohebbi stated that he "get[s] a final copy" of the filing and "peruse[s] through it," but never had any involvement with the particulars of

---

[22]Mr. Mohebbi stated that he would sometimes be consulted about a statement concerning an operational issue – "we activated a network somewhere, et cetera" – but nothing in the record indicates he was involved with any issue relating to disclosure of revenues.

how Qwest reported about IRU revenues or the "communications services" bucket.  This is insufficient to demonstrate either that Mr. Mohebbi "caused" Qwest to issue misleading statements in the public filings, nor show that he substantially assisted another person in committing a primary violation.

The SEC also contends that misrepresentations and omissions were made in Qwest's written earnings releases and in statements made by officials in investor conference calls.  The SEC contends that Mr. Mohebbi aided and abetted such misrepresentations and omissions because he "was involved in the preparation" of press releases and "information used in conference calls."  The SEC's support for this proposition is deposition testimony by Mr. Wolfe. Mr. Wolfe stated that Qwest would issue a press release announcing its earnings each quarter, with that press release being drafted by Mr. Wolfe's Investor Relations department.  Once the release was drafted, there would be a "review process" at which Qwest's CEO (Mr. Nacchio), CFO (Mr. Woodruff), and COO (Mr. Mohebbi) would participate, as would public relations and investor relations representatives.  Mr. Wolfe does not offer any detail as to the nature or extent of Mr. Mohebbi's actual participation in the review process regarding any particular press release, and thus, the Court is unable to find that the SEC has shown either that Mr. Mohebbi "caused" any misleading statement made in press releases or conference calls or that he substantially assisted another person to make misleading statements.  Indeed, if general involvement in the review process was all that is necessary for aiding and abetting liability, Mr. Wolfe and the unnamed representatives of the public relations and investor relations departments would be just as culpable as Mr. Mohebbi for aiding and abetting violations based on the earnings releases.

Similarly, with regard to preparation of materials for investor conference calls and presentations at such conferences, the record is also unavailing.  Mr. Wolfe testified that one of his subordinates "worked with the CFO [Mr. Woodruff]" to prepare "an outline . . . almost a full script, but not quite . . . to be used on the conference call."  At some point in time, Mr. Wolfe would have "review sessions" involving Mr. Mohebbi and others, in which he distributed the outline and "would get feedback from some of the folks . . . typically about adding things."  Mr. Wolfe recalls that "Mr. Mohebbi was probably more active in that role . . . than others," but again, he does not elaborate as to any particular feedback Mr. Mohebbi provided with regard to any particular conference call outline.  Once again, without any detail about Mr. Mohebbi's actual contributions to this process, the Court cannot say that Mr. Mohebbi caused or provided "substantial assistance" to Qwest's issuance of misleading statements regarding disclosure of IRU revenue. The mere fact that Mr. Mohebbi commented, in unknown ways, about conference call scripts permits nothing more than speculation that Mr. Mohebbi's comments concerned matters touching on Qwest's failure to sufficiently disclose facts about IRU revenues.

Similarly, the SEC's evidence regarding Mr. Mohebbi's participation in investor conferences is insufficient. The evidence cited by the SEC for this proposition involves statements made by Mr. Mohebbi to investors at an unspecified time and place.  Mr. Mohebbi stated "we have been very successful in providing and exceeding and meeting the expectations that we've had to you in the last eleven quarters," although Mr. Mohebbi clarified (without rebuttal by the SEC) that "I'm not talking about financials here.  My presentation was mostly an operational presentation."  Mr. Mohebbi also stated that "we have actually grew [sic] our share in every category, in every single category from voice, consumer data, IP, every category we

measure, and we have exceeded our growth rates compared to the market." The SEC does not contend that this assertion is false, and it is not entirely clear to the Court how a truthful statement to this effect somehow required Mr. Mohebbi to specifically address IRU revenue as well in order to make the statement not misleading.

Another exhibit cited in support of this proposition notes that Mr. Mohebbi spoke at a conference in March 2001, in which he stated that "he was comfortable" with predictions that had been made about Qwest's gross revenue, earnings, and growth for a particular quarter. Once again, it is not clear how these statements were somehow misleading in the absence of a statement by Mr. Mohebbi concerning IRU revenue.

The SEC also points to a document whose significance is unclear. Its first page is simply a label reading "2/16 Analyst's Meeting." The remainder of the document consists of a latter from Mr. Nacchio to "Members of the Investment Community," a table of contents that appears to indicate that Mr. Mohebbi was one of the speakers at a "Qwest Investment Community Conference," and a series of slides. It is not clear whether the SEC is contending that the slides are from Mr. Mohebbi's speech or that they have some other significance. Even if that is the case, it is impossible for the Court to ascertain, without additional elaboration, what significance the SEC intends this evidence to have. (The Court notes that Mr. Nacchio's letter is dated 2000, but one of the slides references Qwest's revenues in 2002 and the period from 2000-2005, making it somewhat unclear whether the documents are related and, if so, what time period they relate to.)

Accordingly, the Court finds that the SEC has failed to come forward with facts showing that Mr. Mohebbi either personally committed a primary violation or aided and abetted such a

violation.  Thus, Mr. Mohebbi is entitled to summary judgment on all of the SEC's securities fraud claims.

### 3.  Mr. Kozlowski

Mr. Kozlowski was involved with Qwest's Financial Reporting department, and was responsible for internal and external financial reporting.  Mr. Kozlowski (or those under his direction) was responsible for drafting Qwest's 10-K and 10-Q filings, including financial statements and the Management Disclosure & Analysis section, in which, the SEC contends, disclosures about IRU accounting should have been made.[23]

As noted above with regard to Mr. Woodruff, Mr. Kozlowski discussed the need for a specific IRU disclosure in Qwest's 1999 10-K and specifically directed Mr. Noyes to draft several varieties of disclosure language.  Mr. Kozlowski eventually concluded that the "minimum" level of disclosure was warranted, and included text in a draft 10-K which would have noted that although "communications services" revenue was generally recognized on a monthly basis, some of the revenue in that bucket – revenue from "agreements whereby customers can obtain capacity on the Company's network – was recognized upfront.  Mr. Kozlowski contends that, prior to Qwest's filing of the 10-K, Mr. Woodruff directed him to remove the IRU disclosure language, and that Mr. Kozlowski did as instructed.

---

[23]The Court understands the SEC to contend that Mr. Kozlowski provided certain financial information to Qwest officials for earnings releases and conference calls, but that Mr. Kozlowski had no involvement in drafting those releases or the scripts for conference calls. Because there is no specific contention describing the particular financial information provided by Mr. Kozlowski to his superiors, the Court cannot simply assume that this information was incorrect or misleading, much less that it had any connection to IRU revenues.  Accordingly, the Court limits its analysis of the claims against Mr. Kozlowski to his involvement with drafting Qwest's public filings.

The SEC contends that there is a genuine issue of fact as to whether Mr. Woodruff did indeed direct Mr. Kozlowski to remove the disclosure language.  The sole authority cited by the SEC in support of this contention is a single page from Mr. Woodruff's deposition.  Shown a copy of what the Court understands was the disclosure language, Mr. Woodruff testified "I don't recall seeing this."  Mr. Woodruff was then asked "did you direct anybody– anybody at Qwest to remove that language from the 1999 form 10-K?"  Mr. Woodruff responded "I don't believe so, because again I don't recall having seen this language."

The Court finds that this evidence fails to create a genuine dispute of fact as to whether Mr. Woodruff instructed Mr. Kozlowski to remove the disclosure language.  Mr. Woodruff does not affirmatively dispute Mr. Kozlowski's contention that Mr. Woodruff directed him to remove the disclosure language; he simply professes to have no recall of the events.[24]  As a result, the SEC has not demonstrated a genuine dispute of fact with regard to Mr. Kozlowski's version of events.  *See Dickey v. Baptist Memorial Hosp.*, 146 F.3d 262, 266 n. 1 (5th Cir. 1998) ("Dr. Lamb specifically stated that he told Dr. Washington about the questionable mass. Dr. Washington,

---

[24]The Court is not inclined to read Mr. Woodruff's statement that "I don't recall seeing" the disclosure language to be the equivalent of stating "I did not see" it.  The two statements are fundamentally distinct, and the SEC has pointed to nothing else in the record that would warrant the Court ascribing a different meaning to Mr. Woodruff's statements than the facial meaning of his words.  Mr. Woodruff's subsequent statement that he "do[es]n't believe" he asked anyone to remove the disclosure language is similarly insufficient for two reasons: (i) it is equally equivocal, and (ii) it is a conclusion expressly derived by Mr. Woodruff solely from his inability to recall seeing the disclosure language.

The Court recognizes that, for various psychological and social reasons (*e.g.* to save face or avoid confrontation), a witness might sometimes cloak an affirmative statement regarding a particular act in a more indirect and diplomatic idiom, testifying that "I don't believe" or "I don't recall" doing something when meaning to convey "I did not" do the thing.  As with any instance in which a witness' testimony is ambiguous, an examining attorney is obligated to ask additional questions to clarify the true meaning of the witness' testimony.

however, has no present recollection of the conversation . . . The mere fact that Dr. Washington does not remember the alleged phone conversation, however, is not enough, by itself, to create a genuine issue of material fact"). Accordingly, for purposes of Mr. Kozlowski's motion, the Court finds it undisputed that Mr. Woodruff instructed Mr. Kozlowski to remove the disclosure language from the 1999 10-K.

Under these circumstances, the Court cannot say that Mr. Kozlowski caused Qwest to make the misleading statement in the 1999 10-K. As the court in *Wolfson* noted, the drafter of a misleading document can be said to have "caused" the company to make the misleading statement in circumstances where the language of the document remains unchanged after review by superiors. 539 F.3d at 1261. But a different result would be appropriate where the drafter created a document that was <u>not</u> materially misleading,[25] and the document only became so because of edits made (or, here, dictated) by a superior. In this circumstance, after Mr. Kozlowski delivered to Mr. Woodruff a draft 10-K that was not materially misleading, Mr. Kozlowski's meaningful participation in the process of creating the 10-K ended. The fact that Mr. Woodruff later issued the directive to remove the disclosure language to Mr. Kozlowski, rather than a secretary, an intern, or to the print shop itself, is simply fortuitous. The SEC expressly concedes that Mr. Kozlowski lacked the authority to disregard Mr. Woodruff's

---

[25]Admittedly, the version of the disclosure language urged by Mr. Kozlowski would have disclosed the fact that IRU revenues were being reported in the "communications services" bucket, but would not have disclosed their magnitude. The SEC has argued that disclosure of <u>both</u> the fact <u>and</u> the magnitude of IRU sales was necessary to prevent Qwest's filings and statements from being misleading, but it has not offered clear evidence that would demonstrate how omitting only the magnitude of IRU revenues but disclosing the fact that such sales were being reported in the "communications services" bucket would still be materially misleading. In the absence of such evidence, the Court is not inclined to assume that disclosure of the fact, but not the magnitude, or IRU sales would have been materially misleading.

instructions.  Thus, in carrying out those instructions, Mr. Kozlowski was powerless to prevent the 10-K from being issued in the form Mr. Woodruff directed.[26]  Under these circumstances, the Court finds that the SEC has not shown that Mr. Kozlowski's fortuitous and ministerial role in the particular events that actually caused Qwest to issue a misleading 1999 10-K – the instruction by Mr. Woodruff to remove the disclosure language – are sufficient to impose liability on him under any portion of section 17(a) or under section 10(b).[27]

---

[26]In this regard, the Court finds the SEC's citation of *SEC v. U.S. Environmental, Inc.* 155 F.3d 107, 112 (2d Cir. 1998), inapposite.  There, the 2d Circuit reversed the dismissal of section 10(b) claims against a stock trader who carried out trade requests he knew to be fraudulent as part of a scheme by other conspirators seeking to falsely inflate a stock's price.  The Court explained that "even if [the trader] were motivated by a desire to obtain compensation, rather than by a desire to change [the company's] market price as [others] were, [he] is liable under § 10(b) if, with scienter, he effected the manipulative trades." *Id.*

The quoted language, in the context of *U.S. Environmental*, simply emphasizes the court's holding that the trial court's requirement of a "manipulative intent," rather than simply knowledge or recklessness, was an improper level of scienter.  The case does not purport to, and this Court does not read it to, address the more fundamental issue presented here: whether Mr. Kozlowski's actions in carrying out Mr. Woodruff's instructions arose to the level of Mr. Kozlowski "caus[ing]" Qwest to issue a misleading statement, as that concept is defined in *Wolfson*.

[27]The Court would also find that, for purposes of the section 17(a)(1) and 10(b) claims, the SEC has also failed to show Mr. Kozlowski's scienter.  Mr. Kozlowski has come forward with evidence that he consulted in good faith with Qwest's outside auditor about the ramifications of removing the disclosure language and was told that the disclosure language was not necessary to prevent the 10-K from being misleading.  The SEC has offered no evidence to dispute this fact (the auditor Mr. Kozlowski consulted with is incapacitated and unable to give testimony), and argues only that the factfinder might discredit Mr. Kozlowski's otherwise uncorroborated assertion on this point. This argument misconstrues the summary judgment paradigm.  On summary judgment, this Court must take the evidence in the light most favorable to the SEC "only if there is a genuine dispute as to those facts." *Ricci v. DeStefano*, 129 S.Ct 2658, 2677 (2009).  Where the SEC cannot come forward with evidence to contradict Mr. Kozlowski's assertion that the outside auditor approved the removal of the disclosure language, the Court (and indeed, the factfinder) must accept Mr. Kozlowski's assertion as undisputed. Credibility is only weighed when there are two competing versions of events; when there is no evidence, direct or circumstantial, that would dispute the proffered version of a story presented, the record does not permit the factfinder to come to any different conclusion.

### 4. Mr. Noyes

Mr. Noyes was Mr. Kozlowski's subordinate.  As with Mr. Kozlowski, the Court understands that the SEC contends that Mr. Noyes' liability for securities fraud arises from his involvement with the inclusion and removal of the disclosure language in the 1999 10-K.[28]

The foregoing discussion regarding the securities fraud claims against Mr. Kozlowski apply with similar force to the claims against Mr. Noyes, with only minor modifications.  Mr. Noyes assisted in drafting the non-misleading version of the 10-K that was initially presented to Mr. Woodruff.  Mr. Noyes' unrebutted deposition testimony states that, after Mr. Woodruff instructed Mr. Kozlowski to remove the IRU disclosure language, "[Mr.] Kozlowski contacted me and . . . told me to call the printers and have them take out that paragraph."  Mr. Noyes does not allege that he himself consulted with Arthur Andersen about whether the IRU disclosure language was required, but his testimony demonstrates that he was advised by Mr. Kozlowski of the auditor's opinion.   He inquired whether "Andersen[, the outside auditor, is] okay with that" and Mr. Kozlowski responded "yes."  Mr. Noyes trusted Mr. Kozlowski and "wouldn't have felt an independent need to ask [the auditor] himself," and thus, Mr. Noyes called the printer to have the disclosure language removed.

For similar reasons discussed above, the Court finds that this evidence fails to demonstrate a triable issue of fact as to Mr. Noyes' "causing" Qwest to make a misleading statement.  As with Mr. Kozlowski, Mr. Noyes properly discharged his duties by supplying Mr.

---

[28]The Court's March 31, 2010 Opinion found a triable issue of fact as to whether Mr. Noyes had engaged in securities fraud when he improperly caused Qwest to recognize revenue from an IRU sale to Enron in Q3 2001 when, in fact, the contract for that sale had not been signed until the first day of Q4 2001.  That finding remains extant and is not within the scope of the matters considered in this Order.

36

Woodruff with a draft 10-K that made sufficient disclosures so as not to be misleading. Thereafter, Mr. Noyes' participation in removing the disclosure language was ministerial in nature, and was not a meaningful "cause" of Qwest ultimately making a misleading statement in the 10-K.[29]  Accordingly, Mr. Noyes is entitled to judgment on all of the securities fraud claims against him premised on his involvement with the 1999 10-K.

To the extent that the Court has not expressly addressed any argument raised by a Defendant with regard to the securities fraud claims, the Court has considered those arguments and found them to be without merit.

### C. Remaining claims

The SEC's remaining claims allege, variously, that the Defendants falsified books and records or aided and abetted Qwest's maintenance of false books and records (Claims Four and Seven), that they deceived Qwest's auditors (Claim Five), or that they aided and abetted Qwest's filing of false SEC disclosures (Claim Six).

As best the Court can determine, extensive discussion of these claims is unnecessary. The narrowing of the SEC's case appears to have truncated these claims to the point that they

---

[29]Arguably, were the Court to reach the question of Mr. Noyes' scienter, it would find that the SEC has come forward with slightly more significant evidence than it did with regard to Mr. Kozlowski.  Mr. Noyes was asked at his deposition whether, at the time, he had an opinion as to whether the disclosure language should have been taken out, to which he stated "qualitatively speaking, I felt we should have talked about it. . .  Did I think it should have been taken out?  No."  However, the record reflects that Mr. Noyes inquired of Mr. Kozlowski whether the outside auditors had approved the removal of the disclosure language and was informed that they had.  Mr. Noyes' own concerns about the propriety of removing the disclosure language appears to have been assuaged by the assurance that "our outside auditors said it wasn't required."  Thus, the Court would find that, like Mr. Kozlowski, Mr. Noyes' actions in causing Qwest to issue a misleading 10-K – assuming the Court found that Mr. Noyes had indeed caused such an event – were not accompanied by the requisite scienter to maintain a section 17(a)(1) or 10(b) claim.

significantly, if not entirely, overlap with the securities fraud claims discussed above.  For

example, with regard to the false books and records claims, the SEC has acknowledged that it no

longer contends that Qwest's means of accounting for IRU transactions – booking IRU revenue

upfront or classifying it as "communications services" revenue – was improper.  The sole

remaining contention for purposes of these claims is whether Qwest's public filings were

"falsified" because they did not disclose the fact that IRU revenues were being included in the

"communications services" bucket and did not disclose the magnitude of that revenue.

Similarly, the alleged deceit of auditors was Qwest's failure to disclose to auditors "the

misleading [IRU] revenue recognition policy [*i.e.* that IRU revenue was recorded upfront, not

monthly like the rest of "communications services" revenue], they failed to disclose the

magnitude of the upfront revenues."

It appears to the Court that the disposition of the securities fraud claims controls the

disposition of the remaining claims.[30]  That is, because the Court has found that Mr. Mohebbi

and Mr. Kozlowski were not participants in causing Qwest to issue misleading public statements

or filings, the remaining claims against these Defendants fail for the same reasons.  Because the

Court has found that Mr. Woodruff and (to the extent of the 2001 Enron IRU) Mr. Noyes caused

Qwest to improperly report revenues, the remaining claims are viable against them to a similar

extent.  Accordingly, Mr. Mohebbi and Mr. Kozlowski's motions for summary judgment on

these claims are granted, Mr. Noyes' motion for summary judgment on these claims is granted in

part and denied in part (as to the claims as they relate to the 2001 Enron IRU), and Mr.

---

[30]Given the apparently extensive overlap between these claims and the securities fraud
claims, the Court has some question as to the utility of the SEC's maintaining the additional
claims.

Woodruff's motion for summary judgment on these claims is denied.

### D.  Remaining motions

      1.  <u>Severance</u>

Mr. Kozlowski and Mr. Mohebbi filed motions seeking severance (**# 770, 821, 826**) of trial of certain claims from one another.  Because the Court grants summary judgment to Mr. Kozlowski and Mr. Mohebbi on all claims in this action, these motions are denied as moot.

As shaped by the discussion above, Mr. Noyes's motion to sever (**# 802**) seeks a separate trial of the claims against him from trial of the claims against Mr. Woodruff, pursuant to Fed. R. Civ. P. 21, on the grounds that the claims against Mr. Noyes are limited to a specific transaction – the 2001 Enron IRU – and are unrelated to the more general securities fraud and related claims remaining against Mr. Woodruff.  Mr. Noyes argues that the two types of claims do not share factual or legal similarities, among other things.

Mr. Noyes makes clear that his motion is brought pursuant to Fed. R. Civ. P. 21, not Rule 42(b).[31]  Rule 21 provides that, as a result of "misjoinder of parties," the Court "may . . . sever any claim against a party."  Joinder of parties is proper where the claims against them "aris[e] out of the same transaction [or] occurrence" and where "any question of law or fact common to all defendants will arise in the action."  Fed. R. Civ. P. 20(a)(2)(A), (B).  The phrase "same transaction or occurrence" is "flexible," contemplating "a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *DIRECTV, Inc. v. Barrett*, 220 F.R.D. 630, 631 (D. Kan. 2004).  Determining whether claims arise out of the "same transaction or occurrence" is guided by questions of "the likelihood of

---

[31]The Court previously denied (**# 462**) a request by Mr. Noyes to sever under Rule 42(b).

overlapping proof and duplication in testimony." *Id.*

The Court finds that the remaining claims against Mr. Noyes and the claims against Mr. Woodruff arise out of the "same transaction or occurrence" and that they share some common questions of law or fact. They are logically connected, insofar as both arise out of the same historical context: Qwest's financial performance and reporting between 1999 and 2001. They share common questions of law: both entail claims of securities fraud and related claims, for which the jury will be instructed regarding the same general elements of each claim, such as materiality and scienter. They also share common questions of fact: among other things, the factfinder may be required to consider disputes between the parties as to the extent to which IRU sales revenues were important to Qwest's financial health during the period at issue, such that those revenues motivated the Defendants to take the actions they allegedly did. Accordingly, the Court finds no misjoinder of claims under Rule 20, and thus, no basis for severance under Rule 21. The Court is confident that joint trial of the claims here is in the best interests of both the parties and the judicial system, as it will promote economy and avoid unnecessary duplication of effort. The Court is also confident that no prejudice will inure to either Defendant from being tried jointly with his co-Defendant, as the Court will carefully tailor its jury instructions and verdict forms to address any risk of improper spillover. Accordingly, Mr. Noyes' motion to sever is denied.

    2. <u>Sanctions</u>

Mr. Kozlowski moves for sanctions **(# 774)** against the SEC, citing Fed. R. Civ. P. 11.[32]

---

[32]Mr. Kozlowski's motion does not specifically tie any particular allegation by the SEC to any particular provision of Fed. R. Civ. P. 11(b).

He contends that the SEC's claims against him never had "an objectively reasonable basis" and were brought simply because "the SEC needed to bring a case against an accountant."  Mr. Kozlowski supports his motion with an approximately 80-page, mostly single-spaced, extremely-detailed summary of evidence adduced by various witness during the SEC's pre-filing investigation of this case and during the discovery phase of this case.

Although the Court has reviewed Mr. Kozlowski's filing in its entirety, it sees little value in addressing it in detail.  Having successfully defended himself on the merits of the SEC's claims, Mr. Kozlowski's motion essentially reverses course, and invites the Court to try the entirety of the case in reverse, with Mr. Kozlowski as the effective plaintiff and the SEC as the defendant.  Although the Court acknowledges Mr. Kozlowski's apparent frustration at being the target of claims that, at times, seemed expansive and aggressive, but also shifting and reactive, the Court cannot say that the SEC's claims against him in this action were so objectively unreasonable that sanctions under Rule 11 are warranted.   Accordingly, the motion for sanctions is denied.

## CONCLUSION

For the foregoing reasons,  Mr. Kozlowski's Motion for Summary Judgment (**# 638**) and Mr. Mohebbi's Motion for Summary Judgment (**# 646**) are **GRANTED**.  The Court will enter judgment in favor of these Defendants at the conclusion of trial proceedings in this case.  Mr. Kozlowski's Motion to Sever (**# 770**), Mr. Mohebbi's Motions to Sever (**# 821, 826**), and the SEC's motion for leave to file a surreply (**#830**) to Mr. Mohebbi's supplemental filing are **DENIED AS MOOT**.  Mr. Kozlowski's Motion for Sanctions (**# 774**) is **DENIED**.  The Court **AMENDS** the caption to omit reference to Mr. Kozlowski and Mr. Mohebbi.

Mr. Noyes' Motion for Summary Judgment (**# 644**) is **GRANTED IN PART** and **DENIED IN PART**, insofar as Mr. Noyes is not entitled to summary judgment on the SEC's claims to the extent that they relate to the 2001 Enron IRU, but that Mr. Noyes is entitled to summary judgment on the SEC's claims against him in all other respects.  Mr. Noyes' Motion to Sever (**# 802**) is **DENIED**.

Mr. Woodruff's Motion for Summary Judgment (**# 645**) is **DENIED**.

Mr. Nacchio's Motion for Change of Venue (**# 732**) is **DENIED AS MOOT**.

The Court will conduct a Pretrial Conference in this matter on **June 7, 2011** at **4:00 p.m.** to address the setting and duration of a trial and other pretrial issues.  In preparation for that trial, the parties shall comply with the requirements of the Trial Preparation Order (**# 658**), with the deadlines therein deemed modified in relation to the date of the Pretrial Conference.

Dated this 31st day of March, 2011

**BY THE COURT:**

Marcia S. Krieger
United States District Judge